IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

===================================================

RICHARD BLACK,

                          Plaintiff,

                                              Civil Action No.
              v.                              9:08-CV-0232 (FJS/DEP)


BRIAN FISCHER, Commissioner;
KENNETH PERLMAN, Superintendent,
Mid-State Correctional Facility;
R. CALIDONNA, Administrator II,
Mid-State Correctional Facility;
M.D. LESTER WRIGHT, MD, Deputy
Commissioner

                          Defendants.

===================================================

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

RICHARD BLACK, *Pro Se*
1260 Burke Avenue
Bronx, New York 10469

FOR DEFENDANTS:

HON. ANDREW M. CUOMO               CHRISTOPHER W. HALL, ESQ.
Attorney General of the            Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Richard Black, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. Alleging claims under the Eighth Amendment, plaintiff's complaint asserts that the food he was served at the facility in which he was housed at the relevant times, as well as the medical treatment he received there for a hemorrhoid, subjected him to cruel and unusual punishment.  As relief, plaintiff seeks to recover compensatory and punitive damages.

Currently pending before the court is defendants' motion for summary judgment dismissing plaintiff's complaint in its entirety, in part based upon plaintiff's failure to exhaust his administrative remedies, and substantively in light of the fact that he cannot prove that his Eighth Amendment rights were abridged.  Having carefully considered the record now before the court in light of the defendants' motion and the plaintiff's arguments in opposition, I find that defendants have established that no reasonable fact finder could conclude plaintiff's Eighth Amendment rights were violated, and therefore recommend that their motion be granted.

I.    BACKGROUND[1]

Plaintiff is a former prison inmate who at all times relevant to the complaint was entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS").  *See generally* Complaint (Dkt. No. 26).  From on or about March 14 until July 3, 2007, plaintiff was confined to the Mid-State Correctional Facility ("Mid-State"), located in Marcy, New York.  Defendants' Rule 7.1(a)(3) Statement of Material Facts (Dkt. No. 37-1) ¶ 3.

While at Mid-State the plaintiff became constipated and, on or about April 6, 2007, observed a hemorrhoid "hanging down" and noticed bleeding.  Plaintiff's Deposition Transcript ("Tr.") (Dkt. No. 37-3) 34, 36-37.  Plaintiff is a "very sensitive eater", and attributes his condition to the cold, overcooked, unhealthy, and sometimes spoiled food served to him while at Mid-State, although no medical person employed at the facility has ever told him that the hemorrhoid was caused by his diet.  In fact, to the contrary, he was advised by a nurse at the facility that hemorrhoids are

_____

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

caused by straining or inappropriate sitting.  *Id.*  at 32-33, 60.  At the time

he began complaining of his hemorrhoid, plaintiff was housed in a special

housing unit ("SHU")[2] and was confined to his cell for twenty-three hours

each day; while confined to SHU, Black was taking what he described as

"mental medication", each dose consisting of 300 milligrams of Seroquel,

and was visited twice daily by a nurse who administered the medication.[3]

*Id.* at 37-38, 44, 58.

On April 7, 2007, the day after he first noticed the hemorrhoid,

plaintiff discussed his condition with a nurse, who advised that it was not

serious and that if he wanted to see a doctor, it would take two or three

weeks to be seen.  Tr. 56.  The nurse instructed Black to drink water and

---

[2]    Prisoners may be placed in SHU for a variety of reasons, including for disciplinary purposes.  *Lee v. Coughlin,* 26 F. Supp.2d 615, 618 (S.D.N.Y. 1998) (quoting, *inter alia*, 7 N.Y.C.R.R. § 301.6); 7 N.Y.C.R.R. § 301.7.  Inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one of hour of outdoor exercise per day.  *Id.*  They are entitled to unlimited legal visits and one non-legal visit per week.  *Id.*  SHU inmates have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

[3]  Seroquel is the trade name for a preparation of quetiapine fumarate, a dibenzothiazepine derivative that is an antagonist to multiple neurotransmitter receptors in the brain and is used as an antipsychotic in the treatment of schizophrenia and other psychotic disorders.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1591, 1723 (31st ed. 2007).  Plaintiff testified that the medication put him to sleep, helped him get through the day, made him hungry, and gave him dry mouth.  Tr. 38-39, 558-59.

provided him with a stool softener, Pepto Bismol, and Preparation H – an

over-the-counter medication that reduces the swelling, inflammation, and

discomfort associated with hemorrhoids – and advised the plaintiff to apply

the ointment with his finger.  Tr. 44, 56-57; Felker Aff. (Dkt. No. 37 -2) ¶¶

15-17.  Following the nurse's instructions, plaintiff applied the Preparation

H to his rectum area approximately eight times daily.  Tr. 45.  Plaintiff

described the pain he experienced from the hemorrhoid as "harsh . . . like

a tingling sensation."  *Id.*

On April 8, 2007, as a result of his continued complaints, plaintiff was

given another three-day supply of Preparation H.  Felker Aff. (Dkt. No. 37-

2) ¶ 18.  Approximately a week and a half after first reporting the

hemorrhoid to a nurse, Black was visited by a doctor who told plaintiff that

his condition was not life threatening and should resolve itself within a

week or two.  Tr. 46-47.  According to plaintiff, the hemorrhoid continued to

bleed, which he reported to the nurse, and having discovered that there is

an "instrument" to apply the ointment, he requested that he be provided

that tool.  *Id.* at 47-48.  The nurse responded that she was not permitted to

dispense the applicator for security reasons.  *Id.*  Plaintiff understood that

in denying plaintiff the applicator for applying the Preparation H the nurses

were not being malicious, but instead simply following prison policy. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 28; Tr. 53.  In response to his complaints of blood loss, the nurses monitored Black's blood pressure, as well as whether he was dehydrated, and questioned him regarding the amount of water that he was drinking.  Plaintiff claims that the water at the facility contained excessive chemicals, and that as a result he could not drink much water because after ingesting eight cups he would experience a headache.  Tr. 33; Plaintiff's Decl. (Dkt. No. 38-2) ¶ 13.

While in SHU confinement at Mid-State plaintiff experienced headaches, heavy gas, and stomach cramps, causing him to stop eating, lose about six pounds, and become weak and "distressful"; he also alleges that he was unable to take his prescribed psychiatric medication twice daily as required because the medication made him hungry.  *Id.* at 58, 61; Plaintiff's Decl. (Dkt. No. 38-2) ¶¶ 1, 9, 12.[4]  According to Black, he therefore stopped taking the medication as prescribed and was "harboring" the pills, and, as a result, the medication was discontinued, which caused him to become verbally and physically violent.  *Id.* at ¶ 12.

Plaintiff's ambulatory health records ("AHR") reveal that while housed

---

[4]  In opposition to defendants' motion, plaintiff has submitted an affidavit and a declaration, both sworn to October 20, 2009.

at Mid-State he was seen by medical personnel approximately forty times over a 104-day period, or an average of every two and one-half days. Felker Aff. (Dkt. No. 37-2) ¶ 14.  Plaintiff's last complaint regarding hemorrhoids occurred on May 3, 2007, at which time he again was advised to use Preparation H.  *Id.* ¶¶ 22-23.

While at Mid-State, plaintiff filed a single grievance, in it complaining of uncooked rice.  Tr. 78-80.  That grievance was informally resolved to plaintiff's satisfaction, having received an explanatory letter from defendant R. Calidonna, the food administrator at the facility.  *Id.*  Additionally, although he does not claim to have complained himself, plaintiff alleges that "many prisoners" informally advised defendant K. Perlman of the "food conditions" at the facility while he a was making daily rounds through the S-Block at Mid-State.  Plaintiff's Decl. (Dkt. No. 38-2) ¶ 7.

Plaintiff was transferred to out of Mid-state and into the Southport Correctional Facility ("Southport") on July 3, 2007.  Felker Aff. (Dkt. No. 37-2) ¶ 26.  Upon arrival at Southport, plaintiff refused to submit to the incoming draft physical, and the nurse noted that Black had no physical conditions preventing him from being placed on a disciplinary diet.[5]  *Id.*

---

[5]    A disciplinary diet is high in fiber and consists of a loaf of bread made with vegetables and wheat flour that is nutritionally adequate.  Felker Aff. (Dkt. No. 27) ¶

While at Southport, on December 28, 2007, plaintiff filed a grievance complaining of the food, having suffered from gas pains, constipation, and blood loss, and of not being placed on a special diet while housed at Mid-State. *Id.* at ¶ 28 and Exh. B. Plaintiff admitted that he filed the grievance at Southport in effort to exhaust his administrative remedies before commencing this lawsuit. Tr. 84-85.

The nurse administrator at Southport, Ms. Catherine Felker, investigated Black's grievance and found it to be without merit. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 67; Felker Aff. (Dkt. No. 37-2) ¶¶ 29-30 and Exh. C. Nurse Felker concluded that the results of laboratory testing showed no evidence of significant blood loss; and that plaintiff's upset stomach was appropriately treated with antacids, as needed, adding that "[c]onstipation is a common complaint for inmates in SHU due to lack of normal activity and failure to drink adequate amounts of fluid. A special diet is not indicated for his complaints. Food temperature is checked and the food is given immediately upon arrival to the housing unit. At no time is spoiled, undercooked or overcooked food served to the

---

27.

inmate population."[6]  *Id.* at Exh. C.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 27, 2008.[7]  Dkt. No. 1. Plaintiff's complaint, as amended, names as defendants Brian Fischer, Commissioner of the DOCS; Kenneth Perlman, the Superintendent at Mid-State; R. Calidonna, an administrator at Upstate; and Dr. Lester Wright, Deputy Commissioner and Chief Medical Officer of the DOCS.  Dkt. No. 26.  Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, in that defendants were deliberately indifferent to both his basic human needs and his serious medical needs.  *Id.*  As relief, plaintiff's complaint seeks recovery of compensatory damages of $1,000,000, and an additional award of punitive damages in an unspecified amount.  *Id.*

On October 1, 2009, following the close of discovery, defendants

---

[6]   Nurse Felker's comments regarding the food are addressed to the food service provided to the plaintiff at Southport, and not Mid-State.  Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 75.

[7]   Plaintiff's complaint was accompanied by an application to proceed *in forma pauperis*.  Dkt. Nos. 1 and 2.  After routine review of the complaint, by order of March 12, 2008, plaintiff was granted leave to proceed *in forma pauperis* and directed to file an amended complaint.  Dkt. No. 5.  In compliance with that order, Black filed an amended complaint on March 27, 2008.  Dkt. No. 6.  He was subsequently granted permission to file a second amended complaint, Dkt. No. 20, which is now the operative pleading in this lawsuit.

moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing plaintiff's complaint.  Dkt. No. 37.  In support of their motion defendants assert that those portions of plaintiff's claims in the action that are based upon the failure of prison officials to provide an applicator for use in administering his hemorrhoid medication are barred due to his failure to exhaust available administrative remedies before commencing suit, and that substantively plaintiff cannot establish a violation of the Eighth Amendment.  *See id.*  Plaintiff has since responded in opposition to defendants' motion through the submission of an affidavit with attached exhibits, along with a statement of material facts in dispute, and a memorandum of law.[8]  Dkt. No. 17.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

---

[8]    With his opposition papers plaintiff also filed a notice of motion seeking "an order dismissing the named defendants [sic] motion pursuant to Rule 56 . . .".  Dkt. No. 38.

10

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477

U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to

special latitude when defending against summary judgment motions, they

must establish more than mere "metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168

F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider

whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable trier

of fact could rule in favor of the non-moving party.  *See Building Trades

Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

      B.    <u>Plaintiff's Failure to File a Proper Local Rule 7.1(a)(3) Statement</u>

      This court's rules provide that a party opposing a motion for summary judgment

> shall file a response to the [moving party's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.

N.D.N.Y.L.R. 7.1(a)(3). This rule, which is typical of similar rules from many other courts, serves to assist the court in identifying material issues in a case and determining whether they are genuinely disputed. *See Monahan*, 214 F.3d at 292. While in opposing defendants' motion plaintiff has filed a document entitled "Statement of Material Facts In Opposition to the Defendants [sic] Motion For Summary Judgment", plaintiff's filing fails to comport with the requirements of Local Rule 7.1(a)(3). The consequences of this failure are potentially significant.

      By its terms, Local Rule 7.1(a)(3) provides that <u>"[t]he Court shall</u>

deem admitted any facts set forth in the Statement of Material Facts that

the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3)

(Emphasis in original). Courts in this district have not hesitated to enforce

Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted

upon an opposing party's failure to properly respond. *See*, *e.g.*, *Elgamil v.*

*Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)

(McCurn, S.J.) (listing cases)[9]; *see also Monahan v. New York City Dep't*

*of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts'

discretion to adopt local rules like 7.1(a)(3)). [10]

Although plaintiff's statement includes seven separately numbered

paragraphs, those paragraphs do not directly respond or correspond to the

eighty-one separately numbered paragraphs contained in the Defendants'

Local Rule 7.1(a)(3) Statement. Additionally, plaintiff has neglected to

include any citations to the record in his Local Rule 7.1(a)(3) Statement.

More importantly, plaintiff expressly acknowledges that the defendants'

"document numbered from 1/81 in paragraphs are true statements looking

---

[9]   Copies of all unreported decisions cited in this document have been appended
for the convenience of the *pro se* plaintiff.

[10]   As to those facts not contained in the defendants' Local Rule 7.1(a)(3)
statements, I assume for purposes of this motion that plaintiff's version of those facts
is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v.*
*Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

back at the deposition transcripts . . ." but argues that "the format in which they are said to challenge the plaintiff [sic] is completely swindling the genuine issue of facts."  Plf.'s Local Rule 7.1(a)(3) Stmt. (Dkt. No. 38-1) As this excerpt suggests, for the most part, plaintiff's Local Rule 7.1(a)(3) Statement improperly consists of argument, rather than statements of fact.

Because plaintiff has failed to comply with the requirements of Local Rule 7.1(a)(3) and submit a proper statement of material facts responding to that filed by defendants, I recommend that the court deem those facts set forth in defendants' Local Rule 7.1(a)(3) Statement to have been admitted.

C.    Exhaustion of Remedies

In support of their motion for summary judgment, the defendants argue that plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies.  This prong of defendants' motion is based upon Black's alleged failure to raise any complaint in the grievances he filed while in prison regarding treatment of his hemorrhoid or the refusal of prison medical personnel to supply him with an applicator.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the

ability of prisoners to maintain federal civil rights actions, expressly

requires that "[n]o action shall be brought with respect to prison conditions

under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."  42 U.S.C. §

1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382

(2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6

(E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to

all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive

force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.

Ct. 983, 992 (2002) (citation omitted).  Plaintiff's claims, which relate to the

his medical treatment, qualify under the PLRA as the type of claims

requiring exhaustion as a prerequisite to asserting them in the context of a

federal civil rights action.  *Kendall v. Kittles*, No. CO Civ. 628(GEL), 2004

WL 1752818, at *3 (S.D.N.Y.  Aug. 4, 2004).

New York prison inmates are subject to an Inmate Grievance

Program ("IGP") established by the DOCS and recognized as an

"available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No.

16

96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing

*Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*,

199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step

review process.  First, a written grievance is submitted to the Inmate

Grievance Review Committee ("IGRC") within twenty-one days of the

incident.[11]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of

inmates and facility employees, then issues a determination regarding the

grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the

superintendent of the facility next reviews the IGRC's determination and

issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the

inmate the right to appeal the superintendent's ruling to the Central Office

Review Committee ("CORC"), which makes the final administrative

decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse

non-compliance with this prescribed process, only upon exhaustion of

these three levels of review may a prisoner seek relief pursuant to section

1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432

(W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727,

2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

---

[11]    The IGP supervisor may waive the grievance timeliness requirement due to
"mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

In this case, plaintiff filed only two relevant grievances.  The first, complaining of uncooked rice, was filed while Black was confined to Mid-State and was informally resolved, apparently to his satisfaction.  The second grievance was filed on December 7, 2007, several months after he Black was transported to Southport.

Defendants' position regarding exhaustion is somewhat schizophrenic.  In their memorandum, defendants assert that the grievance filed by plaintiff at Southport did not reference the hemorrhoid medication applicator issue.  *See* Defendants' Memorandum (Dkt. No. 37-6) at p. 9.  It seems clear that this is the case since in that grievance, in which plaintiff complained that he suffered constipation, blood loss, and an upset stomach, was deprived of adequate medical treatment and a special diet, and served cold, spoiled, uncooked, and overcooked meals while at Mid-State, does not reference the applicator issue.  *See* Felker Aff. (Dkt. No. 37-2) Exh. B.

In their local rule 7.1(a)(3) Statement, however, defendants offer conflicting accounts regarding that grievance, at one point asserting that the Southport Grievance did in fact reference the hemorrhoid ointment applicator issue.  *Compare* Defendants Local Rule 7.1(a)(3) Statement

(Dkt. No. 37-1) ¶ 50 ("Five months after plaintiff left Mid-State, while at Southport Correctional Facility, plaintiff finally filed a grievance related to his claims in this lawsuit: *i.e.,* bad food and being denied an applicator for hemorrhoid ointment at Mid-State"); *with id.* ¶ 78 ("in his grievance plaintiff fails [sic] that he was denied an applicator to apply ointment to his hemorrhoid." (citing to December 7, 2007 grievance).

The record is therefore at least slightly equivocal as to whether plaintiff's Southport grievance was construed by prison officials as dealing with the applicator issue.  This confusion is furthered by plaintiff's deposition testimony, in which he stated that the applicator issue was intended by him to be included within the December 7, 2007 grievance. *See* Tr. 81-90.  There is no indication of whether the result of the December 7, 2007 grievance, which was apparently a denial, was pursued by the plaintiff through to the CORC - a requirement for complete exhaustion.  Given these various unresolved issues, notwithstanding my recommendation with regard to the merits, I have opted not to recommend dismissal of the applicator claim on this procedural ground.

D.    Plaintiff's Eighth Amendment Claims

As an additional basis for granting summary judgment, defendants

19

argue that plaintiff has failed to state a cognizable Eighth Amendment claim.  The essence of plaintiff's complaint appears to be that he was denied the basic human right to adequate food, and that the defendants failed to properly treat his hemorrhoid.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the

plaintiff must demonstrate that prison officials acted subjectively with

"deliberate indifference".  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546

(N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.

Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at

*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally,*

*Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an

official "knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978;

*Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at

*2 (same).

> 1.    Plaintiff's Claim That He Was Denied Adequate Food

To satisfy the objective prong of an Eighth Amendment conditions of

confinement claim, a plaintiff must demonstrate a deprivation of "'the

minimal civilized measure of life's necessities,' such as adequate food,

clothing shelter, sanitation, medical care, and personal safety."  *May v.*

*DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30,

2010) (quoting *Alvarez v. County of Cumberland*, Civil No. 07-346(RBK),

2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)).

Conditions that are merely restrictive or harsh, however, do not implicate

the Eighth Amendment; "they are merely part of the penalty that criminal

offenders pay for their offense against society." *May*, 2010 WL 1286800,

at *4 (quoting *Alvarez*,1009 WL 750200, at *2).  The Second Circuit has

recognized that the Eighth Amendment requires that prisoners be provided

with "nutritionally adequate food that is prepared and served under

conditions which do not present an immediate danger to the health and

well being of the inmates who consume it." *Robles v. Couglin*, 725 F.2d

12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 9:08-CV-

0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy, S.J.)

(citations omitted); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006 WL 2795332,

at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted).

     In this instance, plaintiff has failed to present evidence demonstrating

that the food at Mid-State was prepared and served in a manner that

endangered his health.  Instead, plaintiff's food complaints consist entirely

of broad and conclusory allegations which, while at first blush troublesome,

are devoid of the specifics necessary to prove such a claim.  Plaintiff

states, for example, that after entering Mid-State he "became aware of the

mostly uncooked and cold foods serviced [sic] in which immediately caused stomach cramps and heavy gas."  Plaintiff's Decl. (Dkt. No. 38-2) ¶ 1.   Black further asserts that the food was "unacceptable, unhealthy, and . . . apparently unnutritionally inadequate both quantity and quality . . . there was spoiled vegetables, over cooked and uncooked rice and meats serviced . . . the bread regularly be air filters stale . . . the food service was un-consumable and none-chewable. . . period."  *Id.* ¶ 11.  Plaintiff does not, however, identify any specific occasions, or number of occasions, or meals he claims were spoiled or uncooked.  Although he claims to have lost six pounds while at Mid-State, admittedly as a result of his own refusal to eat, he does not produce any evidence that meals or food that he consumed caused him to become ill on any specific instance, or otherwise immediately threatened his physical well being.  Indeed, there is no evidence in Black's AHR that he suffered any dire physical consequences as a direct result of food consumed by him, or his refusal to eat the allegedly unhealthy food.  Simply stated, plaintiff's allegations are no more than generalized allegations which are troublesome at first blush, but lack the specifics necessary to substantiate an Eighth Amendment claim while housed at Mid-State.  *Brown*, 2009 815724, at *10.

In further support of his position plaintiff submits the declaration of Michael Perkins, also an inmate at Mid-State in 2007, who alleges that while housed there he filed grievances complaining about the rations of food, and the facts that it was cold and, at times, spoiled.  *See* Black Decl. (Dkt. No. 38-2) Exh. A at ¶ 4.  Unfortunately, the Perkins declaration is similarly conclusory and does not provide any factual support for plaintiff's claim. Perkins does not provide any detail regarding the date of and the specific complaint included in any grievance that he filed, or any specific instances that he was served spoiled food while at Mid-State.  At best, the Black affidavit and Perkins declaration establish only that the food at Mid-State was not to their liking, and, on occasion meals may have been cold and/or included some spoiled food.  "Insofar as [the plaintiff] alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action."  *Lunney v. Brureton*, No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Even if plaintiff were able to over come the objective prong of the Eighth Amendment analysis, he still fails with respect to the subjective component.  To show deliberate indifference, a plaintiff must demonstrate

24

that the prison official sued was aware of and disregarded an excessive

risk to the inmate's health or safety.  *Farmer*, 511 U.S. at 837, 114 S. Ct. at

1978.  Plaintiff does not claim that defendants Fischer or Wright had actual

knowledge of the alleged unhealthy food condition; instead, plaintiff alleges

in his complaint that these defendants had "constructive knowledge".

Complaint (Dkt. No. 26) ¶ 17.

    With regard to defendant Perlman, the plaintiff alleges only that

through daily rounds he would be advised of the food conditions by many

prisoners.  While plaintiff claims that he made defendant Calidonna aware

through his grievance, the record is undisputed that Black filed only one

grievance during the time he was housed at Mid-State, and in that

grievance he complained only of uncooked rice.  Plaintiff has otherwise

failed to adduce any evidence that any of the named defendants were

made aware of a pervasive problem of uncooked or spoiled food being

served at Mid-State.  Nor has he produced any evidence that any of them

had noticed that problems with food service endangered prisoners' health;

there is no evidence that anyone, including plaintiff, suffered a serious

illness as a direct result of ingesting the prison food.  For these reasons,

the evidence in the record is insufficient to establish a triable issue of fact

concerning whether defendants were aware of and disregarded a serious problem with the food.  *Newman v. Zenk*, No. 05-CV-259, 2007 6888112, at *6 (E.D.N.Y. Mar. 29, 2007) (citing *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)), *aff'd*, 309 Fed. App'x 535 (2d Cir. Feb. 17, 2009). Accordingly, I find that defendants' motion as to plaintiff's food-related claim should be granted.

> 2.  Plaintiff's Claims Regarding Inadequate Medical Treatment

Plaintiff's medical indifference claim appears to have two components, one in which he complains of the denial of an applicator for use with Preparation H, and the other contending that the treatment he received for his hemorrhoid was inadequate.  Like plaintiff's food-related claim, claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection afforded by the Eighth Amendment,  *Estelle,* 429 U.S. at 102, 104, 97 S. Ct. at 291, and are subject to the two-prong analysis requiring that a plaintiff establish both the objective and subjective elements, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

> a)  Objective Requirement

Analysis of the objective, "sufficiently serious" requirement of a

26

Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and focuses on whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279. The second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.*, at 280 (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). In other words, the critical question is the seriousness of the medical need, or whether the temporary deprivation was objectively harmful enough to establish a constitutional violation.

*Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment, but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Addressing the seriousness of the plaintiff's condition first, plaintiff's AHR establishes that he complained of constipation and an external hemorrhoid for a period of less than one month, during which he experienced typical symptoms, including discomfort and minor bleeding. These conditions, without more, are not sufficiently serious to establish an Eighth Amendment claim.  *Lowman v. Perlman*, No. 9:06-CV-0422, 2008 WL 4104554, at *5 (N.D.N.Y. Aug. 29, 2008) (Kahn, D.J. and Treece, M.J.); *Cabassa v. Gummerson*, No. 01-CV-1039,  2006 WL 1559215, at *9-10 (N.D.N.Y. Mar. 30, 2006) (Lowe, M.J.), report and recommendation adopted by, 2006 WL 1555656 (N.D.N.Y. Jun. 1, 2006) (Hurd, D.J.); *Kendall v. Kittles*, 2004 WL 1752818, at *6 ("Hemorrhoids, albeit, uncomfortable, are a minor issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other

courts.").

Additionally, I note that it cannot seriously be argued that Black did not receive medical attention while incarcerated.  In fact, plaintiff's AHR shows that in response to various minor physical complaints including constipation, upset stomach, hemorrhoids, and bleeding, he was seen by medical personnel approximately forty times during the four months that he was confined to Mid-State.   When plaintiff first noticed the hemorrhoid, he was visited by a nurse, who provided him with ointment and a stool softener and instructions regarding avoiding hemorrhoids, including that he drink water and exercise.  Plaintiff apparently failed to follow these instructions.  Each time he complained of the hemorrhoid, plaintiff was provided with more Preparation H.  Plaintiff was reassured by a physician that, despite some bleeding, his condition was not serious or life threatening and that the hemorrhoid would disappear in time.  Because plaintiff admittedly suffered an external hemorrhoid, an applicator was not necessary for treatment with Preparation H.[12]  Felker Aff. (Dkt. No. 37-2) ¶¶

---

[12]   Even if plaintiff's hemorrhoid required the use of an applicator, it appears that he likely would have been denied access to such a tool based on security concerns, and not out of malice.  *See* Felker Aff. (Dkt. No. 37-2) ¶¶ 40-41.   Under these circumstances, the deliberate indifference standard cannot be established as the record demonstrates that the withholding of the applicator was reasonably calculated to maintain prison security.  *See Trammel v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003)

35, 39.

The record now before the court clearly establishes that prison officials were attentive and acted reasonably in treating plaintiff's hemorrhoid.  Plaintiff's obvious dissatisfaction or disagreement with treatment that he received for his hemorrhoid is patently insufficient to establish an Eighth Amendment violation.  *Tafari v. McCarthy*, No. 9:07-CV-654, 2010 WL 2044705, at *32 (N.D.N.Y. May 24, 2010) (Hurd, J. and Lowe, M.J.) (citation omitted); *McQueen v. County of Albany*, No. 9:08-CV-799, 2010 WL 338081, at * (N.D.N.Y. Jan. 28, 2010) (Hurd, J. and Peebles, M.J.) (citations omitted).

b)     Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300, 111 S. Ct. 2321).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in

---

("[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security") (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861 (1979)) .

criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).  As previously discussed, to establish deliberate indifference a plaintiff must show that the official was aware of facts from which it could be concluded that a substantial risk of serious harm existed and must also draw that conclusion.  *See Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.  Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S. Ct. at 292; *Chance,* 143 F.3d at 703.

For the same reasons that plaintiff cannot prove the objective element of a medical indifference claim, he fails with respect to the subjective element.  Plaintiff's hemorrhoid did not expose him to substantial risk of harm if left untreated, and the condition, in fact, was not ignored by prison personnel.  In sum, the record is devoid of any evidence suggesting that any defendant, or any prison official for that matter, was deliberately indifferent to plaintiff's medical needs.

After carefully reviewing the record before the court, I find that there are no material issues of fact with respect to plaintiff's Eighth Amendment

medical indifference claim and that defendants' motion for summary

judgment dismissing this claim should therefore be granted.

IV.     SUMMARY AND CONCLUSION

Plaintiff complains regarding the conditions of confinement while

housed at Mid-State, alleging the food he was served and the medical

treatment that he was provided with regard to a hemorrhoid subjected him

to cruel and unusual punishment.  These complaints, however, amount to

nothing more than dissatisfaction with the harsh realities of prison life.  The

record fails to show that the food that plaintiff was served was not

nutritionally adequate, or posed an immediate danger to plaintiff's health,

and that defendants were aware of that fact.  Turning to plaintiff's

hemorrhoid, no reasonable factfinder could conclude that it satisfies the

threshold constitutional requirement of a serious medical condition, and in

any event, the record establishes that plaintiff was rendered reasonable

medical treatment for his hemorrhoid.

Unfortunately for plaintiff, while the Eighth Amendment ensures that

inmates are provided the minimal civilized measures of life's necessities, it

does not create a right to comfortable prisons.  For this reason, though I

have concluded that issues of fact remain as to whether plaintiff exhausted

his administrative remedies, I have found that substantively plaintiff has failed to state a constitutional claim and that defendants' motion for summary judgment therefore should be granted.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 37) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ordered that the clerk is also serve a copy of the report and recommendation upon the parties in accordance with this court's local rules.

Dated:      July 1, 2010
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord* *Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See* *Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See* *Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see* *supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See* *Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See* *Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff[FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005)(deeming *pro* se prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests*, W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra*, Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8]*Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9]*Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135980, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero, 467 F.3d at 176* (citing *Woodford*, 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero, 467 F.3d at 176* (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4)

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8;Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

⚑ Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Cyril KENDALL, Plaintiff,
v.
C.O. KITTLES, Shield No. 15396; C.O. Charles, Shield
No. 10739; C.O. Johnson; C.O. Cunningham; Frank
Squillante; William J. Fraser; New York City Dept. of
Correction; Rikers Island Correctional Facility,
Defendants.
**No. C0 Civ. 628(GEL).**

Aug. 4, 2004.

Cyril Kendall, plaintiff pro se.

Michael A. Cardozo, Corporation Counsel for the City of
New York, New York, N.Y. (Hillary A. Frommer) for
defendants Kittles, Charles, Squillante and Fraser, of
counsel.

OPINION AND ORDER

LYNCH, J.

**\*1** This action concerns allegations by plaintiff Cyril
Kendall that he was denied certain medical
accommodations and housing conditions while he was a
pre-trial detainee at Rikers Island Correctional Facility
("Rikers"), and that these denials infringed his
constitutional right to be free from cruel and unusual
punishment. Defendants Kittles and Charles are
corrections officers at Rikers, defendant Squillante is the
Warden of the North Infirmary Command unit where
Kendall was housed at Rikers, and defendant Fraser is the
former Commissioner of the New York City Department
of Correction. All four defendants now move for summary
judgment and, for the reasons that follow, the motion will

be granted.

BACKGROUND

Kendall was arrested on March 13, 2002, and was held as
a pre-trial detainee at the North Infirmary Command
("NIC") unit at Rikers. (Frommer Decl., Ex. D.) Kendall
filed his Complaint in this action on January 28, 2003,
asserting that during his time at Rikers he was denied
medically-indicated accommodations for his asthma and
for his hemorrhoid condition.[FN1]

> **FN1.** Kendall conducted no discovery in this
> action, and the only discovery taken by
> defendants was to subpoena Kendall's medical
> records. Although Kendall complains in his
> opposition brief that he was unable to take
> discovery due to his incarceration, he was
> provided ample opportunity for discovery by the
> Court and neither complained to the Court about
> his inability to take discovery during this period
> nor sought any assistance in doing so. Indeed,
> even now Kendall does not ask for any further
> discovery or suggest what discovery might be
> relevant or helpful. Accordingly, the Court will
> view the record as closed for purposes of
> summary judgment, and the factual discussion
> below will be drawn from the documentary
> evidence attached to Kendall's Complaint or
> submitted as exhibits to the Declaration of
> Assistant Corporation Counsel Hillary Frommer.

*Asthma* and Non-Smoking Housing

Kendall's medical records indicate that on August 26,
2002, Dr. Adriana Vives of the NIC medical clinic
requested that Kendall be housed in a non-smoking area
"for medical reasons." (Frommer Decl., Ex. A.) The same
request was made again by Dr. Vives, again without
further explanation, on September 24, 2002. (*Id.*) Neither
request mentioned Kendall's alleged asthma. When
Kendall visited the medical clinic at NIC on September
30, 2002, the treating physician noted that Kendall had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

previously complained of swelling in his neck, hands and lips, but that none of these conditions had been observed during any of Kendall's previous visits to the clinic. (*Id.,* Ex. J.) Apparently Kendall himself reported to the treating physician during this visit that his previously-complained-of swelling had resolved and that he had "no breathing difficulty." (*Id.*) The doctor noted that the physical exam revealed neither swelling, nor signs of recent swelling, in the face, eyes, lips, tongue, or neck. (*Id.*)

On January 4, 2003, Kendall apparently fell from his bed and was discovered unconscious on the floor of his cell around ten p.m. (*Id.,* Ex. K.) He was attended by emergency medical technicians at Rikers and transferred by ambulance to Elmhurst General Hospital within thirty minutes. (*Id.*) Kendall returned to Rikers on January 6, after refusing a transfer to Bellevue Hospital for further evaluation. (*Id.*) Kendall avers that he "passed out" due to secondhand smoke inhalation. (P. Mem. & Aff. ¶ 15.) It is undisputed that Kendall remained in a smoking-permitted housing unit throughout his time at Rikers.

*Hemorrhoids*

Kendall was treated at the Bellevue Hospital Rectal Clinic for swollen hemorrhoids on September 9, 2002. (Frommer Decl., Ex. J.) On October 4, 2002, Dr. Vives requested that Kendall be allowed to keep bottled water and some additional food in his cell "for medical reasons." (*Id.,* Ex. A.) Kendall avers that he was not provided with bottled water and was denied access to a water fountain, and so had to drink water from the sink in his cell. (P. Mem. & Aff. ¶¶ 7-8.) On the same day, Dr. Vives prescribed a "donut" pillow for Kendall to sit on, as well as stool softeners and suppositories, all to relieve his discomfort from the hemorrhoid condition. (Frommer Decl., Ex. J.) On October 10, 2002, Kendall again visited the Bellevue Rectal Clinic; the treatment notes from the second visit state that Kendall was "doing well" following a rubber band ligation procedure to address a prolapsed hemorrhoid. (*Id.*) Kendall received follow-up care at the NIC clinic on October 11 and 15, 2002. (*Id.*) On November 11, 2002, Physician's Assistant Allen Walker requested that Kendall be allowed an extra sheet to use for privacy while using the toilet, and that he be allowed to hold material to change his surgical dressings in his cell.

(*Id.,* Ex. A.) Kendall avers that the defendants denied him these recommended supplies. (P. Mem. & Aff. ¶¶ 14-15.) On November 13, 2002, Dr. Vives filed a consultation request for Kendall to be seen again at the Bellevue Rectal Clinic for additional treatment. (Frommer Decl., Ex. J.) Kendall was seen at Bellevue the following day and received an additional rubber band ligation on another prolapsed hemorrhoid; the treating physician noted that a "small amount of bleeding is normal" and requested a follow-up visit in five weeks. (*Id.*) On December 12, 2002, Kendall refused to attend his next scheduled visit to the Bellevue Rectal Clinic, despite having the medical consequences of such refusal explained to him. (*Id.*)

**\*2** Throughout the fall of 2002, Kendall was repeatedly seen and treated in the NIC medical clinic for a series of other medical complaints-flu-like symptoms, podiatry complaints, pain in his shoulder, difficulty digesting prison food, etc. (*Id.*)

*Exhaustion of Administrative Remedies*

On September 26, 2002, Kendall's counsel in his criminal case wrote to Warden Squillante, alerting him to the medical staff's recommendations of surgery for Kendall's hemorrhoid condition and transfer to a non-smoking housing unit on account of Kendall's asthma. (Frommer Decl., Ex. A.) Kendall asserts, both in the Complaint and in the sworn Affidavit submitted in opposition to the defendants' summary judgment motion, that he attempted to file a formal grievance with Mohammed Akinlolu, the Grievance Coordinator at NIC, but was told by Akinlolu that his complaints did not qualify as a grievance. (*Id.,* P. Mem. & Aff. ¶ 11.) According to Kendall, Akinlolu refused even to document these conversations. (*Id.*) Kendall also states that he requested and was denied an interview with the Grievance Resolution Committee at Rikers, and that he was unable to make any further efforts to comply with the Rikers grievance procedures because he was housed in protective custody, without access to the grievance form kept in another part of the prison, and because various corrections officers refused his requests to supply him with grievance forms. (*Id.* ¶¶ 11-12.)

Unsurprisingly, defendants dispute Kendall's version of his pursuit of administrative remedies for his complaints.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

Grievance Coordinator Akinlolu declares in a sworn affidavit that Kendall had free and unimpeded access to grievance forms. (Frommer Decl., Ex. B. ¶ 3.) Akinlolu recalls discussing with Kendall his complaints regarding non-smoking housing and the desire to keep food and water in his cell, but Akinlolu avers that he merely told Kendall that, in order to grieve medical concerns, he would need written physician authorization for each request. (*Id.* ¶¶ 4-5.) Defendants have also submitted sworn affidavits from Arthur Harris, the director of the Inmate Grievance Resolution Program for the New York City Department of Corrections, and from Tonya Glover, intake secretary for the Board of Correction, both asserting that a diligent search of the relevant records reveals no grievance or other correspondence from Kendall regarding his desire to be placed in non-smoking housing or the alleged denial of medical accommodations. (*Id.,* Exs. F & H.) Defendant Squillante testified by affidavit that he never received any correspondence from Kendall. (*Id.,* Ex. G.) Finally, defendants Charles and Kittles likewise testified by affidavit that neither of them (i) were aware of any medical condition suffered by Kendall, (ii) were ever shown or given any medical authorizations regarding Kendall, (iii) ever denied Kendall access to a water fountain, or (iv) ever prohibited or prevented Kendall from keeping bottled water or food in his cell. (*Id.,* Exs. L & M.)

**\*3** Defendants previously moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6). In an Opinion and Order dated September 15, 2003, this Court granted the motion as to defendants Johnson and Cunningham for lack of service, and as to defendants New York City Department of Corrections and Rikers Island Correctional Facility on the ground that they are non-suable agencies of the City of New York under the New York City Charter. The motion was denied as to all other defendants. Those remaining defendants filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on April 9, 2004.

DISCUSSION

I. *Standard on Summary Judgment*

Summary judgment must be granted where "there is no

genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (quoting *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 289 (1968)).

II. *Exhaustion of Administrative Remedies*

On their motion for summary judgment, defendants renew the argument made in their motion to dismiss that plaintiff's claims cannot succeed because he has failed to exhaust the available administrative remedies before bringing this action. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

An action for deliberate medical indifference is an action

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

"with respect to prison conditions," and is thus subject to the PLRA's exhaustion requirements. *See, e.g., Harris v. N.Y.C. Dept. of Corrections,* 00 Civ. 7164(NRB), 2001 WL 845448, at *2 (S.D.N.Y. July 25, 2001). Where exhaustion of administrative remedies is required, failure to do so must result in dismissal of the claims. *Neal v. Goord,* 267 F.3d 116, 117 (2d Cir.2001). As a number of courts in this district have detailed, and as defendants outline in their motion for summary judgment, prisoners in the custody of the New York City Department of Corrections must complete a three-step inmate grievance procedure, including two levels of appeals, to exhaust their administrative remedies. *See, e.g., McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003).

*4 However, where a prison fails to provide access to grievance forms, a prisoner's complaint cannot be dismissed for failure to exhaust. *See Feliciano v. Goord,* 97 Civ. 263(DLC), 1998 WL 436358 (S.D.N.Y. July 27, 1998) (denying dismissal on failure to exhaust grounds where corrections officers refused to provide inmate with grievance forms); *Burns v. Moore,* 99 Civ. 977(LMM), 2002 WL 91607, at * 5 (S.D.N.Y. Jan. 24, 2002) ("if an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether he ... had any available administrative remedies"). The plain language of the statute requires only "available" administrative remedies to be exhausted. *See Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from utilizing is not an "available" remedy under § 1997e(a)") (internal quotations omitted). Common sense and fundamental fairness support this reading. A custodian cannot prevent an inmate's access to a grievance procedure, thereby frustrating the inmate's attempt to resolve his complaints administratively, and then defend against the inmate's subsequent lawsuit by faulting the inmate for failure to exhaust the administrative process. Congress could not have intended the PLRA's administrative exhaustion requirement to produce such a Kafkaesque result. On similar reasoning, a custodian may be estopped from arguing that an inmate failed to exhaust administrative remedies where the custodian previously informed the inmate that the complaints are "non-grievable." *See Feliciano,* 1998 WL 436358, at *2; *Davis v. Frasier,* 98 Civ. 2658(HB), 1999 WL 395414, at *4 (S.D.N.Y. June 15, 1999).

The parties present in the instant motion the same factual dispute that was presented on the motion to dismiss. As noted above, plaintiff claims that he did not fail to exhaust "available" administrative remedies because the actions of various corrections officials prevented him from availing himself of the inmate grievance procedure, both by denying him access to the proper forms and by informing him that his complaints were not grievable. (P. Mem. & Aff. ¶¶ 10-13.) Defendants claim that plaintiff's allegations are not true and that he had numerous opportunities to comply with the available grievance procedures but simply chose not to. (D. Mem. 3-5, 12-14; Frommer Decl., Exs. F-H, J-L, M.) The only difference between the presentation of this dispute in the two motions is that plaintiff has now submitted a sworn affidavit, and defendants have supplemented their factual presentation with additional sworn affidavits. However, the core factual dispute as to whether Kendall did or did not have access to grievance forms during the relevant period, and was or was not told by corrections officials that his complaints were nongrievable, remains. Whatever the relative persuasiveness of defendants' affidavit testimony versus plaintiff's affidavit testimony, such credibility determinations are properly for a jury, not for this Court on a motion for summary judgment.

*5 Viewing all evidence and making all reasonable inferences in the plaintiff's favor, as the Court must on summary judgment, the defendants have failed to establish that there is no material factual dispute as to the availability of administrative remedies, or that no reasonable fact-finder could find for the plaintiff on this issue. Defendants' argument that they are entitled to summary judgment because plaintiff has submitted "no evidence" is unavailing; Kelly's own sworn affidavit, relating his version of the conversation with Akinlolu and his experience trying to secure grievance forms, does constitute evidence creating a factual dispute, whatever defendants' views on its credibility. Accordingly, the motion for summary judgment on the ground of failure to comply with the requirements of the PLRA is denied.

### III. *Section 1983 and the Eighth Amendment*

However, as to the substance of Kendall's claims-that the denial of requests for non-smoking housing and to be allowed to keep food, bottled water, and extra sheets and surgical dressing in his cell violated his Constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

rights, the defendants' motion for summary judgment will be granted because, even accepting Kendall's version of disputed facts, his claims do not rise to the level of a Constitutional violation.

Kendall predicates his section 1983 claim on the Eighth Amendment, which protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). To establish an Eighth Amendment violation in the context of denial of medical care or accommodation, an inmate must show that prison officials acted with "deliberate indifference" to the inmate's serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05; *Fulmore v. Mamis,* 2001 WL 417119 at *7 (S.D.N.Y. Apr. 23, 2001); *Carbonell v. Goord,* 2000 WL 760751 at *6 (S.D.N.Y. Jun. 13, 2000). The requirement has two prongs-an objective inquiry as to whether the deprivation of medical attention is "sufficiently serious," and a subjective inquiry as to whether the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (*Hathaway II* ).

As to the first prong, it is well established that more than discomfort or minor injury is required in order for a plaintiff to demonstrate a serious medical need. *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (serious medical need may be demonstrated if "unnecessary and wanton infliction of pain" results, or if the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss of function); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (*Hathaway I* ) (the standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain.") *Compare Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* 98 Civ. 5011(WHP) 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting

that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, rose to the level of sufficiently serious condition); *Hathaway I,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and produced extreme pain that led to registered complaints on almost seventy occasions); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days was sufficiently serious).

**\*6** Kendall's complaints, even viewing the evidence in the light most favorable to him, simply do not rise to the level of Constitutional seriousness. Although placement in non-smoking housing would undoubtedly be preferable, from a health perspective, to exposure to secondhand smoke from other prisoners, there is no evidence that Kendall suffered any serious health consequences from this housing. The medical consultation forms that recommend he be transferred to non-smoking housing do not specify any medical condition, nor do they suggest that any serious consequences will result if the transfer does not occur. (Frommer Decl., Ex. A.) Kendall's medical records indicate that he was examined for his complaints of swelling due to secondhand smoke exposure, and that those complaints were not substantiated. (*Id.,* Ex. J.) Kendall himself told medical personnel that his previously-complained-of swelling had subsided and that he had no further breathing difficulties. (*Id.*) The one serious incident was the apparent fall that rendered Kendall unconscious. However, the medical records clearly indicate that Kendall received prompt and appropriate treatment, including hospitalization at a non-prison facility, and that Kendall refused further evaluation or treatment, even though he was advised of the possible medical consequences. (*Id.,* Ex. K.) No reasonable factfinder could, on this record, conclude that the failure to transfer Kendall to a non-smoking housing unit was "sufficiently serious" as to constitute a deprivation of Eighth Amendment rights.

The record similarly does not support a finding of a Constitutional violation with regard to Kendall's hemorrhoid condition. Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed "sufficiently serious" by other courts. Moreover, Kendall's medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

records indicate that he received frequent and appropriate medical treatment for this condition, and that the only time he was without medical care for his hemorrhoids was when Kendall refused to attend a scheduled visit to the Bellevue Rectal Clinic for a follow-up exam. (*Id.,* Ex. J.) The medical recommendation that Kendall be allowed to keep bottled water and extra food in his cell is not, on its face, even connected to his hemorrhoid condition (it appears connected to Kendall's complaints to NIC clinic staff about his difficulty adjusting to prison food). (*Id.,* Exs. A & J.) However, even assuming that the recommendation was related to the hemorrhoids, there is no evidence that the alleged failure to follow this recommendation caused any health consequences whatsoever for Kendall, much less consequences that are "sufficiently serious" to constitute an Eighth Amendment violation.

Finally, Kendall's allegations in his Complaint about the alleged failure of corrections officers to allow him an extra sheet or extra surgical dressing in his cell are not, at bottom, complaints about medical care, but rather amount to an argument that Kendall suffered embarrassment due to the difficulty of hiding the physical consequences of his hemorrhoid condition. (*Id.,* Ex. A.) While the Court sympathizes with Kendall's embarrassment, some loss of privacy and attendant loss of dignity is an inevitable consequence of incarceration, and, so long as no serious medical consequences result, these allegations likewise do not amount to a Constitutional deprivation.

**\*7** As to the second prong of the inquiry, an official will be found to act with "deliberate indifference" to a prisoner's needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Mere negligence, even that which is tantamount to medical malpractice, does not amount to an Eighth Amendment violation. *Estelle v. Gamble,* 429 U.S. at 106; *Hathaway I,* 37 F.3d at 66 (2d Cir.1994) ("[d]eliberate indifference requires more than mere negligence, but less than conduct undertaken for the very purpose of causing harm"). On the present record, no reasonable factfinder could conclude that Kendall has satisfied this standard-chiefly because, as noted above, the recommendations that were allegedly disregarded (request

for non-smoking housing, request to keep bottled water and extra food in cell, request for "personal care" items such as an extra sheet for privacy and extra surgical dressing) did not constitute "an excessive risk to inmate health or safety." Thus, even accepting Kendall's testimony that defendants Kittles, Charles, and Squillante were all aware of the medical recommendations and aware of Kendall's complaints and requests, their alleged disregard of these recommendations does not give rise to a Constitutional violation.

All of the medical evidence in this case indicates that, while in the custody of the New York City Department of Corrections, Kendall received frequent, prompt, and appropriate medical treatment for his hemorrhoid condition, as well as for a variety of other complaints, both substantiated and unsubstantiated. (Frommer Decl., Exs. A, J, K .) Even though Kendall was denied requested transfers to non-smoking housing, and may have been denied permission to keep bottled water and extra food in his cell, there is no evidence that any of the medical personnel that examined or treated Kendall on a nearly weekly basis observed or noted any serious consequences from these circumstances. In short, the record of Kendall's time at Rikers does not remotely demonstrate the kind of callous disregard of the inmate's needs that is "repugnant to the conscience of mankind" and incompatible with "evolving standards of decency" that would constitute cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. at 105-06. Accordingly, the defendants' motion for summary judgment on Kendall's section 1983 and Eighth Amendment claims is granted.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted on the grounds that plaintiff has failed to establish an Eighth Amendment violation.

SO ORDERED:

S.D.N.Y.,2004.
Kendall v. Kittles
Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1752818 (S.D.N.Y.)
(Cite as: 2004 WL 1752818 (S.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**   Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered

that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed

Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> **FN5.** Plaintiff himself filed objections which were not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant must assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> **FN6.** In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

**\*3** Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

*Energy Co.*, 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.*, 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan*, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack*, 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds*, 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger*, 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers*, 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers*, 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin*, 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the complaint delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the

record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,

2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day
Sulton went to sick call and saw P.A. Williams. Williams

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December 17, 2000, Sulton complained that he never received a

response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead, 174 F.3d 271, 274-75 (2d Cir.1999).* As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen, 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000)* (citations omitted).

In New York, the relevant administrative vehicle is the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief,

money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied,513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

***RULING ON MOTION FOR SUMMARY
JUDGEMENT***

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and handcuffs for the return trip to Osborn.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir.1994).* When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987).* Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in

short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224.*

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248.* Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir.1990).*

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000)*(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990)).* However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir.1997)* (quoting *Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir.1990)).* Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252.*

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994).* Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

**III. Discussion**

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

> **FN1.** Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

**A. Constitutional Violation: Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at \*16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

**\*4** The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009) (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,* 387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated

Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

*5 Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004) ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003) (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998) (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997) (lack of a working toilet in prison cell for approximately 10 hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir.2003)*("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy,

convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)*).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

▷  Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court, D. New Jersey.
Julio ALVAREZ, Jr., Plaintiff,
v.
COUNTY OF CUMBERLAND, et al, Defendants.
**Civil No. 07-346 (RBK).**

March 18, 2009.

West KeySummary
**Federal Civil Procedure 170A**  ⟳      **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to the conditions of an inmate's confinement in an isolation unit at a county jail. Therefore, summary judgment was precluded in an action for an Eighth Amendment conditions of confinement claim. The inmate spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. The inmate also pointed to evidence that he contracted methicillin-resistant staphylococcus aureus (MRSA) while in isolation to show that he lived and slept exposed to feces in his cell. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Richard A. Stoloff, Law Offices of Richard A. Stoloff, Linwood, NJ, for Plaintiff.

Steven L. Rothman, Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, Vineland, NJ, Nancy L. Siegel, White & Williams, LLP, Cherry Hill, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, District Judge.

**\*1** This matter comes before the Court on a motion by Defendants County of Cumberland, Cumberland County Board of Chosen Freeholders, Cumberland County Department of Corrections, Cumberland County Sheriff's Department, Kenneth Lamcken, Michael Palau, Glenn Saunders, and Lewis Walker (collectively, "the County Defendants") for partial summary judgment on the Complaint of Plaintiff Julio Alvarez, Jr. ("Plaintiff") and on a motion by Defendant Prison Health Services, Inc. ("PHS") for summary judgment on Plaintiff's Complaint. Plaintiff's Complaint includes allegations that the County Defendants and PHS acted negligently and violated Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985(3). The County Defendants only move for summary judgment on Plaintiff's civil rights claims against them. For the reasons expressed below, the Court will grant in part and deny in part the County Defendants' motion and grant Prison Health Services' motion.

**I. BACKGROUND**

The allegations in Plaintiff's Complaint arise from events that occurred while he was an inmate at the Cumberland County Correctional Facility ("Cumberland County Jail"). Plaintiff was placed in an isolation unit at the Cumberland County Jail on or about January 28, 2005 and released from isolation on or about February 2, 2005. Plaintiff's isolation cell measured six feet by eight feet and was the middle cell in a group of three adjacent isolation cells in the unit. The cells on either side of Plaintiff's had working toilets and sinks. However, the parties agree that the toilet and sink in Plaintiff's original cell was in a state of disrepair at the time of his placement in isolation. Other inmates occupied the adjacent isolations cells, which contained working toilets and sinks. For the purposes of summary judgment, the parties agree that Plaintiff's toilet in isolation was not only non-functional, but also filled to the point of overflowing with urine, feces, and trash.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

While in his original isolation cell, Plaintiff urinated in a Styrofoam cup which he then emptied into the broken sink so as not to cause the toilet to overflow onto the floor. Plaintiff defecated in the toilet, only after removing from it pieces of plastic and cardboard, which he placed on the floor of the cell. Plaintiff used the toilet by squatting over it, attempting to avoid touching the toilet seat.

Plaintiff was not provided with cleaning products with which to clean the isolation cell himself, nor was it cleaned by someone else while Plaintiff occupied it. Plaintiff was not provided equipment to use to empty the toilet or sink. At one time during his stay, a corrections officer did attempt to fix the toilet but was unsuccessful. Plaintiff did not ask to use a toilet outside his cell. Plaintiff alleges, and the County Defendants refute, that he did not ask because there was not a guard available to whom Plaintiff could have made such a request. Plaintiff was allowed to shower twice during his time in the original cell. The County Defendants argue that Plaintiff had frequent access to corrections officer, including at the time of his showers.

**\*2** Plaintiff contends that on February 1, 2005, one day before he was released from isolation, he transferred himself, with the permission of the guards, to an adjacent isolation cell with working plumbing. Plaintiff further contends that he could not have moved to an adjacent cell until February 1 because both adjacent cells were occupied from the time of Plaintiff's arrival in the isolation unit until that date. The County Defendants do not agree to the date of Plaintiff's self-transfer, but agree that he did so at some point during the time he was in isolation.

Plaintiff was released from isolation on February 2, 2005, at which time he was seen by a nurse to be treated for boils. He was seen by a doctor on February 4, 2005, at which time he had developed 10 lesions over his buttocks, legs, and penis. Plaintiff was placed in a medical isolation cell with other prisoners until February 9, 2005 when he was sent to the hospital to be treated for his lesions. Plaintiff stayed at the hospital eight days and underwent surgery. Plaintiff's medical expert reports that Plaintiff was infected with methicillin-resistant staphylococcus aureus ("MRSA") at least in part due to his exposure to waste matter in his isolation cell and his inability to wash after touching contaminated surfaces. (Pl.Opp.Ex. B.)

Plaintiff and the County Defendants agree that in 2005, the Cumberland County Jail was overcrowded. Further, Plaintiff presents the deposition testimony of Defendant Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken, but that inmates were placed in cells with broken toilets. He further testified that those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her]favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U .S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

**\*3** Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

(1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III. ANALYSIS

### A. The County Defendants' Motion

The County Defendants move for partial summary judgment on Plaintiff's constitutional claims against the County Defendants in Count IV of the Complaint.

### 1. Plaintiff's Fifth Amendment Claim

Plaintiff's Fifth Amendment claim does not present a genuine issue for trial and will be dismissed. The County Defendants move for summary judgment on Plaintiff's claim that they violated his constitutional rights guaranteed under the Fifth Amendment, contending that there is no genuine issue of material fact regarding a Fifth Amendment violation because Plaintiff has no evidence to support such a claim. Plaintiff has provided no argument to refute the motion on this point and thus presents no evidence to satisfy his burden. See Fed.R.Civ.P. 56(e). Finding no genuine issue of material fact, the Court will grant summary judgment for the County Defendants on Plaintiff's Fifth Amendment claim.

### 2. Plaintiff's Eighth Amendment Claim

The County Defendants move for summary judgment on Plaintiff's claim that they violated his Eighth Amendment rights. There are genuine issues of fact regarding the conditions of Plaintiff's confinement at the Cumberland County Jail, so Plaintiff's Eighth Amendment claims will survive summary judgment.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show

that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Prisoners have a protected right in being incarcerated at a place of confinement conforming to the standards set forth in the Eighth Amendment. The Constitution "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In its prohibition of "cruel and unusual punishments, the Eighth Amendment ... imposes duties on [prison] officials, who must provide humane reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); see Helling, 509 U.S. at 31-32; Washington v. Harper, 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. Rhodes, 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Rhodes, 452 U.S. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

*4 To state a claim under the Eighth Amendment, an inmate's allegation must include both an objective and a subjective component. See Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities'" ... are sufficiently grave to form the basis of an Eighth Amendment violation." Helling, 509 U.S. at 32 (quoting Rhodes, 452 U .S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The subjective component requires that the state actor have acted with "deliberate indifference," a state of mind equivalent to a reckless disregard of a known risk of harm. Farmer v. Brennan,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Wilson, 501 U.S. at 303.

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety. See Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F.2d 351, 364 (3d Cir.1992). To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society. See Rhodes, 452 at 347. An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety." Ingalls v. Florio, 968 F.Supp. 193, 198 (D.N.J.1997). An official "must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

In Young, the Third Circuit reversed the district court, which granted summary judgment for the defendant on plaintiff's claims regarding the conditions of his confinement. See Young, 960 F.2d at 353. In that case, Young was a federal prisoner who allegedly suffered continuous physical and psychological abuse by his cellmates. Id. at 353-54. In response to threats from one cellmate, Young stopped up his cell toilet, consequently flooding his cell. Id. at 355. As punishment, Young was placed in a dry cell, one without a toilet or running water, for ninety-six hours. Id. In addition, Young was not provided with toilet paper. Id. During the first twenty-nine hours of his confinement in the dry cell, Young asked repeatedly for a urinal and for permission to leave his cell to defecate. Id. Not receiving same, Young relieved himself in his cell. Id. Young was finally provided with a urinal and allowed to leave his cell to defecate, only after having been confined in the dry cell for twenty-nine hours. Id. The following day, Young again requested permission to leave his cell to defecate, but his requests were ignored or rejected. Id.

*5 When the Third Circuit considered whether Young had

raised a genuine question of fact regarding the constitutionality of his confinement, it applied the standard described supra. Id. at 360. Specifically, the court noted that "inhumane prison conditions, including prolonged isolation in dehumanizing conditions ... and unsanitary conditions have ... been found to be cruel and unusual under contemporary standards of decency." Id. at 363. Further, the court explained that "segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." Id. at 364 (citing Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984); Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir.1969); Mims v. Shapp, 399 F.Supp. 818, 822 (W.D.Pa.1975)). Noting that "the touchstone [of the constitutional analysis] is the health of the inmate," the court determined that the conditions of Young's confinement worked a deprivation of the basic necessities of human existence and thus were sufficient to satisfy the objective prong of the analysis. Young, 960 F.2d at 364. Indeed, the court opined that "it would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." Id. at 365. Turning to the subjective prong of the Eighth Amendment analysis, the court found that among other questions, it was a genuine issue whether or not "prison officials were deliberately indifferent to Young's requests for a minimal amount of relief," and so summary judgment by the district court had been inappropriately granted. Id.

The facts of the instant case appear similar to Young's allegations regarding the toilet facilities in his dry cell.[FN1] As to the objective component of the analysis in Alvarez's case, the conditions of his confinement in isolation were similar to Young's. Plaintiff spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. Although the Plaintiff in this case does not claim, as Young did, that he explicitly was denied access to alternate toilet facilities, he does contend that the guards generally were unavailable to respond to his request for alternate facilities. In support of his contention, Plaintiff points to his own deposition testimony in response to the question, "Did you ever ask the guard to go someplace to use the bathroom?" Plaintiff's answer was, "They wouldn't come back there. What they are saying is all a lie." (Pl.Opp.Ex. A.) Plaintiff further points to evidence that he contracted MRSA, specifically boils in his groin area, while in isolation to show that he lived and slept exposed

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

to feces in his cell.

> FN1. To be sure, Young made numerous other allegations regarding his treatment in isolation, although for the purposes of this Court's analysis, we will consider the parallels to Young's and Alvarez's claims regarding toilet facilities.

The County Defendants contest Plaintiff's version of events, alleging that Plaintiff never asked to use alternate toilet facilities and was allowed to shower at least twice (which Plaintiff admits, but the County Defendants contend provided Plaintiff an opportunity to ask for alternate toilet facilities). The Court finds the facts of this case sufficiently similar to those in *Young* to find that the objective prong of the Eighth Amendment analysis is satisfied. So too, are there genuine issues of material fact as to the knowledge and response of prison officials. Summary judgment would thus be inappropriate on the Eighth Amendment claims.

**3. Plaintiff's Fourteenth Amendment Claim**

*\*6* Plaintiff's Fourteenth Amendment claim, insofar as it supports Plaintiff's Eighth Amendment claim, will remain before the Court, although summary judgment is appropriate as to any other Fourteenth Amendment claim. The County Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim on two grounds: (1) that the County Defendants did not violate Plaintiff's due process rights and (2) that Plaintiff's Fourteenth Amendment claim cannot stand on its own without Plaintiff's Fifth and Eighth Amendment claims. In response, Plaintiff contends that because there are genuine issues of material fact regarding the alleged violation of his Eighth Amendment rights, his Fourteenth Amendment claim must remain.

The County Defendants motion must fail in part because Plaintiff has pointed out that there is a genuine issue as to whether or not his Fourteenth Amendment rights were violated so long as Plaintiff's claim rests on the Eighth Amendment's prohibition against cruel and unusual punishment. The Court will deny summary judgment as to Plaintiff's Eighth Amendment claim made pursuant to the

Fourteenth Amendment, because Plaintiff's Eighth Amendment claim remains, *see supra,* and the Eighth Amendment is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Plaintiff, having failed to provide any argument to refute the County Defendants' motion with respect to a Fourteenth Amendment due process claim in and of itself, does not meet his burden on that possible claim. *See* Fed.R.Civ.P. 56(e). Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's Fourteenth Amendment claim as it stands alone.

**4. Plaintiff's § 1983 Claim**

The County Defendants move for summary judgment on all of Plaintiff's claims made pursuant to 42 U.S.C. § 1983. They contend that Plaintiff's constitutional rights have not been violated, nor is there evidence of a policy or custom of such violation.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As discussed *supra,* there is a genuine issue of fact as to the possible Eighth Amendment rights violations which may form the basis of a § 1983 claim against the County Defendants. The Court finds that prison officials employed by Cumberland County qualify as state actors, so Plaintiff's § 1983 claims against the individual County Defendants remain.

To hold the entity County Defendants liable under § 1983, Plaintiff must first demonstrate the underlying constitutional violation, about which there is a genuine issue of material fact, as discussed. Under § 1983, however, a local government entity such as a county "cannot be held liable solely because it employs a tortfeasor." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. To the extent that Plaintiff also makes allegations against those of the County Defendants which are entities, the Court undertakes a *Monell* analysis.

**\*7** The County Defendants contend that Plaintiff has no evidence of a policy of refusing working clean toilets to inmates in Cumberland County. So too, they contend that Plaintif has presented no evidence of similar incidents involving other inmates. Further, the County Defendants point to the undisputed material fact that the two isolation units next to Plaintiff's had working toilets to support its contention that no policy exists to satisfy the *Monell* standard. Plaintiff's responsive submission to the Court points to the deposition testimony of Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken and inmates were nonetheless placed in a cell with a broken toilet, where those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief. Accordingly, the Court finds that there is a genuine issue of material fact with respect to whether there is a policy or custom in the Cumberland County Jail which deprives inmates' constitutional right to be free from cruel and unusual punishment. As Plaintiff's Eighth Amendment claims against the individual County Defendants remain, and there appears to be a genuine issue regarding a policy or custom of Eighth Amendment rights deprivations, the Court finds no reason to grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1983.

**5. Plaintiff's § 1985 Claim**

The County Defendants move for summary judgment on Plaintiff's claim made pursuant to 42 U.S.C. § 1985(3). They argue that Plaintiff has not shown evidence sufficient to make out such a claim, in particular providing no evidence of a conspiracy whatsoever, particularly not a conspiracy intended to inhibit Plaintiff's equal protection rights.[FN2] Plaintiff contends that there is a genuine issue as

to whether or not a conspiracy existed that prevented him from enjoying his civil rights, as evidenced by his placement in the isolation cell without a functioning toilet. Plaintiff avers that the conspiratorial aspect of his treatment arises out of a policy of placing other inmates in the same or similar conditions.

> FN2. Although the County Defendants also point out that there is no evidence of a conspiracy to deprive Plaintiff of his voting rights, Plaintiff makes clear in his opposition brief that his right to vote is not the basis of this claim.

To state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege, among other things, a conspiracy motivated by a racial or class based discriminatory animus designed to deprive him of equal protection of the laws. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (*citing Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Plaintiff has provided no specific allegations of such discrimination, nor any evidence to support such a claim. He has simply not alleged any class or race-based motive which would support a § 1985(3) claim. Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1985(3).

*B. Prison Health Services' Motion*[FN3]

> FN3. Plaintiff previously agreed to dismiss Defendant Betty Gambrell from this matter; Gambrell was a health services administrator at Cumberland County Jail.

**\*8** PHS was contracted to provide health care management and staffing for the Cumberland County Jail at the time of the events alleged in Plaintiff's Complaint. PHS contends that it did not employ nurses to provide direct care to inmates, but rather that any nurses who did so were employed by Cumberland County. (PHS Br. at 1.) The Agreement between Cumberland County and the regional office of PHS reflects that PHS provided "physician and administrative personnel" at the Cumberland County Jail; there is no mention of PHS providing nurses. (PHS Exs. B, C.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

**1. Plaintiff's § 1983 Claim**

PHS moves for summary judgment on Plaintiff's Eighth Amendment claims against it filed pursuant to 42 U.S.C. § 1983.[FN4] PHS grounds its motion on Plaintiff's lack of evidence that PHS violated his constitutional rights and upon the legal argument that 42 U.S.C. § 1983 does not permit a claim based solely upon vicarious liability. Plaintiff did not oppose the instant motion.

> FN4. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's Eighth Amendment claims. It appears to the Court, however, that PHS has not addressed Plaintiff's Fifth and Fourteenth Amendment claims, nor for that matter Plaintiff's § 1985 claims, in the instant motion. Accordingly, the Court only considers PHS's motion with respect to Plaintiff's Eighth Amendment claims made pursuant to § 1983.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West, 487 U.S. at 48. Because a physician under contract with a state prison acts under the color of state law when he treats an inmate, the Court finds that PHS was also acting under the color of state law when it provided medical personnel to treat inmates at the Cumberland County Jail Id. Plaintiff may establish liability by showing that PHS had a policy or custom that caused the civil rights he alleges. Monell, 436 U.S. at 694. Thus, there can be no entity liability unless there is an underlying constitutional violation.

Where § 1983 claims are grounded on claims that medical treatment fell below constitutional standards, an inmate must show that the defendant was deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; Rouse, 182 F.3d at 197. "Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Further, claims of negligence or malpractice are not sufficient to establish "deliberate indifference." Id.

PHS contends that Plaintiff's only evidence regarding its treatment of Plaintiff comes in the form of an expert report by Dr. John Kirby. PHS notes that Dr. Kirby, Plaintiff's own expert, mentions PHS employees when it says that, "Once detected, Mr. Alvarez's wounds were treated appropriately by his physicians," although "wound care was neglected by the prison nurses." (PHS Ex. E at 7.)[FN5] The report further states that when Plaintiff discovered the boils on his abdomen and upper legs, "the prison physician lanced [the] boils." (PHS Ex. E at 3; PHS Ex. F at 3.) PHS also argues that there is no evidence that PHS was responsible for the cleaning and sanitation of the inmates' housing, a focus of both of Dr. Kirby's reports.

> FN5. The Court has taken into consideration both versions of the Kirby report submitted by PHS in support of its motion.

*9 The Court finds that PHS has met its burden, that Plaintiff's own expert report shows that PHS' physicians did not act with deliberate indifference to Plaintiff's serious medical need and that there is no evidence that PHS is responsible for Cumberland County Jail's failure to adequately prevent infection. PHS' contract with Cumberland County reinforces the notion that cell cleaning and sanitation were not its responsibility. There is thus no evidence before the Court which shows a genuine issue of material fact as to PHS' alleged Eighth Amendment violations. Plaintiff, having not opposed the instant motion, has not met his burden to show that there is a genuine issue for trial. Accordingly, the Court will grant summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983.

**2. Plaintiff's Negligence Claim**

PHS also moves for summary judgment on Plaintiff's negligence claims [FN6], arguing that Dr. Kirby's report

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

concludes that the medical care provided to Plaintiff was appropriate. Plaintiff's medical malpractice claim fails and must be dismissed.

> FN6. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's medical malpractice claims of negligence. It appears to the Court, however, that PHS has not addressed in the instant motion Plaintiff's claims that PHS was negligent in other respects. Accordingly, the Court only considers PHS's motion as to Plaintiff's medical malpractice claims.

Plaintiff's negligence claim against PHS is, in part, a medical malpractice claim requiring expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation caused the injury. *See Teilhaber v. Greene,* 320 N.J.Super. 453, 727 A.2d 518 (N.J.Super.Ct.App.Div.1999). The facts of this case, as presented to the Court, do not show that there is a genuine issue as to Plaintiff's treatment by PHS. The physicians who treated him at the Cumberland County Jail provided medical care that, according to Plaintiff's own expert, was appropriate. Because Plaintiff has not responded, and there are no facts currently before the Court to support the bare allegations of medical malpractice in the Complaint, PHS is entitled to summary judgment Plaintiff's medical malpractice claims against it.

**IV. CONCLUSION**

Based upon the foregoing, the Court will GRANT summary judgment for the County Defendants on Plaintiff's Fifth Amendment claims, Plaintiff's claims made pursuant § 1985(3), and Plaintiff's Fourteenth Amendment claim to the extent that it alleges a violation of Plaintiff's Fourteenth Amendment right to due process. Further, the Court will DENY summary judgment for the County Defendants on Plaintiff's Eighth Amendment claims made pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The Court will GRANT summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983 and on Plaintiff's medical malpractice claims against PHS. The accompanying Order shall issue today.

D.N.J.,2009.
Alvarez v. County of Cumberland
Slip Copy, 2009 WL 750200 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

H Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.
**No. 9:08-CV-0009 (TJM/DRH).**

March 26, 2009.

West KeySummary
**Civil Rights 78** ☞ **1395(7)**

78 Civil Rights
   78III Federal Remedies in General
      78k1392 Pleading
         78k1395 Particular Causes of Action
            78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases
An inmate's § 1983 claims of deliberate indifference to his
serious medical needs were so fantastic or incredible that
they were dismissed as factually frivolous. The inmate
alleged that prison officials gave him a "medical resource
drink" that contained blood and feces, intentionally
infected him with Hepatitis A and H. Pylori and denied
testing and treatment. The inmate also alleged that the
prison officials were working with Spanish inmates to
contaminate his food tray with blood, urine, semen, and
chemicals. Further, the inmate failed to allege a tangible
connection between the acts of any of the prison officials
and any injuries he suffered. 42 U.S.C.A. § 1983.

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Richard Lombardo, Esq., Assistant Attorney
General, of Counsel, for Represented Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

**\*1** Plaintiff Frank Brown commenced this action *pro se*
pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging
that Defendants violated his rights under the United States
Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks
substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims
that Defendants conspired and retaliated against him for
filing grievances; denied him access to the courts by
interfering with his legal mail; were deliberately
indifferent to his serious medical needs; failed to protect
him from known harm; subjected him to excessive force;
conspired against Plaintiff; and denied him due process,
all in violation of his rights under the First, Fifth, Eighth,
and Fourteenth Amendments to the United States
Constitution.

Presently before the Court is Defendants' Motion to
Dismiss the Complaint pursuant to FED. R. CIV. P.
12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in
opposition to the Motion. Dkt. No. 65. For the following
reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its face."
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550 U.S.
544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); FN1
cf. *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007)
(recognizing that the Supreme Court "is not requiring a
universal standard of heightened fact pleading, but is
instead requiring a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

allegations in those contexts where such amplification is needed to render the claim *plausible.*" ). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). The court must accept the material facts alleged in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

> FN1. The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"-and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07-CV-687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

### III. Facts

*2 The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

### A. First Cause of Action

On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA-BINE-YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11-12. Plaintiff's mail was tampered with "to prevent [Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

### B. Second Cause of Action

On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33-34.

### C. Third Cause of Action

On January 1, 2005 Defendants Nurse Smith [FN2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13-14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

> FN2. Nurse Smith has not been served and has not appeared in this action.

**D. Fourth Cause of Action**

Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

**E. Fifth Cause of Action**

On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action, to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

**F. Sixth Cause of Action**

**\*3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections." [FN3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being

exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

> FN3. Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

**G. Seventh Cause of Action**

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

**H. Eighth Cause of Action**

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

**I. Ninth Cause of Action**

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of the Eighth Amendment. Comp. at 38.

**J. Tenth Cause of Action**

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18-19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

**K. Eleventh Cause of Action**

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19-20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

**L. Thirteenth Cause of Action**[FN4]

> **FN4.** Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39-40.

**\*4** On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called Hepatitis A" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

**M. Fourteenth Cause of Action**

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge,

"being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40-41.

**N. Fifteenth Cause of Action**

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of Hepatitis A, Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

**O. Sixteenth Cause of Action**

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

[t]his massive conspiracy is from prison to prison with massive criminal acts of food tampering, mail tampering, property destruction, assaults, conspiracy to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

**\*5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

**P. Seventeenth and Eighteenth Causes of Action**

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27-28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44-46.

**Q. Nineteenth Cause of Action**

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28-29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

**R. Twentieth Cause of Action**

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29-30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48-49.

**S. Twenty-first Cause of Action**

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

**T. Twenty-second Cause of Action**

Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." [FN5] Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

> **FN5.** Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

**IV. Defendants' motion to dismiss**

Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S .C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

**V. Discussion**

**A. Statute of limitations**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citing *Owens v. Okure,* 488 U.S. 235, 250-51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)).

*6 Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50-2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his pleading is deemed "filed" when it is delivered to prison officials. *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993); *Pritchard v. Kelly,* 9:98-CV-0349, 2000 WL 33743378, at *2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. *Mingues v. Nelson,* 96-CV-5397, 2004 WL 324898, at *3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 17, 2004 continuing **until March 8, 2005.** Comp. at 11-13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred.[FN6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

FN6. The sufficiency of Plaintiff's allegations will be discussed below.

**B. Personal Involvement**

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

*7 Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11-12); Burge, Goord, and LeClaire did nothing to stop "the spanish inmates" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of all infections and did nothing at all" (Comp. at 15-16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See* "they did nothing" *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants-Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy-were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice.**[FN7]

> [FN7.](#) As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

**C. Failure to State a Claim**

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d

434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

**\*8** A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32-33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325-28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

**1. Eighth Amendment**

The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

*9 Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

**a. Medical claims**

Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290-91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth

Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817-18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

*10 Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

**b. Food contamination**

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

**c. Excessive force**

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [FN8]

> FN8. To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27-28. Since Plaintiff has not named any of the officers

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

## 2. Retaliation

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco,* 854 F.2d at 590.

**\*12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged-which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family-are so outrageous and unbelievable as to be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

## 3. Denial of access to the courts

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 351). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis,* 518 U.S. at 353; *Reneligue v. Duncan,* 03-CV1256, 2007 WL 1110913, at \*9 (N.D.N.Y. Apr.12, 2007) (Strom, J.) (same) (citing *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19-20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

**4. Conspiracy claims under Sections 1983 and 1985**

To survive a motion to dismiss, a conspiracy claim under § 42 U.S .C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002); *see also Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss).[FN9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363-64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

FN9. The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

**\*13** Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

" '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087-88 [ ( 2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271-72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal

interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04-CV-9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01-CV-1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

*14 In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice.**

**5. Due process**

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22-23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g. Torres v. Mazzuca, 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)* (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does *not* give rise to a claim under Section 1983. *Cancel v. Goord, No. 00 Civ.2042, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001)*. Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

**6. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50-2, Memorandum of Law at 24-25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir.2003)* (quoting *McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir.1997)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)*).

**\*15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)*, modified by *Pearson v. Callahan, ---U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)* (holding that although "the sequence set forth [in *Saucier*] is often appropriate, it should no longer be

regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier, 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272*. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier, 533 U.S. at 201, 121 S.Ct. at 2156*. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

**VI. Conclusion**

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA-BINE-YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8-15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety.[FN10]

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

> FN10. Since the Complaint has been found to be
> factually frivolous, it "is exactly the sort of case
> that the PLRA now requires that a district court
> dismiss 'before docketing, if feasible' ... [since
> a]llowing these frivolous suits to proceed would
> subject the prospective defendants to the type of
> inconvenience and expense that concerned the
> Supreme Court in *Neitzke....*" *Jones v. City of
> New York,* Nos. Civ.A. 99-8281 and Civ.A.
> CV-00-370, 2000 WL 516889, at *3 (E.D.N.Y.
> Mar.15, 2000). Moreover, because the problem
> with Plaintiff's complaint is substantive, such that
> a better pleading will not cure it, leave to
> re-plead is denied as futile. *See Cuocco v.
> Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No.
50) is **GRANTED** and Plaintiff's claims and all
Defendants are **dismissed in their entirety without
prejudice;**[FN11] and it is further

> FN11. While Defendants Correctional Officer
> Smith, W. Robinson, and Nurse Smith have not
> been served or appeared, because all of Plaintiff's
> claims have been dismissed in their entirety, this
> action is dismissed as to the unserved Defendants
> as well.

**\*16** ORDERED that the Clerk shall serve a copy of this
Memorandum-Decision and Order upon the parties in
accordance with the Local Rules.

N.D.N.Y.,2009.
Brown v. Eagen
Slip Copy, 2009 WL 815724 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head
Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O. Bouyea,
Defendants.

FN1. Defendant John Doe has not been identified
and therefore has not been served with the
Amended Complaint or otherwise appeared in this
action. *See* Dkt No 12.

FN2. Plaintiff mistakenly spells Defendant
Bennett's name as "Bennet." *See* Dkt. No. 23,
Answer at n. 1. The Court will refer to this
Defendant by the proper spelling.

**No. 9:03-CV-1128 (NAM/RFT).**

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York,
Senta B. Siuda, Esq., Assistant Attorney General, Syracuse,
NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

**\*1** Presently before this Court is defendants' motion (Dkt.
No. 105) for summary judgment dismissing the complaint in

this civil rights action pursuant to 42 U.S.C. § 1983. In his
amended complaint (Dkt. No. 8), plaintiff, an inmate in the
custody of the New York State Department of Correctional
Services ("DOCS"), alleges deliberate indifference towards
his health and safety in violation of the Eighth Amendment,
interference with mail and access to the law library in
violation of the First Amendment, inadequate visitation, and
harassment.

Defendants' motion was referred to United States Magistrate
Judge Randolph F. Treece for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c). In a thorough Report and
Recommendation (Dkt. No. 110), Magistrate Judge Treece
recommends that the Court grant the motion for summary
judgment. Plaintiff objects (Dkt. No. 112). After the Court
extended time for plaintiff to file additional objections to the
Report-Recommendation (Dkt. No. 113), plaintiff filed a
second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a
*de novo* review of those parts of a magistrate judge's Report
and Recommendation to which a party specifically objects.
Where only general objections are filed, the Court reviews
for clear error. *See* Brown v. Peters, 1997 WL 599355,*2-*
3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d
Cir.1999). Failure to object to any portion of a Report and
Recommendation waives further judicial review of the
matters therein. *See* Roldan v. Racette, 984 F.2d 85, 89 (2d
Cir.1993).

Plaintiff's objections include a variety of allegations. A
number of them revisit issues which are the subject of the
Report and Recommendation. They do not, however,
demonstrate the existence of material questions of fact which
would warrant denial of summary judgment. Other
allegations concern events allegedly occurring subsequent to
the filing of the amended complaint herein; these are not
properly the subject of this action. Upon thorough *de novo*
review, the Court accepts and adopts the Report and
Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.
RANDOLPH F. TREECE, Magistrate Judge.

**REPORT-RECOMMENDATION and ORDER**

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

**I. FACTS**[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available

with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

**\*2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.*, Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.*, Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

*3 On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

> **FN8.** Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

**\*4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,*

Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

> **FN9.** Jean Botta is not named as Defendant in this action.

> **FN10.** "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

## B. Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993)

& quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)).

## C. Exhaustion of Remedies

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care; [FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

> FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at \*3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 FN12 & *Mendoza v. Goord,* 2002 WL 31654855, at \*2 (S.D.N.Y. Nov. 21, 2002)).

> FN12. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances" may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

*8 Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

### D. Eighth Amendment Claims

**\*9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also*

*Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at \*4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at \*3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However,

Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

*11 Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16, lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

*Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

*12 Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Casey, 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Cancel v. Goord, 2001 WL 303713, at *5 (citing Jermosen v. Coughlin, 877 F.Supp. 864, 871 (S.D.N.Y.1995) & Jones v. Smith, 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment in an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. Id.

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. Davis v. Goord, 320 F.3d at 351 (citing, inter alia, Heimerle v. Attorney General, 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " Id. (quoting Washington v. James, 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." Id. (citing, inter alia, Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " Id. (quoting Cancel v. Goord, 2001 WL 303713, at *6); see also Wolff v. McDonnell, 418 U.S. 539, 574-76 (1974); Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir.1975); Gill v. Riddick, 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

*13 With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " Cancel v. Goord, 2001 WL 303713, at *6 (quoting Thornburgh v. Abbott, 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." Id. (quoting Gaines v. Lane, 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of

interference without the legitimate penological interest. Id.

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. Id. at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things [he] was writing in [his] mail." Id. at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. Id. at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds*). However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

*16 Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v. Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

(S.D.N.Y.1996) (citing, *inter alia,* *Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See* *Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

**\*17** Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

      **FN15.** Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this

action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

H  Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
George LUNNEY, Plaintiff,
v.
Lieutenant BRURETON, Donald Selsky, and Brian
Fischer, Defendants.
**No. 04 Civ. 2438 LAK GWG.**

Jan. 21, 2005.

George Lunney, Collins Correctional Facility, Collins,
NY, pro se.

*REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.

*1 George Lunney, currently an inmate at the Collins
Correctional Facility, has brought this suit *pro se* under 42
U.S.C. § 1983 against three employees of the Sing Sing
Correctional Facility ("Sing Sing"), where Lunney was
previously housed. Lunney alleges that defendants
Lieutenant Brureton,[FN1] Donald Selsky, and Brian Fischer
violated his Due Process rights by improperly conducting
a disciplinary hearing which resulted in his confinement in
the Special Housing Unit ("SHU") of Sing Sing. He
further alleges that Brureton and Fischer were deliberately
indifferent to inhumane conditions of confinement in the
SHU in violation of his Eighth Amendment rights, that he
was the victim of an assault, and that he was retaliated
against for filing grievances with respect to conditions in
the SHU in violation of his rights under the First
Amendment. Defendants have moved to dismiss Lunney's
complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the
following reasons, the defendants' motion should be
granted in part and denied in part.

FN1. This name is spelled "Brereton" in the
defendants' submissions.

I. *BACKGROUND*

A. *Facts*

For the purposes of deciding this motion, the Court
assumes that the facts alleged in Lunney's complaint and
his memorandum of law are true. *See, e.g., Donahue v.
United States Dep't of Justice,* 751 F.Supp. 45, 49
(S.D.N.Y.1990) ("The policy reasons favoring liberal
construction of *pro se* pleadings warrant the Court's
consideration of the allegations contained in plaintiffs'
memorandum of law, at least where those allegations are
consistent with the allegations in the complaint."); *accord
Torrico v. IBM Corp.,* 213 F.Supp.2d 390, 400 n.4
(S.D.N.Y.2002). In addition, Lunney's complaint may be
deemed "to include any written instrument attached to it as
an exhibit or any statements or documents incorporated in
it by reference, as well as ... documents that [Lunney]
either possessed or knew about and upon which [he] relied
in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81,
88-89 (2d Cir.2000) (internal citations omitted).

On May 21, 2002, Lunney returned to his cell following a
"medical shower" to find Correction Officer Hadzovic
leaving the cell. Complaint, filed March 29, 2004 (Docket
# 2) ("Compl."), ¶ 1. Hadzovic informed Lunney that he
had just searched his cell. *Id* . After conducting a pat frisk
on Lunney, Hadzovic reentered the cell and came out with
a box of spaghetti. *Id*. Hadzovic announced that he would
confiscate the box, which appeared to be altered, and
locked Lunney in his cell. *Id*.

Approximately 45 minutes after Hadzovic left, Correction
Sergeant Guadagno came to Lunney's cell with two other
corrections officers. *Id*. ¶ 2. Guadagno informed Lunney
that a "shank type weapon" was discovered in the
confiscated spaghetti box. *Id*. Lunney asserted that the
weapon was not his and that he had merely purchased the
spaghetti from the commissary. *Id*. Nonetheless, he was
escorted to the SHU to await disciplinary action. *Id*.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

**\*2** Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* ¶ 3; Inmate Misbehavior Report (reproduced as Ex. A to Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Compl. ¶ 3. Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. *Id.*

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. *Id.* ¶ 4. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 5.

The rehearing commenced on October 15, 2002. *Id.* ¶ 6; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Correction Lieutenant Brureton, and Lunney. Compl. ¶ 6; Transcript at 29-37. Lunney requested permission to leave the hearing, Brureton granted him permission to do so, and Lunney was escorted out. Compl. ¶ 6, Transcript at 36-37. Lunney was again convicted for possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Compl. ¶ 6; Transcript at 59.

Lunney subsequently filed a request for review with Brian Fischer, the Superintendent of Sing Sing. Compl. ¶ 7. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. *Id.* An appeal to the Commissioner of the New York State Department of Correctional Services followed. *Id.* ¶ 8. In the appeal, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. *Id.* The Acting Director of Special

Housing denied the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing, (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002 with respect to the rehearing. Article 78 Petition, dated November 19, 2002 (reproduced as Ex. E to Motion to Dismiss). On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services to expunge all references to the incident from Lunney's institutional record. Decision, Order and Judgment, dated August 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl.Opp.")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of Due Process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.*

**\*3** Lunney was confined to the SHU for six months, from May 21, 2002 until November 21, 2002. Compl. ¶ 10. During this period, Lunney filed a number of grievances alleging, *inter alia,* cold, spoiled, or poorly prepared food, an inadequate law library, insufficient reading materials, inadequate laundry services, lack of medical attention, and harassment by SHU staff. *Id.* ¶ 16. In his grievances, Lunney also alleged that he was criticized and threatened for filing grievances related to prison conditions by SHU staff, particularly by Brian Fischer. *Id.* ¶¶ 17, 19. On one occasion, Lunney asserts that he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Memorandum of Law, dated June 28, 2004 (annexed to Pl. Opp.) ("Pl.Mem."), at 9-10.

B. *Procedural History*

The complaint in this action was filed March 29, 2004. *See* Compl. In his complaint, Lunney alleges that his Due Process rights were violated by two "faulty disciplinary hearings." *Id.* at 7 (¶ 1). The first violation occurred when Selsky convened a new disciplinary hearing while an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

Article 78 review of the first hearing was pending, and Lunney alleges that his Due Process rights were violated a second time when Brureton failed to provide a timely written disposition of the second hearing and neither Selsky nor Fischer corrected the error. *See* Pl. Mem. at 18. He also alleges that he was subject to "inhumane" conditions of confinement in the SHU of Sing Sing, *id.* at 17, including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material. Compl. ¶ 16, Pl. Mem. at 6-9. He also alleges that he was assaulted, Pl. Mem. at 9-10, and that he was retaliated against for filing grievances with respect to conditions in the SHU, Compl. ¶¶ 17, 19; *id.* at 7 (¶ 2); Pl. Mem. at 18, in violation of his rights under the First Amendment. Lunney seeks $10 million in punitive and compensatory damages. Compl. at 8.

Defendants filed a motion to dismiss on June 10, 2004 arguing that Lunney failed to state any constitutional claims. Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16) ("Def.Mem") at 2. Defendants also argue sovereign immunity under the Eleventh Amendment, qualified immunity, and the lack of personal involvement of the defendants. *Id.* Lunney filed opposition papers on July 6, 2004. *See* Pl. Mem. Defendants thereafter submitted a reply memorandum of law. *See* Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss, filed August 4, 2004 (Docket # 19) ("Def.Reply"). This Court also received a letter from Lunney dated December 18, 2004, which attached copies of several of Lunney's grievances and responses to the grievances. *See* Letter from George Lunney, dated December 18, 2004.

### C. *Law Governing a Motion to Dismiss*

**\*4** In resolving a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004); *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In making this determination, complaints drafted by *pro se* plaintiffs are held " 'to less stringent standards than formal pleadings drafted by lawyers," ' *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam)), and they "should be interpreted 'to raise the strongest arguments that they suggest," ' *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

### II. *DISCUSSION*

The defendants have moved to dismiss the complaint on the following grounds: (1) Lunney has failed to allege that defendants Fischer and Brureton subjected him to inhumane conditions of confinement, or knew of and disregarded an excessive risk to Lunney's health and safety in violation of his Eighth Amendment rights; (2) Lunney failed to state a claim under the First Amendment because he does not allege adverse action in retaliation for his grievances; (3) Lunney has failed to state a Due Process claim with respect to his second disciplinary hearing; (4) because Lunney cannot show personal involvement; all claims should be dismissed as to Selsky; the First and Eighth Amendment claims should be dismissed as to Brureton; and the Due Process claim should be dismissed as to Fischer; (5) all defendants are entitled to qualified immunity; and (6) the defendants have sovereign immunity in their official capacities under the Eleventh Amendment. Def. Mem. at 6-13.

In his responsive papers, Lunney clarified that he was raising a Due Process claim against Selsky, Due Process and Eighth Amendment claims against Brureton, and Due Process, First and Eighth Amendment claims against Fischer. Affirmation of George Lunney, dated June 28, 2004 (included as first pages to Pl. Opp.) ("Affirm."), ¶ 3(d); Pl. Mem. at 17. These grounds are discussed below to the extent necessary for disposition of the defendants' motion.

### A. *Sovereign Immunity*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U.S. 279, 280 (1973). Thus, "[i]t is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (citations omitted). The same rule applies to suits for money damages against individual employees of the State named in their official capacities. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 340-45 (1979). A finding of sovereign immunity under the Eleventh Amendment deprives a federal court of jurisdiction. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73 (2000) (citations omitted); *Atl. Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (citations omitted), *cert. denied,* 510 U.S. 1043 (1994).

**\*5** Lunney's complaint names the three defendants in both their individual and official capacities. Although the Eleventh Amendment does not bar suit against the defendants in their individual capacities, it does bar this suit insofar as it is brought against the defendants in their official capacities.

B. *Analysis of Lunney's Claims Under 42 U.S.C. § 1983*

Lunney has brought this action under 42 U.S.C. § 1983. *See* Compl. at 1. In order to assert a claim under section 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution

or federal statutes. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240 (1994).

Because the defendants do not dispute that their actions were under the color of state law, the only issue presented is whether Lunney has alleged any violations of a constitutional right. Lunney has presented three different claims in which he alleges: (1) violations of the Eighth Amendment with respect to the conditions of his confinement; (2) that he was the victim of retaliation in violation of the First Amendment; and (3) Due Process violations under the Fourteenth Amendment based on the conduct of his disciplinary hearing and his confinement in the SHU. Each claim is discussed separately.

1. *Eighth Amendment Claims*

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

Lunney's Eighth Amendment claims relate to five distinct areas: food, laundry services, physical assault, regular library services and law library services. Each is discussed below.

a. *Cold, spoiled and improperly prepared food*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

**\*6** i. *Merits of the Claim.* Lunney maintains that he was served food that was "cold, spoiled and poorly prepared" "on a near daily basis" during his detention in the SHU. Pl. Mem. at 6. Lunney asserts that he and other inmates regularly refused the meals-or portions of meals-that "were clearly spoiled and or poorly prepared." *Id.* at 7. On one occasion, Lunney describes how he and other SHU inmates became ill after a meal of chili and rice, began vomiting violently, and required treatment by medical staff. *Id.* Lunney and other inmates filed formal grievances with the Inmate Grievance Committee and sent informal letters to the Director of Inmate Nutritional Services and the State Commission of Correction, but the authorities found no problems with the food service. *Id.* at 6. As a result of regularly having to refuse meals, Lunney states that he suffered "weight loss, muscle atrophy, lethargy and the inability to maintain mental focus." *Id.* at 7.

Under Eighth Amendment case law, prisoners are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 14 (2d Cir.1983) (per curiam) (citation omitted) (claim that food was purposely contaminated with dust, rocks, glass, and human waste sufficient to withstand dismissal of § 1983 complaint); *see also Griffin v. Smith,* 493 F.Supp. 129, 131 (W.D.N.Y.1980) (allegation of "[u]nsanitary food utensils, including cigarette burns and hair on food trays" sufficient to sustain an Eighth Amendment claim); *Murphy v. Wheaton,* 381 F.Supp. 1252, 1261 (N.D.Ill.1974) ("spoiled, rotted and foul" food served in a wagon used to dispose garbage indicates "existence of unsanitary conditions which transcend mere unpleasantness").

Insofar as Lunney alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action. *See Waring v. Meachum,* 175 F.Supp.2d 230, 238 (D.Conn.2001) (Report and Recommendation) ("The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (citation and quotation omitted); *see also Hutto v. Finney,* 437 U.S. 678, 683, 686 (1978) (1000 calorie per day diet of "grue," a substance "created by mashing meat, potatoes, oleo, syrup,

vegetables, eggs, and seasoning into a paste" and baking it, "might be tolerable for a few days and intolerably cruel for weeks or months").

Here, however, Lunney alleges that his meals were regularly spoiled and/or improperly prepared on "numerous occasions." Pl. Mem. at 7. Thus, eating the meals caused him to get sick and not eating them caused him to suffer the effects of malnutrition. *See id.* Because Lunney's allegations are sufficient to support the inference that prison officials were aware of the risk to his health and safety created by the condition of the food served but disregarded the excessive risk of harm, his allegations are sufficient to state an Eighth Amendment claim.

**\*7** ii. *Qualified Immunity.* To hold an individual defendant liable, however, it is not sufficient merely to state a constitutional claim. Prison officials are entitled to qualified immunity if their actions either "did not violate clearly established law," or "it was objectively reasonable for the defendant [s] to believe that [their] action[s] did not violate such law." *Anderson,* 317 F.3d at 197 (citations and internal quotations omitted). Prison officials performing discretionary functions thus "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine whether defendants are entitled to qualified immunity, the court must decide whether a constitutional right was violated, whether the law clearly established the right alleged to have been violated, and whether a reasonable person under the same circumstances would have understood that his conduct was unlawful. *See Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam) (citing *Vega v. Miller,* 273 F.3d 460, 466 (2d Cir.2001)).

A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle" given that all inferences must be drawn in plaintiff's favor. *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). Here, defendants have argued the applicability of the qualified immunity defense only in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

most general terms. *See* Def. Mem. at 13-15; Def. Reply at 9-10. Significantly, they make no specific argument with respect to whether the case law regarding serving spoiled food was "clearly established," stating only that "[t]here is no clearly established constitutional right to perfectly prepared meals." Def. Reply at 10. Lunney, of course, is not asserting a right to "perfectly prepared meals" and thus defendants have not asserted a qualified immunity defense with respect to these allegations.

iii. *Personal Involvement.* Lunney seeks to sue only Brian Fischer and Lieutenant Brureton for Eighth Amendment violations. *See* Affirm. ¶ 3(d); Pl. Mem. at 17. An individual defendant's liability under 42 U.S.C. § 1983 is predicated on his or her personal involvement in the constitutional deprivation. *See, e .g., Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996).* A plaintiff may prove personal involvement by supervisory defendants by showing one of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*8** *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)* (citing *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)).* Fischer does not contest that he meets the *Colon* test with respect to the conditions in the SHU and thus he remains a proper defendant on this claim. With respect to Lieutenant Brureton, however, Lunney makes no allegation that Brureton had any role in creating the conditions of confinement in the SHU or that his involvement satisfied any of the other *Colon* factors. Accordingly, Brureton cannot remain as a defendant as to this or any other claim relating to conditions at the SHU.

b. *Laundry services*

Lunney alleges that the laundry services in the SHU were inadequate. In his memorandum of law, Lunney describes how the staff would collect inmates' soiled laundry and place it under the "Officer's In Charge station" but never send it to the laundry. Pl. Mem. at 9. The day staff would not advise later shifts that the clothing had not been sent to be cleaned and the laundry would be returned to the inmates unwashed. *Id.* Furthermore, the soiled laundry of all the inmates would be mixed together and the inmates would have to sort through the piles of clothing to look for their own clothes. *Id.*

Prisoners are entitled to "reasonably adequate sanitation" and "personal hygiene" under the Eighth Amendment, particularly over long periods of time. *Howard v. Adkison, 887 F.2d 134, 137 (8th Cir.1989).* Courts have held that these rights encompass the right to adequate laundry services. *Id.* (denial of laundry service for five months, followed by service in which laundry was returned wet and dirty sufficiently serious under the circumstances to state a claim); *Divers v. Dep't of Corr., 921 F.2d 191, 194 (8th Cir.1990)* ("inmates are ... entitled to adequate laundry facilities") (citation omitted).

There is no Eighth Amendment violation, however, in instances where inmates are provided the opportunity and the supplies to wash their own clothes. *Green v. Ferrell, 801 F.2d 765, 771 (5th Cir.1986)* (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent); *Benjamin v. Fraser, 161 F.Supp.2d 151, 178-79 (S.D .N.Y.2001)* (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in part and vacated in part, 343 F.3d 35 (2d Cir.2003).* Thus Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services.

c. *Assault*

Lunney asserts that he was routinely subject to threats and harassment by the SHU staff-an allegation discussed below as a First Amendment retaliation claim-but he also

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

describes a specific incident of assault which is more properly addressed here. Lunney alleges that, three days after entering the SHU on May 21, 2002, he complained that his cell lacked, *inter alia,* a toothbrush, toothpaste, and a working sink. Pl. Mem. at 9. He says that after "shouting to" an officer regarding the missing items, two unnamed officers came to the cell and told him to "shut the fuck up or we [are] coming in there and you will not like the results." *Id.* at 10. Lunney claims that one officer became increasingly hostile, and eventually the officers ordered the cell open, "began punching [him] in the head and body," and put him in a choke hold. *Id.*

**\*9** Defendants argue that Lunney's claim for assault should be dismissed for failure to exhaust administrative remedies. Def. Reply at 4. It is not necessary to reach this argument, however, as Lunney's claim cannot proceed in its current form because he has not alleged that any of the three named defendants were personally involved in the assault under any of the prongs of the *Colon* test. Accordingly, the assault claim must be dismissed against the existing defendants. Obviously, Lunney would be free to file an amended complaint that names the officers involved, though he is cautioned that he should do so only if he meets the exhaustion requirements of 42 U.S.C. § 1997e(a) or has a basis for being relieved of the obligation to meet those requirements.

d. *Inadequate library services*

Lunney alleges that library services in the SHU were inadequate. He asserts that in spite of inmate grievance complaints, the general library cart was not "properly stocked" as it was "void of magazines, newspapers and periodicals." Pl. Mem. at 7. These allegations, however, fail to state a claim under the Eighth Amendment because magazines, newspapers and periodicals are not considered one of life's "basic necessities" within the meaning of the Eighth Amendment. *See, e.g., Loe v. Wilkinson,* 604 F.Supp. 130, 136 (M.D.Pa.1984) (diminished access to the general library while prisoner was in administrative detention not an Eighth Amendment violation); *see also May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (prisoner's First Amendment rights were not violated when his confinement to the special housing unit prevented him from using the general prison library); *cf. Boyd v. Anderson,* 265 F.Supp.2d 952, 966 (N.D.Ind.2003) (no

equal protection violation where prisoners confined to detention unit could not use general prison library).

e. *Inadequate law library services*

Lunney's final claim under the Eighth Amendment relates to the inadequacy of the "mini law library" in Sing Sing's SHU. Pl. Mem. at 8. Lunney alleges that Sing Sing is under a consent degree issued by a court in the Southern District of New York and is obligated to stock the mini law library within SHU with legal books and materials. *Id.* He contends that these materials were often missing and had to be ordered from the prison's main law library. *Id.* He alleges that there were "extensive delays" in getting books from the main law library and, as a result, he was unable to do legal research with respect to the Article 78 petition he filed in the New York State Supreme Court in a timely fashion and was forced to seek extensions from the court. *Id.*

The adequacy of law library services does not implicate the Eighth Amendment, however, but rather the right of access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 828 (1977) (establishing that "the fundamental constitutional right of access to the courts requires prison authorities" to provide adequate law libraries or adequate assistance with filing legal papers from a person trained in the law); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right is grounded "in the constitutional guarantees of equal protection and due process." *Bourdon,* 386 F .3d at 92 (citations omitted). A prisoner, however, must allege more than inadequate facilities to state a constitutional claim. Rather, the prisoner "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). The examples in *Lewis* used to demonstrate a cognizable injury-for example, that a complaint was dismissed because the plaintiff failed "to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known" or was unable to file a complaint at all because he was "so stymied by inadequacies of the law library"-all show a real and prejudicial effect arising from the denial of legal material. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

**\*10** Here, by contrast, Lunney alleges no such denial. Although he alleges delays in conducting research for his lawsuits in the State Supreme Court and the need to request extensions on deadlines, Pl. Mem. at 8, he does not allege that he was not granted the extensions or suffered any harm from having to request extensions. We note that "if an inmate experienced delays in pursuing a civil claim, but files acceptable legal pleadings within court deadlines, he cannot claim that he was prejudiced by shortcomings in a prison facility's law library, because he has sustained no relevant actual injury." *Benjamin v. Kerik,* 102 F.Supp.2d 157, 164 (S.D.N.Y.2000) (citing *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996)), *aff'd Benjamin v. Fraser,* 264 F.3d 175 (2d Cir.2001). The fact that Lunney not only successfully filed his claims in the State Supreme Court but even won a favorable judgment obviously cannot support any inference of injury resulting from inadequate access to the law library. *See id.* at 166-67 (dismissing claims of four inmates complaining of an inadequate law library because each inmate was able to properly file a claim in court); *Amaker v. Coombe,* 1998 WL 637178, at \*1 (S.D.N.Y. Sept. 16, 1998) ("[T]he very fact that the plaintiff has been able to proceed on this motion (as well as the numerous other motions filed in this case) tends to indicate that he has not been prejudiced by any lack of access to the law library."). Accordingly, Lunney has not stated a constitutional violation of his right of access to the courts under the Fifth and Fourteenth Amendments.

### 2. First Amendment Claim of Retaliation

Lunney states that he filed "numerous grievance complaints" regarding the conditions of his confinement in the SHU as well as the Inmate Grievance Committee's perceived lack of proper attention to inmate complaints. Compl. ¶ 16. Lunney claims that he "was often criticized and threatened by S.H.U. staff and defendant Fischer" in retaliation for filing these grievances. *Id.* ¶ 17. Specifically, Lunney asserts that he was "threatened with physical violence on several occasions by S.H.U. staff for his writing of grievances," *id.* ¶ 19, that he was denied recreation and showers by staff who knew of his complaints, Pl. Mem. at 11, and that Fischer threatened to transfer him to Attica for writing grievances, Compl. ¶ 19. As mentioned above, Lunney also describes being assaulted by two corrections officers after complaining about the conditions in his cell, an assault he did not report

"fearing for his life and not wanting to receive another ticket." Pl. Mem. at 10.

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). To establish a prima facie case of retaliation, an inmate must show: 1) that his speech or conduct was constitutionally protected; 2) that the defendant took adverse action against the plaintiff; and 3) a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, only those acts that are likely to " 'chill a person of ordinary firmness from continuing to engage' in activity protected by the First Amendment" will support a claim of retaliation. *Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003) (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999)); *accord Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (per curiam); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *vacated on other grounds,* 523 U.S. 574 (1998).

**\*11** Lunney's general allegations of threats and harassment are insufficient to state a claim because comments that are merely "insulting" or "disrespectful" do not give rise to a constitutional violation. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)) (sarcastic comments do not rise to the level of retaliatory action); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) ("name calling" insufficient to state a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 376 (S.D.N.Y.2001) ("Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983.") (citations omitted). In addition, "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal citations and quotations omitted) (alterations in original). Thus, Lunney's general allegations regarding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

improper behavior by staff against other inmates that he is alleged to have witnessed while confined in the SHU, Pl. Mem. at 11, do not state a claim.

Lunney makes an additional claim that defendant Fischer threatened to transfer Lunney to another facility for writing grievances. Compl. ¶ 19. Although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (internal citation omitted). At least one circuit has held that threats to transfer an inmate who complained about the administration of the law library can constitute the basis of a retaliation claim, even if the inmate is never transferred. *Gomez v. Vernon,* 255 F.3d 1118, 1127 (9th Cir.2001). In *Gomez,* the Ninth Circuit held that because threats to transfer a prisoner had a "chilling effect" on the prisoner's exercise of his First Amendment rights, the threats were sufficient to sustain a retaliation claim. *Id.* at 1127-28

Even under the standard of *Gomez,* however, Fischer's threats cannot be said to constitute retaliation. Although Lunney is no longer at Sing Sing, he does not allege that he was transferred because he filed grievances against prison officials. In addition, Lunney does not allege that he was actually deterred from filing grievances because of Fischer's threats. Consequently, Lunney's retaliation claim against Fischer must fail with respect to the threatened transfer.

Nonetheless, Lunney does assert that he was threatened with physical violence for filing grievances, Compl. ¶ 19; Pl. Mem. at 11, and thus he has stated a claim under the First Amendment. *See, e.g., Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim); *but see Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (threats of "disciplinary action, physical violence, an extension of his time in keeplock, and possible segregation" in retaliation for seeking medical care do not state a claim where plaintiff does not suffer an injury). No "greater level of detail," Def. Reply at 5, is required for Lunney's pleading. *See Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002). While Lunney does not allege that Selsky and Brureton had any responsibility for these retaliatory practices, he does allege that Fischer

was responsible, Affirm. ¶ 3(b), and thus he has stated a claim against Fischer. Fischer does not appear to attempt to raise a qualified immunity defense at this time with respect to the First Amendment claim. *See* Def. Reply at 9-10. Nor does he allege a lack of personal involvement to the extent a claim is stated. *See id.* at 8-9. Consequently, the First Amendment claim remains against Fischer with respect to Lunney's claims of threats of physical violence.

### 3. *Fourteenth Amendment Due Process Claim*

**\*12** Lunney argues that his right to Due Process was violated by two separate actions. First, he argues that the defendants' failure to provide him with a timely written disposition of his second disciplinary hearing was a violation of his Due Process rights. Compl. at 7 (¶ 1); Pl. Mem. ¶¶ 18, 26, 27, 28. Second, Lunney claims that Selsky improperly ordered a second disciplinary hearing after an Article 78 proceeding had been filed with respect to the first hearing. Compl. ¶ 8; Pl. Mem. at 6. Each claim will be analyzed separately. Although Lunney mentions a dispute with the hearing officer over the hearing officer's alleged bias in the second hearing, Compl. ¶ 6, he does not appear to raise it as an additional basis for his Due Process claim.

#### a. *Law governing disciplinary proceedings*

A party asserting a Due Process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giant v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). "Factors relevant to determining whether the plaintiff endured an atypical and significant hardship include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

F.3d 60, 66 (2d Cir.2004) (quoting *Wright v. Coughlin,*
*132 F.3d 133, 136 (2d Cir.1998)*).

There is no bright line rule in determining whether a
particular period of confinement in a SHU meets the
*Sandin* standard of an "atypical and significant" hardship
thereby implicating Due Process protection. *Palmer,* 364
F.3d at 64 (citations omitted). Defendants do not argue
that Lunney's liberty interests were not implicated by his
nine-month sentence of confinement to the SHU-which
was later reduced to six months-under the standard
established in *Sandin.* It is assumed, therefore, that
Lunney's sentence of confinement did implicate a liberty
interest for purposes of this motion. Consequently, the
issue is whether Lunney was denied Due Process when he
was not provided with a written disposition of his
disciplinary hearing and when the second hearing was
scheduled.

b. *Written disposition of disciplinary hearing*

Under the Fourteenth Amendment, the following
procedural protections are required in disciplinary
hearings when the length or conditions of confinement
trigger due process protections: "advance written notice of
the charges; a fair and impartial hearing officer; a
reasonable opportunity to call witnesses and present
documentary evidence; and a written statement of the
disposition, including supporting facts and reasons for the
action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d
Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108
(2d Cir.1999)); *accord McCann v. Coughlin,* 698 F.2d
112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL
362776, at *2 (S.D.N.Y. Mar. 6, 2002); *Silva v. Sanford,*
1998 WL 205326, at *6 (S.D.N.Y. Apr. 24, 1998). The
importance of providing inmates with a detailed written
disposition is well established. "Without a detailed
statement of the [decisionmaker's] findings and
conclusions, a reviewing court or agency cannot determine
whether the finding of guilt was based on substantial
evidence or whether it was sufficiently arbitrary so as to
be a denial of the inmate's due process rights." *Chavis v.
Rowe,* 643 F.2d 1281, 1287 (7th Cir.1981) (citation
omitted). Without a written disposition of a charge, an
"inmate will be at a severe disadvantage in propounding
his own cause to or defending himself from others." *Wolff,*
418 U.S. at 565.

**\*13** Defendants contend that there is no Due Process
violation, in part, because Lunney admits that he
requested, and was granted, permission to leave the
hearing. *See* Def. Mem. at 10. It is unclear why this
circumstance should have any bearing on the right to
receive a "written statement of the disposition," *Luna,* 356
F.3d at 487, a requirement that has been in place since the
Supreme Court's decision in *Wolff v. McDonnell. See* 418
U.S. at 563.

Defendants assert that Lunney eventually received a
transcript of the disposition on or about April 16, 2003,
prior to the conclusion of his Article 78 proceeding. Def.
Mem. at 10. The transcript does contain the required
elements of the written disposition, *see* Transcript, at
59-60, but it hardly satisfies Due Process to receive such
a transcript five months following the prisoner's release
from the SHU. *See generally Walker v. Bates,* 23 F.3d
652, 658-59 (2d Cir.1994) ("[O]nce prison officials
deprive an inmate of his constitutional procedural rights at
a disciplinary hearing and the prisoner commences to
serve a punitive sentence imposed at the conclusion of the
hearing, the prison official responsible for the due process
deprivation must respond in damages...."). The defendants
may have a stronger argument that any Due Process
violation was mitigated, or perhaps obviated, based on the
allegation that Lunney was informed of the results of the
disposition, or was otherwise given the opportunity to
obtain the written disposition, but no such facts are
available to the Court on this motion to dismiss. *See
McKenna,* 386 F.3d at 436 ("[T]he plaintiff is entitled to
all reasonable inferences from the facts alleged, not only
those that support his claim, but also those that defeat the
immunity defense.").

Finally, defendants argue that New York law provides that
the remedy for failure to provide a written disposition is an
order that the disposition be served, not that the penalty be
expunged. Def. Mem. at 10-11 (citing *Vargas v. Coughlin,*
168 A.D.2d 917 (4th Dep't 1990) and *Matter of Ramos v.
Herbert,* 256 A.D.2d 1191 (4th Dep't 1998)). The
defendants' argument is irrelevant, however, as Lunney is
seeking damages for a violation of the federal constitution,
not for a violation of state law.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

The defendants' argument on qualified immunity for this claim is confusing. They assert that the "plaintiff has failed to identify any Supreme Court or Second Circuit case law that clearly establishes a right to receive a written copy of a disciplinary hearing decision." Def. Reply at 9. This may be literally true inasmuch as Lunney notes that "the State of New York and the [Department of Correctional Services] have promulgated regulations and procedures governing disciplinary hearings in prison so as to comply with those minimal due process requirements established by the Supreme Court in *Wolff v. McDonnell*," but only claims that "these regulations and procedures were not followed." Pl. Mem. at 16. The issue, however, is not what legal argument Lunney has been able to muster but whether or not there is clearly established law requiring a written disposition of disciplinary charges. Tellingly, defendants make no reasoned argument that this right is not clearly established. While they assert that *Ramos* and *Vargas* have cast doubt on whether an inmate is entitled to a written disposition of the charges, both cases in fact explicitly affirm the existence of such a right and *Ramos* actually identifies the entitlement as a requirement of "due process." 256 A.D.2d at 192.

**\*14** As already noted, *Wolff* unambiguously established the right to receive a written notice of the disposition. *Wolff*, 418 U.S. at 563-65. Second Circuit case law has reaffirmed this requirement. *See Luna*, 356 F.3d at 487; *Kalwasinski*, 201 F.3d at 108; *McCann*, 698 F.2d at 121-22. Further, courts have rejected other claims that procedural rights set forth under *Wolff* are not clearly established. *See, e.g., Pino v. Dalsheim*, 605 F.Supp. 1305, 1314 n.9 (S.D.N.Y.1985) (decisions in *Wolff* and in subsequent litigation put Department of Corrections staff on notice with respect to constitutional principles at stake in disciplinary proceedings). While additional specifics regarding the circumstances under which defendants did not supply Lunney with this written disposition might show that "a reasonable person, acting under the circumstances then confronting [the] defendant, would [not] have understood that his actions were unlawful," *Hanrahan*, 331 F.3d at 98 (internal citation and quotation omitted), that determination cannot be made in the context of this motion to dismiss. Accordingly, Lunney's claim must stand.

c. *Validity of the second disciplinary hearing*

Lunney claims that his Due Process rights were violated when Selsky ordered a rehearing after Lunney exhausted his administrative appeals and had commenced an Article 78 proceeding. *See* Compl. ¶ 8, *id.* at 7 (¶ 1). Lunney argues that because Justice Sheridan of the New York Supreme Court found that the rehearing was invalid under New York law, he should be entitled to collateral estoppel. Pl. Mem. at 14.

The collateral estoppel doctrine "prevents a party from relitigating an issue decided against that party in a prior adjudication." *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir.2003) (citation and quotation omitted). Lunney's argument is rejected because no determination was made by the State Supreme Court of any issue of federal law, let alone the issue of "qualified immunity." *See id.* (collateral estoppel "may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate") (citation and quotation omitted). Indeed, as a general matter, the Second Circuit has held that Article 78 judgments may not be used to estop defendants from litigating the same claims in § 1983 lawsuits because the incentive to litigate is not the same and the defenses available in § 1983 suits are not available in Article 78 proceedings. *See Gutierrez v. Coughlin*, 841 F.2d 484, 486 (2d Cir.1988) (per curiam).

Lunney's argument on the merits is also unavailing. Whatever violation Lunney claims of New York law is not relevant because violations of state procedural rules are not necessarily violations of the federal constitution. *See, e.g., Shakur v. Selsky*, 391 F.3d 106, 118-19 (2d Cir.2004); *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir.1990). The Court is not aware of any cases suggesting that the federal Due Process clause bars the ordering of a second hearing and it is not clear why this should even be the case. As long as the essential requirements of Due Process were met-such as notice of the charges and a hearing conducted in accordance with Due Process, *see, e.g., Luna*, 356 F.3d at 487-there is no basis on which to conclude that Lunney's constitutional rights were violated.

d. *Personal involvement*

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

**\*15** Lunney charges Brureton, Fischer, and Selsky with violations of his Due Process rights at the prison disciplinary hearing. *See* Pl. Mem. ¶ 3(d). Each defendant's personal involvement is examined in turn.

The basis for Lunney's Due Process claim against Lieutenant Brureton is Brureton's role as a hearing officer in the rehearing that began October 15, 2002 at which Lunney was eventually sentenced to SHU confinement. Compl. ¶¶ 6, 21; Pl. Mem. at 18. Defendants do not contest that Brureton's involvement in the disciplinary hearing is sufficient to allege personal involvement and thus he remains as a defendant on this claim.

Lunney's Due Process claim against Fischer stems from Fischer's failure to correct Brureton's procedural error when the plaintiff applied for a Superintendent's Review immediately after the disciplinary hearing. Compl. ¶ 7; Pl. Mem. at 18. With respect to his Due Process claims, Lunney has not adequately alleged Brian Fischer's personal involvement. Although Lunney filed a Request for Superintendent's Review with Brian Fischer, the review of the second hearing was conducted by the First Deputy Superintendent of Sing Sing, Paul Kikendall. Compl. ¶ 7. Lunney does not allege that Fischer himself had any involvement with deciding the appeal or reviewing Kikendall's disposition of the appeal. Mere "linkage in the prison chain of command" is insufficient to ground a claim of personal involvement, *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (citations omitted), and submitting an appeal or complaint to a subordinate for disposition is not sufficient to find personal involvement, *see Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (referring an appeal from an administrative segregation hearing to another official for determination and responding to an inquiry regarding the status of the appeal insufficient to create personal involvement); *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (no personal involvement where a prisoner's petition was received by defendant but "sent ... down the chain of command for investigation"). Therefore, the Due Process claims against Fischer must be dismissed.

With respect to Selsky, he is sued only because he ordered the second hearing-a claim that we have determined is subject to a qualified immunity defense-and for "failing to provide plaintiff with a written copy of the hearing disposition." Pl. Mem. at 18. But no facts are alleged showing his involvement in this latter failure. Lunney asserts that he appealed to the Commissioner of the Department of Correctional Services and that, while the appeal was "turned over" to Selsky for review and consideration, Compl. ¶ 8, it was ultimately decided by Robert J. Murphy, *id.* ¶ 9; Hearing Review, who has not been named as a defendant. Accordingly, the claim against Selsky cannot proceed. *Cf. Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (personal involvement stated where defendant superintendent of prison either affirmed improper disciplinary conviction, was directly responsible for the conduct of prison disciplinary hearings, or permitted the challenged unconstitutional practice to occur as a matter of custom or policy).

III. *CONCLUSION*

**\*16** For the foregoing reasons, the defendants' motion should be granted in part and denied in part. Specifically, the following claims should remain in the case: (1) the Eighth Amendment claim against Fischer with respect to improperly prepared food; (2) the First Amendment claim against Fischer alleging that Lunney was threatened with physical retaliation for filing grievance complaints; and (3) the Due Process claim against Brureton regarding the failure to receive a written disposition of his disciplinary hearing. The remaining claims should be dismissed. Lunney should be given the opportunity to file an amended complaint in the event that he can cure any of the defects in his original complaint. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead") (citing cases), *cert. denied,* 503 U.S. 960 (1992).

*PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)
(Cite as: 2005 WL 121720 (S.D.N.Y.))

to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York,
New York 10007, and to the undersigned at 40 Centre
Street, New York, New York 10007. Any request for an
extension of time to file objections must be directed to
Judge Kaplan. If a party fails to file timely objections, that
party will not be permitted to raise any objections to this
Report and Recommendation on appeal. *See Thomas v.
Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2005.
Lunney v. Brureton
Not Reported in F.Supp.2d, 2005 WL 121720 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

**H** Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
E.D. New York.
Simon NEWMAN, Plaintiff,
v.
Michael A. ZENK, et al., Defendants.
**No. 05-CV-759 (ARR).**

March 29, 2007.

Simon Newman, FCI Cumberland, Cumberland, MD, Plaintiff, pro se.

Steven Michael Warshawsky, U.S. Attorney's Office, Brooklyn, NY, for Defendants.

*OPINION AND ORDER*

ROSS, United States District Judge.

**\*1** Simon Newman ("plaintiff") brought this action *pro se* against defendants Michael A. Zenk, former warden of the Metropolitan Detention Center in Brooklyn, New York ("MDC"), and Harley G. Lappin, Director of the Federal Bureau of Prisons (collectively "defendants"), on January 30, 2005 pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and the Federal Tort Claims Act. Plaintiff alleged violations of his First and Eighth Amendment rights and brought a common law tort claim for food poisoning. On July 8, 2005, defendants moved to dismiss plaintiff's complaint under Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6). By order dated September 27, 2005, the court dismissed all of plaintiff's claims except his *Bivens* claim that the inadequate quantity and quality of the food served to him while he was incarcerated at MDC violated his Eighth Amendment right to be free of cruel and unusual punishment. By motion filed September 30, 2006, defendants move for summary judgment on plaintiff's remaining claim. For the reasons stated below, the court grants defendants' motion for summary judgment.

BACKGROUND

The following facts are undisputed unless otherwise noted.[FN1] This action arises out of incidents that occurred while plaintiff was an inmate at MDC. MDC Brooklyn is a federal detention facility operated by the Bureau of Prisons ("BOP"). (Defs.' Statement of Undisputed Material Facts Pursuant to L. Civ. R. 56.1 [hereinafter Defs.' Fact Stmt.] ¶ 3.) Plaintiff claims he was "half-starved ... constantly being served cold and often uncooked food," such as "uncooked potato, bloody roast beef, hard-cold rice, cold oatmeal and grits, cold meatloaf and raw powder potato among other foods." (Compl. at 5-6.) During his deposition, plaintiff testified that food served at the MDC made him ill on five occasions between February 2002 and February 2005.

FN1. Plaintiff has not submitted a statement of material facts in opposition to defendants' Rule 56.1 Statement, as required by Local Rule 56.1. Defendants ask the court to deem admitted all statements of facts in their Rule 56.1 Statement. Given plaintiff's *pro se* status, the court will deem admitted only those facts in defendants' Rule 56.1 Statement that are supported and verified by admissible evidence in the record and not controverted by other admissible evidence in the record. *See Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003).

First, plaintiff experienced symptoms of stomach pain and diarrhea lasting overnight in October 2003 while plaintiff was placed in the Special Housing Unit ("SHU"). (Newman Dep. at 49-51.) Plaintiff believes that this episode resulted from eating spaghetti with "bits of seafood in it" that was "not fresh" and "tasted funny." (*Id.* at 52; Pl.'s Resp. to Defs.' Interrogs. ¶ 2.) He did not seek medical attention. (Newman Dep. at 51.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

In January 2004, plaintiff experienced symptoms of "severe stomach pain, diarrhea, vomiting, weakness and loss of appetite" that lasted "through the next day towards the next night." (Pl.'s Resp. to Def.'s Interrogs. ¶ 2; Newman Dep. at 53-54.) Plaintiff attributed these symptoms to eating "cold meatloaf" in SHU that did not look or taste "like it was properly cooked." On this occasion, the medical staff prescribed medication for him. (Newman Dep. at 53.) Plaintiff thereafter filed an administrative tort claim detailing the episode. (*Id.* at 54.)

The third episode occurred in March 2004 when plaintiff was located in the area of the prison known as "general population." (Newman Dep. at 56-58.) Plaintiff experienced "extreme stomach pain and a bit of nausea." (Pl.'s Resp. to Defs.' Interrogs. ¶ 2). Plaintiff believes these symptoms resulted from consuming "raw," "uncooked" sliced beef. (Newman Dep. at 57.) At his deposition, plaintiff testified that he told the officer on duty about the problems he was experiencing but did not seek further medical attention because his symptoms had abated by the next morning. (Pl.'s Resp. to Def.'s Interrogs. ¶ 2; Newman Dep. at 56-57.)

**\*2** Plaintiff testified that, in April 2004, he ate "spoiled," "discolored" chicken that "smelled ... like it was going bad" and thereafter experienced stomach pain. (Newman Dep. at 63-65; Pl.'s Resp to Defs.' Interrogs. ¶ 2.) Plaintiff explained that the pain was gone by the next morning, and therefore he did not seek medical attention. (Newman Dep. at 63.)

The fifth episode occurred in general population in October 2004. Plaintiff testified that he ate "old or spoiled" chicken that was not "fresh." (Newman Dep. at 64-65.) Plaintiff stated at his deposition that he suffered from stomach pain on that occasion but did not seek medical attention because his symptoms abated by the following morning. (*Id.*)

MDC utilizes a "cook-chill" satellite feeding program to prepare inmate meals. (Zenk Dep. at 5-7.) "[T]he food is initially ... fully cooked in the food services department," and then is "quick chilled," where "the food is chilled to

a temperature of forty degrees." (*Id.* at 5-6.) After storing the chilled food in the food bank, the meal is transported to inmate housing units where, in general population, the meals then are reheated to 160 degrees in "retherm ovens." (Defs.' Fact Stmt. ¶ 11.) In SHU, the staff uses microwave ovens to reheat pre-cooked food before serving the food to inmates. (*Id.* ¶ 3.) Warden Zenk maintains that the BOP and MDC-Brooklyn does not serve spoiled food. (Zenk Dep. at 22.) Warden Zenk further testified that food services fully cooks the food prior to transportation to the housing units and is expected to reheat it to the appropriate temperature prior to service to the inmates. (*Id.* at 10.)

In addition to plaintiff's claims relating to the quality of food, plaintiff also claims that, while housed in SHU, he was served an inadequate quantity of food. For example, he testified that the breakfast he was served in consisted of "three slices of bread, a three fourth ounce box of cereal, a box of milk and a half spoiled orange," and he was served weekend brunch consisting of "one waffle, a slice of cold-cut, a box of milk and eight teaspoons of cold or lukewarm grits." (*Id.* at 29, 37.) Warden Zenk testified that the menus of the food prisoners were served were reviewed and approved by a dietician, and averaged 3,000 calories per day, above the 2,800 calories required by the BOP. (Zenk Dep. 42-43, 50.) Plaintiff contends that the menus do not accurately reflect the food that is actually served to inmates. (*See* Pl's Resp. to Defs.' Mot. for Summ. J. at 12-16.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are deemed "material" to the outcome of the claim if they must be determined to apply the relevant substantive law. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when "a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

initial burden of "informing the district court of the basis for its motion" and identifying the matter that it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Cartrett,* 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment should only be granted when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Serv. Ltd. P'ship,* 22 F.2d 1219, 1223 (2d Cir.1994).

**\*3** In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). Yet, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247-48. Therefore, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. To defeat a properly supported motion for summary judgment, the opposing party must set forth specific facts indicating that a genuine issue of material fact exists; "[s]tatements that are devoid of any specifics, but replete with conclusions" are insufficient to defeat a motion for summary judgment. *Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir.1999).

II. Plaintiff's Eighth Amendment Claim for Inadequate Quality and Quantity of Food

In the court's order denying defendants' motion to dismiss in part, the court construed all plaintiff's claims against defendants in their individual capacities as claims brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). To maintain a *Bivens* action, plaintiff must allege a violation by a federal official of a clearly established constitutional right for which the federal official does not have immunity. *Siegert v. Gilley,* 500 U.S. 226, 232 (1991).

Plaintiff's Eighth Amendment claim that he was served food inadequate in quality and quantity while he was an inmate at MDC-Brooklyn, which allegedly constitutes cruel and unusual punishment, was the only claim that survived defendants' motion to dismiss. In this claim, plaintiff alleges that MDC served him food inadequate in quantity and quality when he was stationed in both SHU and general population. Specifically, plaintiff claims he was "half-starved ... constantly being served cold, and often uncooked food." (Compl. at 5-6. *See also* Newman Dep. at *passim.*) Plaintiff further attests that not only is the food "unhealthy," but the food also "caused [him] to be sick on more than one occasion." (*Id.* at 6.)

The conditions under which a prisoner is confined are subject to scrutiny under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). "While the Constitution 'does not mandate comfortable prisons,' prisoners may not be denied the minimum civilized measure of life's necessities." ' *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349-347). Prisoners may not be deprived of their " 'basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety' '-under the Eighth Amendment. *Phelps,* 308 F.3d at 185 (quoting *Helling v. McKinney,* 509 U.S. 25, 32 (1993)).

**\*4** The Second Circuit has held that "a substantial deprivation of food [to a prisoner] may well be recognized as being of constitutional dimension," in particular, a violation of the Eighth Amendment's prohibition of "cruel and unusual punishment." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). A prison official violates the Eighth Amendment when two conditions are met. *Farmer,* 511 U.S. at 834. First, the plaintiff must show the deprivation he suffered was "objectively, sufficiently serious" and a denial of "the minimal civilized measure of life's necessities." *Id.* Second, the allegedly responsible prison official must have a "sufficiently culpable state of mind," which the Supreme Court has interpreted as one of "deliberate indifference." *Id.*

A. The Objective Prong

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

The first requirement of the Eighth Amendment's prohibition against "cruel and unusual" punishment ultimately demands that prison conditions must not violate "contemporary standards of decency." *Phelps,* 308 F.3d at 185. Prisoners should be "served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles,* 725 F.2d at 15 (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980), *cert. denied,* 450 U.S. 1041 (1981)).

Plaintiff has presented evidence that the food at MDC-Brooklyn was prepared and served in a manner that endangered his health. In particular, plaintiff testified that he grew sick on five occasions between February 1, 2002 and February 28, 2005. He provided sufficient detail regarding improperly cooked food that he was served in each instance to support an inference that the food was the cause of his symptoms. For example, plaintiff testified that, in March 2004, he was served sliced beef that was "uncooked," "raw," and had "blood ... on it" and, that night, he experienced extreme stomach pain. (Newman Dep. at 57; Pl.'s Resp. to Defs.' Interrogs. ¶ 2.) Plaintiff also testified that in April 2004 he experienced stomach pain after eating chicken that "was discolored ... and smelled ... like it was going bad." (Newman Dep. at 63-65.) In addition, plaintiff stated at his deposition that because so many of the meals that he was served in SHU contained uncooked, raw, spoiled or undercooked food items and were therefore inedible, he would throw food away without eating it. (*See id.* at 69, 86.) He testified that he lost approximately 20 pounds during the period between August 2003 to January 2004 that he was housed in SHU. (*Id.* at 69-70.)

Drawing all inferences against the moving party, it appears as though there may be a genuine issue of material fact about whether plaintiff was served improperly prepared food that endangered his health and nutrition in a manner that could be found to violate the Eighth Amendment. *See Phelps v. Kapnolas,* 123 F.3d 91, 93 (2d Cir.1997) (holding that a seven-day bread diet could state a claim for cruel and unusual punishment); *Murphy v. Wheaton,* 381 F.Supp. 1252, 1261 (N.D.Ill.1974) (finding that "spoiled, rotted and foul" food served in a wagon used to dispose of garbage indicates "existence of unsanitary conditions which transcend mere unpleasantness"). Based on plaintiff's testimony, it appears that a jury could find that

the food served to plaintiff in both general population and SHU was raw, uncooked or spoiled, and therefore, eating the food caused him to fall ill, while not eating the food risked inadequate nutrition. However, the court does not need to decide this issue because, for reasons described below, plaintiff has failed to allege a genuine issue of material fact with regard to the subjective prong of the Eighth Amendment standard.

B. The Subjective Prong

**\*5** The second requirement to establish an Eighth Amendment violation is that plaintiff show prison officials acted with "deliberate indifference" to the health or safety of inmates. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). As the Supreme Court explained, "[t]his approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' " *Id.* at 837. "Deliberate indifference" to a substantial risk of harm requires "something more than mere negligence ... [and] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result ." *Id.* at 835. Acting or failing to act with deliberate indifference thus "is the equivalent of recklessly disregarding that risk." *Id.* at 836. A prison official that denies a prisoner's Eighth Amendment right must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety. [T]he official must ... [1] be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and [2] he must also draw the inference." *Id.* at 837. Determining whether the official had the requisite knowledge is a question of fact, which may be demonstrated by circumstantial evidence or by "the very fact that the risk was obvious." *Id.* at 842.

Plaintiff makes two arguments in an attempt to establish proof of the subjective prong. First, plaintiff asserts that Director Lappin was made aware of the poor food quantity and quality by a previous suit brought by plaintiff in 1998. (Newman Dep. at 89-90.) *See Newman v. Holder,* 101 F.Supp.2d 103 (E.D.N.Y.2000) (dismissing complaint for failure to exhaust administrative remedies). Second, plaintiff claims that he filed several administrative complaints-a BP-8, BP-9, BP-10 and BP-11-which Warden Zenk must have known about through regular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

meetings with staff. (Newman Dep. at 41, 104-105.) For example, in October 2003, plaintiff filed a BP-9 complaining about the "measly amount of food" he was served in SHU (*see id.* at 29), and in January 2004, he complained of spoiled meatloaf (*see id.* at 53-55).

When plaintiff's complaints are examined together with all other complaints MDC received relating to the food served, they do not create a material issue of fact as to whether defendants had the requisite notice of the problems with the food identified by plaintiff. Of the twenty-four administrative complaints submitted to MDC about their food service program between February 2002 and February 2005, only two other inmates complained about the quantity or quality of food. (Dannels Decl. ¶ 5 & Attach.) The remainder of the complaints related to receiving the wrong type of diet (e.g.kosher, vegetarian, low-fat), or not receiving sugar packets at breakfast. (*Id.*) None of the inmates' administrative complaints, not even plaintiff's, alleged a widespread epidemic of uncooked, spoiled or raw food served at MDC, or systematic problems with the nutritional adequacy or sanitary conditions of the food.

**\*6** Moreover, plaintiff has not presented evidence showing that prison officials had sufficient notice that problems with food service endangered prisoner's health. *See Salahuddin v. Goord, 467 F.3d 263, 281 (2d Cir.2006)* (emphasizing that an Eighth Amendment violation requires willful blindness-as opposed to simple blindness-on the part of defendants). There was no evidence of any prison outbreaks of food-borne illnesses. Plaintiff sought medical treatment only twice over a three-year period, and he was prescribed medication only once, meaning that his episodes were unremarkable in severity or frequency. Consequently, the evidence presented to the court is insufficient to establish that there is a triable factual issue concerning whether defendants were aware of and disregarded a serious problem with the food of the type plaintiff has alleged. *Compare Salahuddin v. Goord, 467 F.3d 263, 281 (2d Cir.2006)* (dismissing an Eighth Amendment claim related to denial of medical treatment when no evidence was presented showing that defendants were aware that such a denial would be harmful), *with Johnson v. Wright, 412 F.3d 398, 406 (2d Cir.2005)* (holding that an Eighth Amendment claim relating to denial of hepatis C medication survived summary judgment when prison officials followed prison

policy "in the face of unanimous, express, and repeated recommendations of plaintiff's treating physicians").

Additionally, the mechanisms established by the federal government to periodically review the food served to inmates validated the MDC's food preparation methods. The satellite feeding program had been approved by the U.S. Department of Agriculture and Food and Drug Administration, and MDC's Food Service was deemed "superior" by the Federal Bureau of Prisons Program Review Division. (*See* Zenk Dep. at 5-7; Food Service Prog. Rev. at *passim* ). The Division's 2005 report found that "[t]emperatures ... taken during the cooking, chilling, holding and service ... all were found within proper ranges." (*Id.* at 7.)

Given the lack of information provided to defendants from which they could have drawn the inference that MDC served an inadequate quantity and quality of food, plaintiff's Eighth Amendment claim fails on the subjective prong of the analysis. Plaintiff has failed to set forth a genuine issue of material fact that defendants acted with "deliberate indifference" to his health and safety by disregarding a "substantial risk" of serious harm to plaintiff. Accordingly, plaintiff's claim that he was subjected to "cruel and unusual" punishment under the Eighth Amendment is dismissed.[FN2]

> FN2. Because the court has determined that summary judgment in favor of defendants is appropriate, there is no need to address defendants' additional contention that they are protected by qualified immunity. *See Duamutef v. Hollins, 297 F.3d 108, 113 n.1 (2d 2002).*

III. Plaintiff's Discovery-Related Complaints

In plaintiff's response to defendants' motion for summary judgment, plaintiff raises a number of discovery-related complaints. In particular, plaintiff complains that defendants failed to fully answer his interrogatories or produce documents in violations of Rules 33 and 34 of the Federal Rules of Civil Procedure. (*See* Pl's Resp. to Defs.' Mot. for Summ. J at 10.) The court notes that the record for the instant case does not reflect any request by plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2007 WL 6888112 (E.D.N.Y.)
(Cite as: 2007 WL 6888112 (E.D.N.Y.))

to Magistrate Judge Bloom or this court for assistance in resolving these matters prior to the close of discovery on March 31, 2006. Further, with regard to the issues about which plaintiff complains, defendants' objections to plaintiff's interrogatories and requests for production of documents appear to be reasonable, as those requests appeared to be either overly broad and unduly burdensome or outside the scope of this litigation. Therefore, plaintiff has failed to establish that defendants violated their discovery obligations.

**\*7** In light of plaintiff's *pro se* status, the court construes the discovery-related issues raised by plaintiff as an application for a continuance of defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(f) so as to conduct further discovery. In addition to requesting court-enforcement of plaintiff's previous requests to defendants relating to MDC Bookyln, plaintiff also asks to court to order defendants to turn over a variety of materials related to conditions at the United States Penitentiary in Atlanta, Georgia while Warden Zenk served as warden of that institution. (*See* Pl's Resp. to Defs.' Mot. for Summ. J at 26.) However, plaintiff has failed to make the necessary showing that the additional discovery he requests would raise a genuine issue of material fact related to the key issue in this case: the subjective prong of the Eighth Amendment analysis. *See Sage Realty Corp. v. Insurance Co. of N. Am., 34 F.3d 124, 128 (2d Cir.1994).* Accordingly, plaintiff's application for additional discovery is denied.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted and plaintiff's claim is dismissed. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

E.D.N.Y.,2007.
Newman v. Zenk
Slip Copy, 2007 WL 6888112 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Vincent LOWMAN, Plaintiff,
v.
Kenneth PERLMAN, Superintendent of Mid-state
Correctional Facility, Glenn Goord, Commissioner of
New York State Department of Correctional Services,
Dr. Ramineni,[FN1] Director of Administrator Health
Services, Defendants.

FN1. The Complaint and Docket misspell this
Defendant's name as "Dr. Remeinena." We will
refer to the correct spelling used in the caption.

No. 9:06-CV-0422 (LEK/RFT).

Aug. 29, 2008.

Vincent Lowman, Marcy, N.Y., pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen H. Schwartz, Esq., Assistant
Attorney General, of Counsel, Albany, N.Y., for
Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 4, 2008 by the
Honorable Randolph F. Treece, United States Magistrate
Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.
54). After ten days from the service thereof, the Clerk has

sent the entire file to the undersigned, including the
objections by Plaintiff Vincent Lowman, which were filed
on August 8, 2008. Objections (Dkt. No. 55).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
54) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Vincent Lowman brings this civil rights

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

action, pursuant to 42 U.S.C. § 1983, asserting that the Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. Dkt. No. 1, Compl. Specifically, Plaintiff claims that the treatment and medication he was receiving at Woodbourne Correctional Facility ("Woodbourne") for his back, knee, high blood pressure, and asthma were wrongly discontinued after his transfer to Mid-State Correctional Facility ("Mid-State"). *Id.* at p. 3. Defendants now move for Summary Judgment pursuant to Fed.R.Civ.P. 56, (Dkt. No. 42), which Plaintiff opposes (Dkt. No. 48). For the reasons that follow, it is recommended that the Defendants' Motion be **granted** and the Complaint **dismissed.**

### I. FACTS

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ( "*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*" (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional violations.

**\*2** Plaintiff was transferred from Woodbourne to Mid-State on June 28, 2005, where Defendant Dr. Ramineni was employed. Dkt. No. 42, Defs.' Mot. for Summ. J., Defs.' 7.1 Statement, at ¶ 1. During Plaintiff's first visit with Dr. Ramineni on August 18, 2005, he complained of pain in his lower back and right knee, although an examination revealed no swelling, discoloration, or any other signs of injury to his back or knee. *Id.* at ¶ 8. Dr. Ramineni prescribed Naprosyn, an anti-inflammatory drug. *Id.* On September 14, 2005, Plaintiff again complained of back and knee pain. Again, Dr. Ramineni found no inflammation nor swelling. *Id.* at ¶ 10. Plaintiff requested a magnetic resonance imaging (MRI) and a transcutaneous electrical nerve stimulator (TENS) unit, but Dr. Ramineni denied those requests as medically unnecessary. *Id.* at ¶ 11. Plaintiff's final meeting with Dr. Ramineni was on November 14, 2005. Plaintiff complained of pain in his left knee for which he was

prescribed Motrin. *Id.* at ¶ 12.

### II. DISCUSSION

#### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted).

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional

violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In the case at bar, Plaintiff has not made any specific allegations against Defendants Perlman and Goord, nor has he advanced a theory of supervisory liability against them. *See generally* Compl. Because his Complaint is completely devoid of any mention of Defendants Perlman and Goord beyond listing them as Defendants, it is recommended that the Complaint be **dismissed** as to these Defendants.[FN2]

FN2. In addition, it appears that Plaintiff may not have intended to file this action against Defendants Perlman and Goord. In his Statement of Undisputed Material Facts, included in his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff states "[t]he plaintiff's [sic] only file [sic] a civil action against the defendant Dr. Ramineni." *See* Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., at p. 1.

### C. Eighth Amendment Claim

**\*4** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The plaintiff must allege conduct that is " 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105-06).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway I,* 37 F.3d at 66). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301-03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

*1. Serious Medical Need*

Plaintiff alleges that prior to his arrival at Mid-State, he sustained injuries to his lower back and knee and suffered from asthma and high blood pressure, and that because the

treatment he received at Woodbourne was discontinued upon his arrival at Mid-State, he suffered "swelling of the knee, continued lost [sic] of sleep, joint swelling and discoloration in the lower back area, and knee." Compl. at Statement of Facts, ¶¶ 2-4. Plaintiff also alleges that while at Mid-State he had problems going to the bathroom and may have had hemorrhoids. Compl. at [unnumbered] p. 4.

**\*5** Plaintiff's Ambulatory Health Record (AHR) reflects that he made several complaints of pain in his knee and back, but provides no additional evidence of any concrete injury beyond a pulled groin muscle he suffered while playing basketball and Dr. Ramineni's diagnosis of a sprained left knee. *See* Defs.' 7.1 Statement, Ex. A, AHR. Plaintiff has failed to allege any specific injury, serious or otherwise, with respect to his back. Plaintiff's indication that he had trouble going to the bathroom and suffered from hemorrhoids is supported by one entry in his AHR noting that he was constipated and possibly had hemorrhoids. AHR, entry dated Oct. 24, 2005. However, these conditions, without any other evidence or allegation as to their severity, are not sufficiently serious to establish an Eighth Amendment claim. *See, e.g., Cabassa v. Gummerson,* 2006 WL 1559215, at \*9-10 (N.D.N.Y. Mar. 30, 2006) (evidence that plaintiff may have suffered from hemorrhoids, without more, did not establish a viable Eighth Amendment claim); *see also Kendall v. Kittles,* 2004 WL 1752818, at \*6 (S.D.N.Y Aug. 4, 2004) (stating hemorrhoids "are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.")).

With respect to Plaintiff's knee, two referral orders indicate that a MRI from August 2004 "showed possible small partial tear of [Plaintiff's] ACL [anterior cruciate ligament]," and that after a consultation with orthopedics on December 6, 2005, Plaintiff was scheduled to have arthroscopic surgery on his left knee [FN3] and possibly ACL reconstruction. Defs.' 7.1 Statement, Ex. C, Referrals, dated Nov. 28, Dec. 6, 2005, & Jan. 10, Feb. 23, 2006 & CORC Response, dated Mar. 1, 2006 (stating "CORC also notes that on 2/27/06 the greivant was referred for arthroscopic [sic] knee surgery, which is pending approval.").[FN4]

FN3. We note that it is not altogether clear which knee Plaintiff asserts was not properly treated. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

his Complaint, Plaintiff refers nonspecifically to his knee, while his AHR entries make references to problems in both the left and right knees. *See* AHR, entries dated Aug. 18, Nov. 7, & Nov. 14, 2005. In any event, our analysis is the same.

FN4. There is no record of Plaintiff's surgery in the AHR or in any other submissions to the Court, however, Plaintiff indicated in his Opposition to the Defendants' Motion for Summary Judgment that "[i]t took [him] two or three grievances to see another doctor and have the knee surgery done." Dkt. No. 48, Pl.'s Opp. to Defs.' Mot. for Summ. J., Pl.'s Decl., at ¶¶ 10 & 18. Thus, it appears that at some point after February 23, 2006, Plaintiff underwent arthoscopic knee surgery.

However, even assuming that Plaintiff suffered from a small tear in his ACL, generally speaking, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." *Guarneri v. Bates,* 2008 WL 686809, at *7 (N.D.N.Y. Mar. 10, 2008)* (internal quotation marks and citations omitted). Furthermore, in this case, Plaintiff was able to walk and apparently play basketball until he pulled a groin muscle on July 8, 2005. AHR, entries dated July 8, 2005 (noting Plaintiff pulled his groin playing basketball) & Sept. 9, 2005 (noting Plaintiff's ability to walk without any pain). In addition, Dr. Ramineni noted that there was no inflammation nor restricted movement in Plaintiff's left knee. *Id.* at entry dated Nov. 14, 2005. Thus, Plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *See Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y. July 11, 2006)* (partially torn ACL in conjunction with other knee problems did not establish Eighth Amendment claim); *see also Moody v. Pickles,* 2006 WL 2645124, at *6-7 (N.D.N.Y. Sept. 13, 2006)* (holding that a "medial meniscal tear, with joint effusion," which did not render plaintiff immobile, was not a serious medical need).

### 2. *Deliberate Indifference*

**\*6** Even assuming, *arguendo,* that Plaintiff met his burden on the first prong, he has failed to establish that Dr.

Ramineni was deliberately indifferent to his medical needs. Plaintiff claims that upon being transferred from Woodbourne to Mid-State, the treatment he had been receiving for his back and left knee was arbitrarily discontinued. Plaintiff first visited with Dr. Ramineni on August 18, 2005, complaining of pain in his lower back and right knee.[FN5] AHR, at entry dated Aug. 18, 2005. Dr. Ramineni observed no inflammation nor swelling in his knee and prescribed Naprosyn, an anti-inflammatory drug. *Id.;* Defs.' Mot. for Summ. J., Subbarao Ramineni, M.D., Decl., dated Dec. 20, 2007, at ¶ 5. Plaintiff saw Dr. Ramineni on September 14, 2005, again complaining of back and knee pain and requesting a MRI, a referral to orthopedics, a TENS unit, and physical therapy. AHR, at entry dated Sept. 14, 2005. Dr. Ramineni noted Plaintiff was able to walk without any pain and showed no objective signs of swelling nor inflammation, and denied Plaintiff's requests for a MRI and TENS unit because they were "not medically indicated." *Id.* With respect to Plaintiff's request for physical therapy, Dr. Ramineni noted he had received such treatment in the past but it did not help. *Id.;* Ramineni Decl. at ¶ 8.

FN5. Plaintiff's AHR indicates that he was a "no show" for an appointment with Dr. Ramineni scheduled for July 21, 2005. AHR, entry dated July 21, 2005.

November 14, 2005, was the date of Plaintiff's last meeting with Dr. Ramineni. Ramineni Decl. at ¶ 10. Plaintiff complained of pain in his left knee, although Dr. Ramineni observed no inflammation nor restricted movement. AHR, at entry dated Nov. 14, 2005. Dr. Ramineni diagnosed Plaintiff with a sprained knee and prescribed Motrin. *Id.*

Considering this record, there is no indication that Dr. Ramineni displayed anything close to the criminal recklessness required under the Eighth Amendment subjective prong. In order to establish deliberate indifference, an individual must " 'know of and disregard an excessive risk to inmate health or safety.' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000)* (quoting *Chance v. Armstrong,* 143 F.3d at 702 & *Farmer v. Brennan,* 511 U.S. at 837). Although Dr. Ramineni denied Plaintiff's requests for physical therapy, a MRI, and x-ray, those denials were based on his opinion that they were not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)
(Cite as: 2008 WL 4104554 (N.D.N.Y.))

medically necessary as Plaintiff showed no objective signs of serious injury such as swelling, inflammation, nor inhibited ambulation. Furthermore, Dr. Ramineni did not disregard Plaintiff's medical needs, but rather, prescribed him Naprosyn and Motrin for the pain he complained of in his knee.

Thus, Plaintiff has failed to establish that Dr. Ramineni displayed a deliberate indifference towards his medical needs. For the reasons stated above, this claim should be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Plaintiff's Complaint (Dkt. No. 1) be **dismissed** in its entirety and Defendants' Motion for Summary Judgment **granted;** and it is further

**\*7 ORDERED,** that in the event the District Judge adopts this recommendation, Plaintiff's Motion to Compel (Dkt. No. 44) is **denied** as moot; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2008.
Lowman v. Perlman
Not Reported in F.Supp.2d, 2008 WL 4104554 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

H  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner/Director of Special Housing/
Disciplinary Program; Anthony Graceffo, Chief Medical
Doctor, Auburn Correctional Facility; Glenn S. Goord;
Hans Walker; Gary Hodges; D.W. Seitz; Terry A.
Halcott; Christine Coyne; Nancy O'Connor; Ann
Driscoll; John Mcclennen; John Rourke, Captain,
Security Services, Auburn Correctional Facility; Koors,
Head Pharmacist, Auburn Correctional Facility; Robert
Mitchell, Correctional Counselor, Auburn Correctional
Facility; and Androsko, Registered Nurse, Auburn
Correctional Facility, Defendants.
**No. 01-CV-1039 (DNH/GHL).**

March 30, 2006.

Samuel Cabassa, Wallkill, NY, Plaintiff, Pro Se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, David L. Fruchter, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

GEORGE H. LOWE, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). In this *pro se*
civil rights complaint brought under 42 U.S.C. § 1983,
Inmate Samuel Cabassa ("Plaintiff") generally alleges that

Defendants (fifteen employees of the New York State
Department of Correctional Services) violated his rights
under the First, Eighth and/or Fourteenth Amendments
between January of 1998 and August of 1998 by confining
him to the Auburn Correctional Facility Special Housing
Unit without cause or explanation, and by being
deliberately indifferent to his serious medical needs, which
included severe dehydration during his hunger strike, a
painful eye condition, a painful hemorrhoid condition, and
a deteriorating mental health condition. (*See generally*
Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No.
58.) Generally, Defendants' motion raises three issues: (1)
whether Plaintiff's claims against Defendants Mitchell,
Koors, Coyne, Halcott and Hodges should be dismissed
due to Plaintiff's failure to serve them with process, (2)
whether the majority of Plaintiff's claims should be
dismissed as barred by New York State's three-year statute
of limitations governing such claims, and (3) whether two
of Plaintiff's claims should be dismissed for lack of
personal involvement and/or failure to establish a claim
under the Eighth Amendment. (Dkt. No. 58, Part 4 [Def.'s
Mem. of Law].) For the reasons discussed below, I answer
each of these questions largely in the affirmative. As a
result, I recommend that Defendants' motion for summary
judgment be granted in part and denied in part, with leave
to renew.

**I. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is
warranted if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). In
determining whether a genuine issue of material [FN1] fact
exists, the Court must resolve all ambiguities and draw all
reasonable inferences against the moving party. *Schwapp
v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)
(citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716,
720 (2d Cir.1990) (citation omitted). However, when the
moving party has met its initial burden of establishing the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." FN2

FN2. Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement

... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

**2 "If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c]). FN3 Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

FN3. Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record. FN4 A district court has no duty to perform an independent review of the record to find proof of a factual dispute. FN5 In the event the district court chooses to conduct such an independent

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN6] I note that, here, Plaintiff's Fourth Amended Complaint ("Complaint") is verified.

> **FN4.** *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

> **FN5.** *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe,

M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

> **FN6.** *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN9] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN10]

> **FN7.** Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

> **FN8.** *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)]'s requirement that affidavits be made on personal knowledge is not satisfied by assertions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

made 'on information and belief.'% y(3)27 [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a

dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN11

FN11. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004)* (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

## II. ANALYSIS

**A. Whether Plaintiff's Claims Against Defendants Mitchell, Koors, Coyne, Halcott and Hodges Should Be Dismissed Due to Plaintiff's Failure to Serve Them with Process**

In their Memorandum of Law, Defendants argue that Auburn C.F. Corrections Counselor Robert Mitchell, Auburn C.F. Pharmacist "Mr. Koors," Auburn C.F. Nurse Christine Coyne, Auburn C.F. C.O. Terry A. Halcott and Gowanda C.F. Superintendent Gary Hodges are not properly "Defendants" in this action because they were never served with process. (Dkt. No. 58, Part 4 at 2.)

I find that this argument is factually supported by the record. Specifically, the docket in this action shows that, in the nearly two years between the filing of Plaintiff's (Fourth Amended) Complaint on February 3, 2003, and the filing of Defendants' motion for summary judgment on January 28, 2005, Plaintiff repeatedly failed to take the steps necessary to have these five individuals served with process,[FN12] despite being twice ordered by the Court to provide "any documents that are necessary to maintain this action" (e.g., USM 285 Forms),[FN13] and despite the agreement of two of the five individuals to permit the DOCS' Counsel's Office to accept service on their behalf

if an Acknowledgment of Receipt by Mail of Summons and Complaint were sent to DOCS' Counsel's Office.[FN14] Because of Plaintiff's failure to provide the necessary USM 285 Forms, service was not effected on these five individuals.[FN15]

FN12. (Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process and that Plaintiff had to submit a new USM 285 form if he wished service to again be attempted]; Dkt. No. 45 [Notice to Plaintiff from U.S. Marshals Service, filed on 4/19/04, informing him that he failed to properly sign his USM 285 forms]; Dkt. No. 50 [Notice to Plaintiff from U.S. Marshals Service, filed on 7/9/04, that Plaintiff failed to provide USM 285 forms for each Defendant].)

FN13. (Dkt. No. 17 at 3-4 [Order of Judge Hurd, filed on 3/27/03, directing that, *inter alia,* "the Clerk shall issue summonses and forward them ... to the United States Marshal for service upon Defendants .... [and] Plaintiff shall ... comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action"], *accord,* Dkt. No. 21 at 2-3 [Order of Judge Hurd, filed on 10/15/03].)

FN14. (Dkt. No. 47 [letter to Court from DOCS' Counsel filed on 5/26/04, informing Court that Defendants Coyne and Halcott have authorized DOCS' Counsel to accept service on their behalf if an Acknowledgment of Receipt by Mail of Summons and Complaint were sent to DOCS' Counsel.)

FN15. (Dkt. No. 26 [documents, filed on 11/17/03, showing that Christine Coyne could not be served with process because "she is no longer employed by the Dept. of Corrections and her whereabouts is unknown"]; Dkt. No. 34 [documents, filed on 12/3/03, showing that Terry A. Halcott could not be served with process because the U.S. Marshals Service "tried unsuccessfully to contact Ms. Halcott. She has not been employed by the Dept. of Corrections

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

for several years"]; Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process because "service of process ... was attempted [unsuccessfully] on 11/6/03]; Dkt. No. 51 [documents, filed on 8/5/04, showing that Robert Mitchell and Mr. Koors could not be served with process because "Mr. Mitchell retired to Florida several years ago and [DOCS has no record of anyone] named Koors currently employed at" Auburn C.F.]; Dkt. No. 57 [documents, filed on 12/14/04, showing that Gary Hodges could not be served with process because he was "no longer employed at Gowanda C.F."].)

**\*3** Plaintiff acknowledges this failure to serve, but blames the failure on (1) opposing counsel (Assistant Attorney General David L. Fruchter), whom he says promised to "locate ... and serve [these five individuals] on [Plaintiff's] behalf," and (2) two of his named Defendants (Terry Halcott and Gary Hodges), whom he argues "twice refused to accept service from the U.S. Marshal." (Dkt. No. 60, Part 4 at 2 [Plf.'s Mem. of Law].) I can find no evidentiary support for these conclusory arguments. Furthermore, I am unconvinced by Plaintiff's legal argument that opposing counsel somehow abrogated or assumed Plaintiff's legal duty to provide USM 285 forms to the U.S. Marshals Service.

The only plausible argument that Plaintiff has that the failure to serve was not his fault is with respect to Defendants Coyne and Halcott. As indicated above, Defendants Coyne and Halcott authorized the DOCS' Counsel's Office (on or about May 26, 2004) to accept service on their behalf. The U.S. Marshals Service then informed Plaintiff (on or about July 9, 2004) that he needed to provide them with new USM 285 Forms. However, no record exists of Plaintiff having done so in a timely manner (or at all). Under the circumstances, I find the failure to serve was Plaintiff's fault, not the U.S. Marshal's fault. [FN16] Even after receiving notice of Defendants' failure-to-serve argument through the filing of their summary judgment motion in January of 2005, Plaintiff has not taken the steps necessary to effectuate service on these two individuals (or the other three individuals).[FN17]

FN16. *See Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *6-7, 21-23 (N.D.N.Y. March 31, 2005) (Scullin, C.J.) (reaching same conclusion where U.S. Marshal's Service notified the plaintiff that, if he desired further attempts of service on two defendants, he must notify the U.S. Marshal's Service in writing, which the plaintiff did not do; also finding that two other defendants were properly served where they had authorized the DOCS' Counsel's Office to accept service on their behalf, *and the plaintiff had provided proper USM 285 forms for those two defendants* ).

FN17. *See Webber v. Hammock,* 973 F.Supp. 116, 121 (N.D.N.Y.1997) (Scullin, J.) (holding that, even if initial failure to serve Defendant Hammack in 1990 was attributable to U.S. Marshal's Service, due to its failure to reasonably infer that when Plaintiff referred to "Dr. Hammock" he meant Dr. Hammack, "this error may have constituted 'good cause' for the Court to allow an extension of time for service of Defendant Hammack in 1990, [but] it is now 1997" and "[t]he Court cannot, at this point in time, overlook the Plaintiff's failure to serve the Defendants with a complaint that was filed in 1990").

As a result, I recommend that the Court dismiss Plaintiff's claims against Defendants Mitchell, Koors, Coyne, Halcott and Hodges under the Local and Federal Rules.[FN18] In the alternative, I would recommend dismissal of nearly all Plaintiff's claims against these five individuals (i.e., all of Plaintiff's claims except his claim, asserted in his "Fourth Cause of Action," that Defendant Mitchell violated Plaintiff's Fourteenth Amendment rights by failing to provide "meaningful review" of Plaintiff's status in administrative segregation), based on Plaintiff's violation of the three-year statute of limitations governing such claims, as discussed below in Part II.B. of this Report-Recommendation.

FN18. *See* Fed. R. Civ. 16(f) ("If a party ... fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

just [including dismissal]...."); Fed.R.Civ.P. 4(m) ("If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); N.D.N.Y. L.R. 4.1(b) ("General Order 25 ... requires ... service of process upon all defendants within sixty (60) days of the filing of the complaint.... In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4.").

**B. Whether the Majority of Plaintiff's Claims Should Be Dismissed as Barred by the Statute of Limitations**

Defendants argue that the vast majority of Plaintiff's claims are barred by New York State's three-year statute of limitations governing such claims. (Dkt. No. 58, Part 4 at 3-5.) However, Plaintiff responds correctly that, under "the prison mail box rule," his original Complaint should be deemed as having been "filed" with the Court when he handed that Complaint to a corrections officer to be mailed.[FN19] In addition, Plaintiff has persuaded me, through the submission of record evidence, that he handed the original Complaint in this action to a corrections officer for mailing on June 20, 2001.[FN20] Even if Plaintiff had submitted no such record evidence, I would conclude that the date that Plaintiff handed his original Complaint to corrections officers at Auburn C.F. for mailing was June 20, 2001, based on the date Plaintiff signed that Complaint (June 20, 2001) (Dkt. No. 1 at 20). [FN21]

FN19. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying the rationale of *Houston v. Lack,* 487 U.S. 266 [1988], regarding the filing date of appeals to *habeas corpus* proceedings, to prison civil rights actions filed pursuant to 42 U.S.C. § 1983); *accord, Pritchard v. Kelly,* 98-CV-0349, 2000 WL 33743378, at *2 & n. 2 (N.D.N.Y. Oct. 3, 2000) (Sharpe, M.J.).

FN20. (Dkt. No. 60, Part 5 at 3-4 [referenced by Plaintiff as Exhibits "A1" and "A2," containing two New York State Department of Correctional

Services Disbursement or Refund Requests, signed by Plaintiff, addressed to the Clerk's Office of this Court, and dated 6/20/01].) Evidence like this was found sufficient in *Dory v. Ryan,* 999 F.2d 679, 681 (2d Cir.1993) ("[Plaintiff's] argument is substantiated by a copy of the Department of Correctional Services form demonstrating that he had submitted his legal papers to prison officials prior to the official filing of the complaint.").

FN21. *See Minguez v. C.O. Nelson,* 96-CV-5396, 2004 WL 324898, at *3 (S.D.N.Y. Feb. 20, 2004) ("Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed.").

*4 However, this does not end the inquiry. Also needing to be determined is the date of the events giving rise to each of the claims asserted in Plaintiff's (Fourth Amended) Complaint. Generally, I agree with Defendants and not with Plaintiff regarding the dates of the events giving rise to each of Plaintiff's claims in this action. (*Compare* Dkt. No. 58, Part 4 at 3-5 *with* Dkt. No. 60, Part 4 at 5-6.) After carefully scrutinizing Plaintiff's (Fourth Amended) Complaint, I find that, liberally construed, Plaintiff's claims, and the dates of the events giving rise to those claims, are accurately summarized as follows:

(1) **January 12, 1998-January 13, 1998**-Defendant Seitz violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when he authored an Administration Segregation ("AS") recommendation without first making an independent inquiry as to the reliability and credibility of the confidential informants (who provided the information upon which that recommendation was based). (Dkt. No. 16, ¶¶ 6-6(3) ["First Cause of Action"] );

(2) **January 14, 1998**-Defendant Gummerson violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when, after a disciplinary hearing, he accepted Defendant Seitz's recommendation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

without first making an independent inquiry as to the reliability and credibility of the confidential informants (who provided the information upon which that recommendation was based) (Dkt. No. 16, ¶¶ 6[4]-6[5] ["Second Cause of Action"] );

(3) **March 11, 1998**-Defendants Goord and Selsky violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when they affirmed on appeal and "deliberately fail[ed] to overturn the faulty disciplinary conviction" of January 14, 1998 (Dkt. No. 16, ¶¶ 6[6]-6[10] ["Third Cause of Action"] );

(4) **January 14, 1998-June 22, 1998**-Defendants Walker, Rourke, Seitz and Mitchell violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment when they repeatedly failed to provide meaningful review of his status in administrative segregation despite the existence of grounds that required such review (Dkt. No. 16, ¶ 6[18] ["Fourth Cause of Action"] );

(5) **June 19, 1998-June 22, 1998**-Defendants Walker, Gummerson and Seitz violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment, and his right of access to the courts under the First Amendment, when they intentionally delayed his release from SHU for three days (i.e., from June 19, 1998, to June 22, 1998), despite knowing of the issuance of a state court decision requiring Plaintiff's release from SHU (Dkt. No. 16, ¶¶ 6 [11]-6[17] ["Fifth Cause of Action"] );

(6) **January 25, 1998**-Defendants Walker and Hodges violated Plaintiff's rights under the Eighth Amendment when they deliberately interfered with Plaintiff's necessary access to emergency medical treatment outside Auburn C.F. (e.g., for dehydration, malnutrition, and ketosis) (Dkt. No. 16, ¶¶ 6 [23]-6[26] [first part of "Sixth Cause of Action"];

**\*5** (7) **February 19, 1998-May 13, 1998**-Defendant Hodges violated Plaintiff's rights under the Eighth Amendment when he repeatedly "vetoed" Defendant Graceffo's plan to safely break Plaintiff's hunger strike

with a special diet (Dkt. No. 16, ¶¶ 6[36], 6[52]-6[55], 6[58]-6[61] [second part of "Sixth Cause of Action"];

(8) **February 17, 1998-February 19, 1998** and **April 6, 1998-April 20, 1998**-Defendants O'Connor and Holcott violated Plaintiff's rights under the Eighth Amendment when they deliberately tormented him through the sadistic use of bright light on him when he was in the facility's infirmary (causing him eye pain, migraine headaches, etc.) (Dkt. No. 16, ¶¶ 6[33]-6[34], 6[51] ["Seventh Cause of Action"] );

(9) **January 14, 1998-January 25, 1998**-Defendant Androsko violated Plaintiff's rights under the Eighth Amendment when she was deliberately indifferent to Plaintiff's serious medical needs and failed to competently diagnose his medical conditions (e.g., dehydration, malnutrition, and ketosis) (Dkt. No. 16, ¶¶ 6[20]6[23] ["Eighth Cause of Action"] );

(10) **January 25, 1998-January 31, 1998, February 17, 1998-March 4, 1998** and **March 28, 1998**-Defendants Driscoll, O'Connor, McClellan and/or Graceffo violated Plaintiff's rights under the First and Eighth Amendments when they tampered with and falsified Plaintiff's medical records to worsen his condition and/or to "oust" him from the facility's infirmary, in retaliation against his hunger strike (Dkt. No. 16, ¶¶ 6[27]-6[28], 6[35], 6[50] ["Ninth Cause of Action"]);

(11) **February 11, 1998-May 13, 1998**-Defendant Graceffo violated Plaintiff's rights under the First and Eighth Amendments when he was repeatedly deliberately indifferent to Plaintiff's serious medical eye condition (for a twenty-five day period), his serious hemorrhoid condition, and his serious mental health condition in retaliation against Plaintiff's hunger strike (Dkt. No. 16, ¶¶ 6[32], 6[44]-6[47], 6[52]-6[55], 6[58], 6[61] [part of "Tenth Cause of Action," part of "Eleventh Cause of Action," "Twelfth Cause of Action," part of "Thirteenth Cause of Action," and part of "Fifteenth Cause of Action"] );

(12) **March 2, 1998-March 28, 1998**-Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

O'Connor, Koors, and McClellan violated Plaintiff's rights under the Eighth Amendment when they were repeatedly deliberately indifferent to Plaintiff's serious medical eye condition in retaliation against Plaintiff's hunger strike (Dkt. No. 16, ¶¶ 6[37]-6[43], 6[48]-6[49] [remainder of "Tenth Cause of Action," and "Fourteenth Cause of Action"] );

(13) **January 14-1998-January 25, 1998** and **May 19, 1998**-Defendant Androsko violated Plaintiff's rights under the Eighth Amendment when he was repeatedly deliberately indifferent to Plaintiff's serious medicals needs when she denied Plaintiff pain medication for his migraine headaches and medication for his serious hemorrhoid condition (Dkt. No. 16, ¶ 6[21], 6[63] [remainder of "Eleventh Cause of Action"] );

**\*6** (14) **February 11, 1998-April 15, 1998**-Defendant Coyne violated Plaintiff's rights under the Eighth Amendment when he was deliberately indifferent to Plaintiff's serious mental health needs (Dkt. No. 16, ¶¶ 6 [32], 6[57] [remainder of "Thirteenth Cause of Action"];

(15) **January 12, 1998-May 15, 1998**-Defendants Walter, Hodges, Rourke, Gummerson, Seitz, Mitchell, Halcott, Coyne, O'Connor, Driscoll and McClellan violated Plaintiff's rights under the First and Eighth Amendments by retaliating against Plaintiff's hunger strike and/or filing of grievances, and by being deliberately indifferent to Plaintiff's serious medical needs (*see generally* Dkt. No. 16, ¶¶ 6[1]-6[62] [remainder of "Fifteenth Cause of Action"];

(16) **July of 1998**-An unspecified "Defendant" violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff medication and access to a specialist outside Auburn C.F., for treatment of Plaintiff's serious hemorrhoid condition (Dkt. No. 16, ¶ 6[64] [unspecified cause of action] ); and

(17) **August of 1998**-Defendant Graceffo violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff access to contact lenses, which had been mailed to the Auburn C.F. medical

department and were to be delivered to Plaintiff, and when he told Plaintiff that he would have to wait one year for such contact lenses (Dkt. No. 16, ¶ 6[65] [unspecified cause of action] ).

As is evident from this summary of Plaintiff's claims, Plaintiff's (Fourth Amended) Complaint contains only four claims that appear to be permitted under the applicable three-year limitations period-i.e ., the claims listed above as "(4)," "(5)," "(16)" and "(17)." No matter how liberally I construe Plaintiff's (Fourth Amended) Complaint, I simply cannot find that the events forming the basis of the other claims-including claims "(7)," "(11)," "(13)," "(14)" and "(15)"-occurred after June 19, 1998. Nor can I grant Plaintiff's request (in his opposition papers) that I consider all of his claims as part of some massive conspiracy against him which continued until (or through) the day he was discharged from SHU on June 22, 1998 (Dkt. No. 60, Part 4 at 6.)

As an initial matter, it is questionable whether the "continuing violation" doctrine, which is typically applied in discrimination actions, may also be applied in actions filed pursuant to 42 U.S.C. § 1983.[FN22] Even assuming that the doctrine may be applied to actions filed pursuant to Section 1983, it should be remembered that "few attempts to invoke the doctrine are successful ... and the ... doctrine is disfavored in the Second Circuit." [FN23] It should also be remembered that, to be available, the doctrine requires proof of "a dogged pattern of related acts." [FN24]

> **FN22.** *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at \*11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at \*3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

regarding, inter alia, the application of the continuing violation doctrine).

FN23. *Konigsberg v. Lefevre,* 267 F.Supp.2d 255, 263 (N.D.N.Y.2003) (Munson, S.J.) [citations omitted]; *McFarlan,* 1998 U.S. Dist. LEXIS 5541, at *11.

FN24. *Konigsberg,* 267 F.Supp.2d at 263; McFarlan, 1998 U.S. Dist. LEXIS 5541, at *11.

Here, I find that Plaintiff's reliance on the "continuing violation" doctrine is misplaced given that Plaintiff's claims (even as liberally construed) allege, overwhelmingly, merely a series of (approximately three-dozen) isolated and unrelated actions taken by one or more of fifteen individuals at various times over a seven-month period at different locations within Auburn C.F., which actions (allegedly) constitute a variety of different constitutional violations.[FN25] I note that Plaintiff has not adequately stated a claim for (or even alleged the existence of) a conspiracy under either 42 U.S.C. § 1983 or 42 U.S.C. § 1985.[FN26] Any implicit allegations by Plaintiff in his (Fourth Amended) Complaint that these isolated acts are somehow linked are conclusory and unsupported by the record.

FN25. *(See generally* Dkt. No. 16, ¶¶ 6-6[65].) *See Verley v. Goord,* 02-CV-1182, 2004 U.S. Dist. LEXIS 857, at *25-26 (S.D.N.Y. Jan. 22, 2004) ("Because these doctors' involvement consisted of isolated acts ... the doctrine of 'continuing violation' cannot be applied to toll the statute of limitations as to [the inmate's] claims" of deliberate indifference to a serious medical need against two defendants for inappropriately cancelling the inmate's appointments for a liver biopsy.); *Konigsberg,* 267 F.Supp.2d at 263 ("Plaintiff's claims concerning the DOCS personnel at Auburn [C.F.], outside the limitations period, do not amount to a continuing violation or a continuous set of events that can be anchored to some event within the limitations period that expired many years ago.").

FN26. *See Rodriguez v. Selsky,* 2003 U.S. Dist. LEXIS 23087, at *12-16 (S.D.N.Y.2003) (rejecting plaintiff's continuing violation argument where, although plaintiff had alleged that defendants' isolated actions were part of a conspiracy, plaintiff failed to state a prima facie claim for conspiracy because, in part, he alleged no facts indicating that there was an *agreement* among defendants to deprive him of any rights), *aff'd sub nom, Rodriguez v. McElroy,* 04-0618, 2005 U.S.App. LEXIS 5288 (2d Cir. Apr. 1, 2005).

*7 Nor can I find any evidence (or even an argument) that the Court should toll the three-year limitations period with respect to any claims that are time barred due to an allegation that Defendants' actions somehow inhibited Plaintiff from filing this action.[FN27]

FN27. I note that Plaintiff acknowledges that, while he was in SHU during this time period, he filed other actions (e.g., a disciplinary decision appeal, a letter complaint, a grievance, and a state court action). (Dkt. No. 16, ¶¶ 6[6], 6[11], 6[43], 6[48] .)

Finally, it appears that Plaintiff's claims against seven of the Defendants (Hodges, Coyne, Driscoll, McClennen, Rourke, Koors, and Mitchell) should be found to be time barred for an additional reason. Even assuming that the continuing violation doctrine applies to all of Plaintiff's claims in his (Fourth Amended) Complaint, the sole reason that Plaintiff's claims against these seven Defendants (which were *first* asserted in Plaintiff's Second, Third or Fourth Amended Complaints) would be considered timely would be if they "related back" to the claims asserted in Plaintiff's original Complaint filed on June 20, 1999. *See* Fed.R.Civ.P. 15(c). However, it does not appear that Plaintiff's claims against these seven Defendants do in fact relate back to the claims in the original Complaint, which does not mention or clearly concern them.[FN28] Plaintiff himself appears to acknowledge this fact.[FN29]

FN28. *(See* Dkt. No. 1 [naming only Gummerson, Selsky and Graceffo as Defendants;

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

and mentioning only Seitz, Androsko, Walker, Goord, O'Connor, and Halcott as additional wrongdoers in the Complaint].)

FN29. (Dkt. No. 40 [letter dated 12/30/03 from Plaintiff to Court, stating, *inter alia,* that "most of them [referring to Defendants Hodges, Rourke, Mitchell, Androsko and Koors] were added as defendants sometime during my third or fourth amend[ed] complaint"].)

Under the circumstances, it would appear to be unfair to these seven Defendants to permit Plaintiff to benefit from the "relation back" rule with respect to his otherwise untimely claims against them.FN30 (For example, during the passage of time between when Plaintiff filed his original Complaint on June 20, 1999, and when he finally got around to asserting claims against Defendants Coyne, Hodges, Mitchell, and Koors, it appears that they left employment with DOCS.) FN31

FN30. *See Doe v. Blake,* 809 F.Supp. 1020, 1025-1026 (D.Conn.1992) (finding that because the DOCS Commissioner "was not named in plaintiff's original *pro se* complaint ... relation back [under Rule 15] is not appropriate here, as [the Commissioner] did not receive, within the limitations period, such notice of the institution of the action that he would not be prejudiced in maintaining a defense").

FN31. (Dkt. No. 26 [documents, filed on 11/17/03, showing that Christine Coyne could not be served with process because "she is no longer employed by the Dept. of Corrections and her whereabouts is unknown"]; Dkt. No. 43 [documents, filed on 3/29/04, showing that Gary Hodges could not be served with process because "service of process ... was attempted [unsuccessfully] on 11/6/03]; Dkt. No. 51 [documents, filed on 8/5/04, showing that Robert Mitchell and Mr. Koors could not be served with process because "Mr. Mitchell retired to Florida several years ago and [DOCS has no record of anyone] named Koors currently employed at" Auburn C.F.]; Dkt. No. 57 [documents, filed on

12/14/04, showing that Gary Hodges could not be served with process because he was "no longer employed at Gowanda C.F."].)

Although this last point provides merely an alternative reason for dismissing the claims against five of the seven Defendants based on untimeliness, it provides the sole reason for dismissing Plaintiff's claims against two of the Defendants (Defendants Rourke and Mitchell) in Plaintiff's "Fourth Cause of Action" based on untimeliness (since I previously found those claims to be timely).

As a result, I recommend that the Court dismiss all of Plaintiffs claims as barred by the applicable statute of limitations, *except* (1) the claims asserted against Defendants Walker and Seitz in Plaintiff's "Fourth Cause of Action," (2) all of the claims asserted in Plaintiff's "Fifth Cause of Action," (3) Plaintiff's claim that in July of 1998 an unspecified Defendant violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff treatment for his serious hemorrhoid condition, and (4) Plaintiff's claim that in August of 1998 Defendant Graceffo violated Plaintiff's rights under the Eighth Amendment when he deliberately denied Plaintiff access to contact lenses. (Dkt. No. 16, ¶¶ 6[4], 6[65], 7.)

**C. Whether Plaintiff's Last Two Claims Should Be Dismissed for Lack of Personal Involvement and/or Failure to Establish a Claim under the Eighth Amendment**

**1. Plaintiff's Claim Against an Unidentified Defendant for Deliberate Indifference to Plaintiff's Alleged Hemorrhoid Condition in or about July of 1998**

**\*8** Defendants argue that Plaintiff's claim for deliberate indifference to his (alleged) hemorrhoid condition in or about July of 1998 should be dismissed for two independent reasons. First, Defendants argue that Plaintiff has failed to establish (or even allege in his Fourth Amended Complaint) that any particular Defendant was personally involved in the alleged denial of adequate medical care of Plaintiff's (alleged) hemorrhoid condition in or about July of 1998. (Dkt. No. 58, Part 2 at 6-7 [citing Paragraph 6(64) of Plf.'s Compl.].) Second, Plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

failed to establish that his (alleged) hemorrhoid condition constituted a *sufficiently serious medical condition* for purposes of the Eighth Amendment, or that any Defendant exhibited the sort of reckless disregard necessary to show *deliberate indifference* to that serious medical condition for purposes of the Eighth Amendment. (Dkt. No. 58, Part 2 at 6-7.)

**a. Personal Involvement**

As to Defendants' first legal argument, I find that argument factually and legally supported. Defendants are correct that Plaintiff fails to identify, in his (Fourth Amended) Complaint, which Defendant (allegedly) denied him pain medication in or about July of 1998. (Dkt. No. 16, ¶ 6[64] [Plf.'s Compl., alleging, "On or about July, 1998, defendant denied plaintiff pain relief medication for his hemorrhoidal condition and access to all outside consult with a specialist for same."].) I agree with Defendants that such a claim fails as a matter of law, especially where (as here) Plaintiff has been given the opportunity to conduct discovery and amend his complaint and still has not identified which Defendant is the subject of his claim.[FN32]

> FN32. *See Shomo v. City of New York,* 03-CV-10213, 2005 WL 756834, at *9 (S.D.N.Y. Apr. 4, 2005) (granting Rule 12[b][6] motion to dismiss inmate's Section 1983 claims of deliberate indifference to a serious medical need due, in part, to the plaintiff's failure to name which individuals allegedly ignored medical instructions, and his use instead of the passive voice when discussing how his alleged injuries were inflicted; stating that the plaintiff "must identify the party responsible for his injuries").

While this conclusion needs no further support, it is further supported by the fact that, in his Memorandum of Law, Plaintiff responds only to the second legal argument advanced by Defendants (regarding the two elements of a deliberate indifference claim), while failing to address the first argument (regarding personal involvement). (Dkt. No. 60, Part 4 at 14-22.) Under the Local Rule 7.1(b)(3), Plaintiff is deemed to have consented to the granting of Defendants' motion based on this first argument.[FN33]

> FN33. *See Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

I note that buried in Plaintiff's opposition papers are two pieces of paper suggesting that Plaintiff may have complained to Defendant O'Connor of hemorrhoids, or shown symptoms of hemorrhoids, on April 26, 27, and 28 1998; and that Plaintiff may have complained to Defendant Graceffo of hemorrhoids, or shown symptoms of hemorrhoids, on April 29, 1998. (Dkt. No. 60, Part 6 at 12-13 [referred to by Plaintiff as "Ex. A69-70"].) Setting aside the fact that those records also indicate that Plaintiff repeatedly refused to let Defendant O'Connor examine and/or treat those hemorrhoids, the fact remains that this "evidence" is too slender a reed to grasp onto to save Plaintiff's deficient claim regarding his hemorrhoid condition. Even if Plaintiff did make such complaints, or exhibit such symptoms, on April 26 through 29, 1998, Plaintiff has adduced no evidence that Defendants O'Connor or Graceffo heard such complaints or observed such symptoms in *July of 1998,* or (more importantly) that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

they did anything to *deprive* Plaintiff of adequate medical care (e.g., a prescribed pain medication, or an authorized consult with a specialist outside the facility) regarding his (alleged) hemorrhoid condition at that time. [FN34]

> [FN34.] There is also the fact that, if the Court permitted Plaintiff's vague and conclusory claim (stated in Subparagraph "64" to Paragraph 6 of his Complaint) to survive based on these two pieces of paper, the Court would be (1) simply guessing that Plaintiff intended his claim to be against Defendants O'Connor and/or Graceffo (as opposed to some other Defendant), and (2) in effect, permitting Plaintiff to amend his (Fourth Amended) Complaint after discovery has closed, thus prejudicing those two Defendants, who have relied on the plain meaning of Plaintiff's allegations.

*9 Because I recommend dismissal of this claim based on Plaintiff's failure to establish the personal involvement of any Defendant in the alleged constitutional deprivation, I need not reach Defendants' alternative argument that Plaintiff has failed to meet either of the two elements of the test for a claim for deliberate indifference to a serious medical need under the Eighth Amendment. However, for the sake of thoroughness, I will briefly address that argument.

**b. Elements of Eighth Amendment Claim**

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

Here, Defendants make the following factual assertions regarding Plaintiff's (alleged) hemorrhoid condition in their Rule 7.1 Statement: "There are no entries in plaintiff's Ambulatory Health Record during the time period January 13, 1998 through September 24, 1998

indicating that Plaintiff complained of hemorrhoids or symptoms of hemorrhoids [and][t]here are no entries whatsoever in Plaintiff's Ambulatory Health Record for the month of July 1998." (Dkt. No. 58, Part 2, ¶¶ 9, 10.) I find that these assertion are supported by the record. (Dkt. No. 58, Part 3, ¶¶ 10-12 & Ex. B.) Moreover, Plaintiff does not specifically controvert these factual assertions in his Rule 7.1 Response. (Dkt. No. 60, Part 2, ¶ 9 [setting forth assertions that are non-responsive to Defendants' assertions].) Therefore, Defendants' factual assertions are deemed admitted by Plaintiff, under Local Rule 7.1(a)(3).

Defendants attempt to use these two factual assertions to support their argument that Plaintiff has failed to establish both elements of the above two-part test for Eighth Amendment denial-of-medical-care claims. Specifically, they argue that, because there is no evidence in Plaintiff's "Ambulatory Health Record" of any complaints about (or symptoms of) a hemorrhoid condition, Plaintiff has not shown that he has established that he even had a hemorrhoid condition (much less a hemorrhoid condition that was so serious as to be of constitutional proportions). Moreover, they argue that, because there is no evidence in Plaintiff's "Ambulatory Health Record" that he made complaints about any medical conditions (or received treatment for any medical conditions) in July of 1998, Plaintiff has not shown that any medical staff at Auburn C.F. even had an opportunity to be deliberately indifferent to his alleged hemorrhoid condition. (Dkt. No. 58, Part 2 at 6-7.)

Liberally construed, Plaintiff's opposition papers offer only one piece of evidence in opposition to this argument-two pieces of paper (the same as discussed above) suggesting that Plaintiff may have complained to Defendant O'Connor of hemorrhoids, or shown symptoms of hemorrhoids, on April 26, 27, and 28 1998; and that Plaintiff may have complained to Defendant Graceffo of hemorrhoids, or shown symptoms of hemorrhoids, on April 29, 1998. (Dkt. No. 60, Part 6 at 12-13 [referred to by Plaintiff as "Ex. A69-70"].) Again, the problem with this "evidence" is that, while it might bear on whether Plaintiff had a hemorrhoid condition in *July of 1998* (three months later), it does not bear on whether any such condition in July of 1998 was sufficiently serious for purposes of the Eighth Amendment, whether Plaintiff complained of that condition (or exhibited symptoms of that condition) in July of 1998, whether Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

prescribed pain medication or authorized to attend a consult with a specialist outside the facility in July of 1998, and (most importantly) whether any Defendant interfered with that (allegedly) prescribed pain medication or authorized consult.

**\*10** Under the circumstances, I agree with Defendants that Plaintiff has failed to establish either element of the two-part test for denial-of-medical-care claims under the Eighth Amendment. As a result, I recommend that the Court dismiss Plaintiff's claim for deliberate indifference to his hemorrhoid condition.

**2. Plaintiff's Claim Against Defendant Graceffo for Deliberate Indifference to Plaintiff's Eye Condition in or about August of 1998**

Plaintiff alleges that "[o]n or around August, 1998, plaintiff required that he be provided with the contact lens that was mailed into medical for min [sic] because he never got it and defendant GRACEFFO told him he had to wait one year"].) (Dkt. No. 16, ¶ 6[65].) Defendants argue that this claim against Defendant Graceffo should be dismissed because Plaintiff has failed to establish that Defendant Graceffo was personally involved in the (alleged) denial of adequate medical care in question. (Dkt. No. 58, Part 2 at 8.)

In support of their argument, Defendants make numerous factual assertions regarding Defendant Graceffo's lack of personal involvement in their Rule 7.1 Statement. *(See* Dkt. No. 58, Part 2, ¶¶ 1-8.) I find that each of these factual assertions are supported by the record. Moreover, Plaintiff does not specifically controvert these factual assertions in his Rule 7.1 Response. (Dkt. No. 60, Part 2, ¶¶ 1-8 [setting forth assertions that either repeat Defendants' factual assertions or that are non-responsive to Defendants' assertions].)

The closest Plaintiff comes to controverting these factual assertions is in Paragraphs 5, 6 and 8 in his Rule 7.1 Response. With regard to Paragraph 5, Plaintiff fails to specifically deny that "Dr. Graceffo has never examined plaintiff's vision"; rather, Plaintiff implicitly argues that Dr. Graceffo in effect examined Plaintiff's vision by

referring Plaintiff to a contact lens clinic on or about August 18, 1997, April 11, 2000, and April 18, 2000. *(Compare* Dkt. No. 58, Part 2, ¶ 5 *with* Dkt. No. 60, Part 2, ¶ 5.) Setting aside whether or not Plaintiff's implicit argument is supported by the record, Plaintiff's implicit argument is not the sort of specific denial required by Local Rule 7.1.(a)(3). In addition, Plaintiff's implicit argument is non-responsive.[FN35]

> **FN35.** For example, Plaintiff's assertion does not bear on whether or not Dr. Graceffo had first-hand knowledge *in July and August of 1998* of the *results* of any examination of Plaintiff's vision, which is the thrust of the relevance of Defendants' factual assertion. (Dkt. No. 60, Part 6 at 47, 50, 51 [cited by Plaintiff as "A104," "A107," and "A108" respectively].)

With regard to Paragraph 5, Plaintiff fails to specifically deny that "Dr. Graceffo has no control over when or even if, [sic] an inmate receives contact lenses"; rather, Plaintiff asserts essentially that "it is well settled" that medical specialists outside of prison merely make recommendations to prison doctors (such as Dr. Graceffo), who are the inmate's primary treating physicians and who make the ultimate decision as to the medical issue addressed by the medical specialists. *(Compare* Dkt. No. 58, Part 2, ¶ 6 *with* Dkt. No. 60, Part 2, ¶ 6.) The maze of record citations through which Plaintiff attempts to lead the Court does not lead to any evidence that supports Plaintiff's factual assertion. *(See* Dkt. No. 60, Part 2, ¶ 6 [citing to Paragraphs 11-12 and 19 of Plf.'s Aff., which cite only to either an unattached "Ex. B" or to Paragraphs 7-9 of the Aff., which again cite to the unattached "Ex. B"].) Even if, by "Ex. B," Plaintiff is referring to the "NYSDOCS Request & Report of Consultation" dated August 18, 1998 (Dkt. No. 60, Part 6 at 47[elsewhere referred to by Plaintiff as "Ex. A104"), at most this evidence (if the document is indeed signed by Defendant Graceffo) suggests that Dr. Graceffo may *request* that Plaintiff receive a consult at an eye clinic; it does not mean that Dr. Graceffo is making the ultimate decision (or has any control over the decision) as to when or if Plaintiff *receives* contact lenses.[FN36]

> **FN36.** I note that, logically, the only way that this document could possibly suggest that Dr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

Graceffo had some modicum of "control" over when or if Plaintiff received contact lenses would be if it were established that (1) the only way that Plaintiff could receive contact lenses was if he were referred to an eye clinic outside Auburn C.F., and (2) Dr. Graceffo was the only doctor at Auburn C.F. who could have referred Plaintiff to an eye clinic outside Auburn C.F. Setting aside whether or not Plaintiff has established such facts, I decline to engage in such hair splitting of Defendants' factual assertion, especially considering (1) Plaintiff's failure to specifically controvert Defendants' factual assertion, and (2) the fact that Plaintiff does not allege in his Complaint that the wrongs that Dr. Graceffo committed included any failure to refer Plaintiff to an eye clinic outside Auburn C.F. (and, therefore, any such dispute of fact created would not be material to this motion).

**\*11** Finally, with regard to Paragraph 8, Plaintiff fails to specifically deny that "Dr. Graceffo has no involvement with the distribution of contact lenses prescribed to inmates at Auburn Correctional Facility"; rather, Plaintiff, in a nearly incomprehensible sentence, appears to argue that Dr. Graceffo must have had such involvement since Plaintiff's contact lenses were sent to the facility medical department (due to the fact that he was "too weak to ambulate or travel because of being on a hunger strike"). *(Compare* Dkt. No. 58, Part 2, ¶ 8 *with* Dkt. No. 60, Part 2, ¶ 8.) The "evidence" Plaintiff cites in support of this assertion are certain portions of his Complaint and Affidavit. (Dkt. No. 60, Part 2, ¶ 8 [citing Plf.'s Compl., ¶¶ 6(38), 6(42)-(44), 6(48)-(49), and Plf.'s Aff., ¶¶ 13-19].) It is perhaps of little surprise (given the presumptive and speculative nature of Plaintiff's factual assertion) that Plaintiff's "evidence" fails to establish (or even suggest) that Dr. Graceffo knew of, or was to play any part in, the medical department's alleged planned receipt and delivery of Plaintiff's contact lenses in or about August of 1998.

In light of the foregoing, Defendants' factual assertions (regarding Defendant Graceffo's lack of personal involvement) in their Rule 7.1 Statement are deemed admitted by Plaintiff, under Local Rule 7.1(a)(3). Given the nature of these assertions about the process by which an inmate receives glasses and contact lenses, and Defendant Graceffo's limited role (or complete lack of a

role) in that process in or about August of 1998, I find that they support Defendants' legal argument in favor of dismissal due to lack of personal involvement.

Plaintiff's memorandum of law spends much effort attempting to create a material issue of fact regarding the general issue of whether Defendant Graceffo (and three other Defendants) were deliberately indifferent to Plaintiff's serious medical needs regarding his eye condition. *(See, e.g.,* Dkt. No. 60, Part 4 at 14-22 [Plf.'s Mem. of Law].) The main problem with Plaintiff's argument is that the vast majority of it fails to address the precise issue at hand (i.e., whether Defendants were personally involved in the alleged denial of Plaintiff's receipt by mail of his contact lenses in August of 1998). *(See id.* [mostly containing argument regarding whether Plaintiff's medical need for contact lenses was sufficiently serious for constitutional purposes, or what the standard is for deliberate indifference to such a serious medical need].) To the extent Plaintiff does address the issue at hand, he fails to cite any record evidence.

For example, Plaintiff argues *conclusorily* that Defendant Graceffo was "sufficiently made aware" of Plaintiff's medical need to wear contact lenses because he "dealt with the plaintiff's medical records [which contained a code used to identify the plaintiff's permission to wear contact lenses] on a daily basis." *(Id.* at 16 [containing no record cite].) In addition, Plaintiff argues *vaguely* and *conclusorily* that, at some point, "Defendant Graceffo issued plaintiff a medical pass granting him authorization to wear his tinted glasses inside of the prison." *(Id.* at 19 [containing blank record cite].) Finally, Plaintiff argues *conclusorily* that Defendant Graceffo "confiscated [Plaintiff's] new contact lens, interefer[ed] with the treatment once prescribed for his serious visual medical need, and intentionally delay[ed] the delivery of his prescribed contact lens cleaning supplies...." *(Id.* at 19 [containing no record cite].) I note that, again, the Court has no duty to independently review the record to find proof of a factual dispute regarding the issue at hand.

**\*12** Even if the Court did find, in the record, evidence of Defendant Graceffo's *knowledge* of Plaintiff's general eye condition, such evidence would not establish Defendant Graceffo's personal involvement in the alleged constitutional deprivation. Still missing would be any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)
(Cite as: 2006 WL 1559215 (N.D.N.Y.))

evidence establishing that Plaintiff was indeed going to be receiving contact lenses by mail in August of 1998,[FN37] that Defendant Graceffo *knew* that Plaintiff was to be going to be receiving contact lenses by mail in August of 1998, and that Defendant Graceffo somehow *interfered* with Plaintiff's receipt of the contact lenses by mail in August of 1998.

FN37. Although this fact is not determinative of my conclusion, I do find it worthy of mentioning that the DOCS Health Service Policy cited by the parties (Policy No. 1.03) provides that "CONSISTENT WITH DOCS DIRECTIVE 4911, INMATES ARE NOT ALLOWED TO RECEIVE PRESCRIPTION EYE WEAR THROUGH THE FACILITY PACKAGE ROOM." (Dkt. No. 58, Part 3 [Ex. A to Graceffo Aff.].)

As a result, I recommend that the Court dismiss Plaintiff's claim against Defendant Graceffo for deliberate indifference to Plaintiff's eye condition in or about August of 1998.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 58) be ***DENIED*** to the extent it seeks dismissal of (1) the claims asserted against Defendants Walker and Seitz in the "Fourth Cause of Action" of Plaintiff's Fourth Amended Complaint (Dkt. No. 16, ¶¶ 6[18], 7), and (2) the claims asserted against Defendants Walker, Gummerson and Seitz in the "Fifth Cause of Action" of Plaintiff's Fourth Amended Complaint (Dkt. No. 16, ¶¶ 6[11]6[17], 7), but that Defendant's motion be ***GRANTED*** in all other respects; and it is further

**ORDERED** that, following the Court's final Order on Defendants' motion for summary judgment, Defendants shall have ***THIRTY (30) DAYS*** in which to file a second motion for summary judgment (if they choose to do so) with regard to any of Plaintiff's claims that have not been dismissed due to a failure to serve or due to a violation of the three-year statute of limitations governing such claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2006 WL 1559215 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Injah TAFARI, Plaintiff,
v.
K. McCARTHY; et al, Defendants.
No. 9:07-CV-654.

May 24, 2010.

Injah Tafari, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, Roger W. Kinsey, Esq., Assistant Attorney General, of Counsel, Albany, NY.

### DECISION and ORDER

DAVID N. HURD, District Judge.

*1 Plaintiff, Injah Tafari, brought this civil rights action in June 2007, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 31, 2010, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment (Dkt. No. 75) be granted in part and denied in part. The following claims should be dismissed:

(1) the Eighth Amendment excessive force claim against defendant Jewett;

(2) the failure-to intervene claims against defendants McCarthy, Matthews, and Deleo;

(3) the due process claim against defendants Farrell and

T.J. Brown regarding the destruction of personal property;

(4) the access-to-courts claim against defendants McCarthy and Torres;

(5) the free speech claim against defendants McCarthy and Torres;

(6) the excessive force claim against defendant Farrell regarding the tobacco-spitting incident;

(7) the claim that defendants Eagen, Miller, K. Lucas, and T. Lucas wrongfully restricted plaintiff's ability to file grievances;

(8) the Eighth Amendment medical care claim against defendants Sisilli and Riester;

(9) the Eighth Amendment conditions of confinement claim against defendants Miller, W. Brown, and Healy regarding recreation periods;

(10) the retaliation claim against defendants Miller, W. Brown, and Healy regarding recreation periods;

(11) the First Amendment claim against defendant Miller regarding Kosher meals;

(12) the claim that defendants DiCairano and Leghorn violated plaintiff's constitutional rights by using racial epithets;

(13) the Eighth Amendment excessive force claim against defendant Leghorn;

(14) the Eighth Amendment medical care claims against defendants W. Brown, Gusman, and Inaganti regarding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

plaintiff's shoulder surgery;

(15) the Eighth Amendment medical care claim against defendant Gusman regarding plaintiff's vision issues;

(16) the claims regarding constant cell illumination and ventilation in the SHU;

(17) any claim against defendant Healy for conducting a disciplinary hearing on October 28, 2005;

(18) all claims against defendant Selsky; and

(19) plaintiff's pendent state law claims.

The Report-recommendation further recommended that defendants' motion should be denied as to the following claims which should proceed to trial:

(1) the Eighth Amendment excessive force claim against defendants Sisilli and Riester;

(2) the Eighth Amendment excessive force claim against defendant T.J. Brown;

(3) the Eighth Amendment excessive force claim against defendant Occhipinti;

(4) the failure to intervene claim against defendant DiCairano; and

(5) the procedural due process claim against defendant Healy regarding the hearing on the November 15, misbehavior report.

Further recommendations were that the following claims should survive sua sponte review and also proceed to trial:

(1) the retaliation claim against defendant T.J. Brown; and

(2) the retaliation claim against defendants Occhipinti and DiCairano.

*2 The Report-Recommendation further recommended that the following claims be sua sponte dismissed:

(1) the supervisory liability claims against defendant Miller regarding the urine-and-feces throwing incident and the mail tampering incident;

(2) the failure-to-investigate claims against defendant Griffin regarding the urine-and-feces throwing incident and the mail tampering incident;

(3) the retaliation claim against defendants McCarthy and Torres regarding the mail tampering incident;

(4) the Eighth Amendment medical care claim against defendant Farrell regarding the tobacco spitting incident;

(5) the claim that defendants K. Lucas, W. Brown, and Eagen failed to properly process plaintiff's grievances regarding the denial of Kosher meals;

(6) the retaliation and due process claims against defendants Gusman, Griffin, Healy, Sisilli, and Riester regarding the March 1, March 2, June 27, October 11, October 12, and October 16, misbehavior reports and the disciplinary hearings that followed them;

(7) the retaliation claim against defendant Occhipinti regarding the October 15, misbehavior report; and

(8) the retaliation claims against defendants Griffin and Healy based upon their conduct during disciplinary hearings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

The plaintiff has filed objections to the Report-Recommendation.

Based upon a de novo review of the lengthy Report-Recommendation and the entire file, including those portions to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Dkt. No. 75) is GRANTED in part and DENIED in part as follows:

2. The following claims are DISMISSED:

(a) the Eighth Amendment excessive force claim against defendant Jewett;

(b) the failure-to intervene claims against defendants McCarthy, Matthews, and Deleo;

(c) the due process claim against defendants Farrell and T.J. Brown regarding the destruction of personal property;

(d) the access-to-courts claim against defendants McCarthy and Torres;

(e) the free speech claim against defendants McCarthy and Torres;

(f) the excessive force claim against defendant Farrell regarding the tobacco-spitting incident;

(g) the claim that defendants Eagen, Miller, K. Lucas, and T. Lucas wrongfully restricted plaintiff's ability to file grievances;

(h) the Eighth Amendment medical care claim against defendants Sisilli and Riester;

(i) the Eighth Amendment conditions of confinement claim against defendants Miller, W. Brown, and Healy regarding recreation periods;

(j) the retaliation claim against defendants Miller, W. Brown, and Healy regarding recreation periods;

(k) the First Amendment claim against defendant Miller regarding Kosher meals;

(l) the claim that defendants DiCairano and Leghorn violated plaintiff's constitutional rights by using racial epithets:

(m) the Eighth Amendment excessive force claim against defendant Leghorn;

**\*3** (n) the Eighth Amendment medical care claims against defendants W. Brown, Gusman, and Inaganti regarding plaintiff's shoulder surgery;

(o) the Eighth Amendment medical care claim against defendant Gusman regarding plaintiff's vision issues;

(p) the claims regarding constant cell illumination and ventilation in the SHU;

(q) any claim against defendant Healy for conducting a disciplinary hearing on October 28, 2005;

(r) all claims against defendant Selsky; and

(s) plaintiff's pendent state law claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

3. Defendants' motion is DENIED as to the following claims which will proceed to trial:

(a) the Eighth Amendment excessive force claim against defendants Sisilli and Riester;

(b) the Eighth Amendment excessive force claim against defendant T.J. Brown;

(c) the Eighth Amendment excessive force claim against defendant Occhipinti;

(d) the failure to intervene claim against defendant DiCairano; and

(e) the procedural due process claim against defendant Healy regarding the hearing on the November 15, misbehavior report.

4. The following claims survive sua sponte review and will also proceed to trial:

(a) the retaliation claim against defendant T.J. Brown; and

(b) the retaliation claim against defendants Occhipinti and DiCairano.

5. The following claims are sua sponte DISMISSED:

(a) the supervisory liability claims against defendant Miller regarding the urine-and-feces throwing incident and the mail tampering incident;

(b) the failure-to-investigate claims against defendant Griffin regarding the urine-and-feces throwing incident and the mail tampering incident;

(c) the retaliation claim against defendants McCarthy and Torres regarding the mail tampering incident;

(d) the Eighth Amendment medical care claim against defendant Farrell regarding the tobacco spitting incident;

(e) the claim that defendants K. Lucas, W. Brown, and Eagen failed to properly process plaintiff's grievances regarding the denial of Kosher meals;

(f) the retaliation and due process claims against defendants Gusman, Griffin, Healy, Sisilli, and Riester regarding the March 1, March 2, June 27, October 11, October 12, and October 16, misbehavior reports and the disciplinary hearings that followed them;

(g) the retaliation claim against defendant Occhipinti regarding the October 15, misbehavior report; and

(h) the retaliation claims against defendants Griffin and Healy based upon their conduct during disciplinary hearings.

6. The Clerk is directed to return the file to the Magistrate Judge for further pretrial proceedings.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION AND ORDER***[FN1]

GEORGE H. LOWE, United States Magistrate Judge.

**\*4** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Injah Tafari alleges that the twenty-one named Defendants, all employees of the New York State Department of Correctional Services ("DOCS") violated his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

constitutional rights by subjecting him to excessive force, destroying his personal property, interfering with his outgoing mail, restricting his ability to file grievances, denying him medical care, subjecting him to inhumane conditions of confinement, denying him Kosher meals, and falsely finding him guilty of disciplinary rules. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 75), Plaintiff's motion to file a second amended complaint (Dkt. No. 84), and Plaintiff's motion to appoint counsel (Dkt. No. 93). For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part and order that Plaintiff's motions be denied.

**I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A. Applicable Legal Standards**

1. *Legal Standard Governing Motions for Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact

exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

2. *Legal Standard Governing Motions to Dismiss for Failure to State a Claim*

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*5** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

punctuation omitted).

"In reviewing a complaint for dismissal under [Rule] 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

**B. Urine and Feces Throwing Incident**

On January 27, 2005, Plaintiff was awakened by the presence of a cold substance which he later determined to be urine and feces. (Am. Compl. ¶ 17, 20; Pl.'s Dep. 15: 4-16, 16:15-20, Mar. 18, 2008.) Upon scanning his cell, Plaintiff discovered Defendant Sergeant C. Jewett standing in his doorway with a white cup accompanied by Defendants Officers Kevin McCarthy and L. Matthews. (Am.Compl. ¶ 17.) When Plaintiff inquired into Defendant Jewett's actions, the Defendants laughed and Defendant Jewett said, "That asshole is now up for the count." (Am.Compl. ¶ 18.) Defendant McCarthy additionally stated, "You better start sleeping with your hearing aid on

because I am going to write you a misbehavior report every time you don't stand up for the 6:30a.m. count." (Am.Compl. ¶ 18.) Defendant Matthews added, "Next time I'm gonna kick [your] ass [if] you don't stand up for my count." (Am.Compl. ¶ 19.) Defendant Officer C. Deleo then closed Plaintiff's cell door. (Am.Compl. ¶ 19.)

**\*6** In a report filed after this incident, Defendant Jewett stated he threw a three ounce cup of water on Plaintiff to wake him because Plaintiff was "unresponsive to the officers during their 6:30am count." (Dkt. No. 75-22 at 10.)

Plaintiff does not allege that he suffered any physical injury as a result of this incident.

Plaintiff reported the January 27 incident to Defendant Officer Thomas Farrell and requested that the area supervisor be notified of the treatment he was receiving. (Am.Compl. ¶ 20.) Defendant Farrell told Plaintiff that he would notify the area supervisor of his concerns. (Am.Compl. ¶ 20.) Plaintiff also reported the incident to Defendant David Miller, who at that time was the acting Superintendent at Eastern, as he was making his rounds of the Special Housing Unit ("SHU") and showed Miller the bed linens soiled from Defendant Jewett's actions [FN3] (Am. Compl. ¶ 21; Pl.'s Dep. 16:15-18.) Defendant Miller told Plaintiff that a Captain would conduct an investigation, that he would be seen by medical personnel, and that he would be provided with a change of linen. (Am. Compl. ¶ 21; Miller Decl., Dkt. No. 75-32 ¶ 3.) Defendant Captain Patrick Griffin was sent to conduct the investigation later that day and allegedly looked into the cell without saying a word or requesting any of the assistance offered by Defendant Miller. (Am. Compl. ¶ 22; Pl.'s Dep. 17:3-9.) After this incident, Plaintiff's family called Glenn Goord, who was then the commissioner of DOCS. He ordered that a more extensive investigation be conducted. (Pl.'s Dep. 18:2-1-25.)

Defendant Jewett admits to throwing something on Plaintiff. However, he claims the substance thrown was water, not urine and feces. (Pl.'s Dep. 19:3-6; Jewett Decl., Dkt. No. 75-32 ¶ 9.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

I construe the complaint as asserting the following claims: (1) an Eighth Amendment excessive force claim against Defendant Jewett; (2) a failure to intervene claim against Defendants Matthews, McCarthy, and Deleo; (3) a supervisory claim against Defendant Miller; and (4) a claim that Defendant Griffin failed to properly investigate the incident.

*1. Excessive Force*

Plaintiff claims that Defendant Jewett exercised excessive force by throwing urine and feces on him while he was sleeping. (Am.Compl.¶ 70.) Defendants argue that this claim should be dismissed because the force used was *de minimis.* (Defs.' Br., Dkt. No. 75-34 at 15-16.)

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantoness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*7** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses

of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10 (citation omitted).

The force used here was *de minimis. See DeArmas v. Jaycox,* No. 92-CV-6139, 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501 (S.D.N.Y. Feb.8, 1993), *aff'd,* 14 F.3d 591 (2d Cir.1993) (holding that punching an inmate in the arm and kicking inmate in the leg was *de minimis* ) [FN4]; *Candelaria v. Coughlin,* 787 F.Supp. 368, 374-75 (S.D.N.Y.1992) (pressing fist against inmate's neck causing inmate to lose breath was *de minimis* force); *Anderson v. Sullivan,* 702 F.Supp. 424, 426-27 (S.D.N.Y.1988) (pulling on an inmate's arms and forcing inmate's face into cell bars was *de minimis* force); *Brown v. Busch,* 954 F.Supp. 588, 597 (W.D.N.Y.1997) (holding that pushing and striking an inmate causing inmate to stumble into his cell was *de minimis* force). The question, then, is whether the force used was "of a sort repugnant to the conscience of mankind."

For the purposes of this analysis I will view the evidence in the light most favorable to Plaintiff and assume that Defendant Jewett threw urine and feces, not water, on Plaintiff. This conduct, while certainly repulsive, is not sufficiently severe to be considered "repugnant to the conscience of mankind." *See Fackler v. Dillard,* No. 06-10466, 2006 U.S. Dist. LEXIS 61480, 2006 WL 2404498, at *1 (E.D.Mich. Aug.16, 2006) (holding that an officer who threw a four-ounce cup of urine on an inmate which caused no physical injury "was not so grievous as to rise to the level of an Eighth Amendment violation."); *Benitez v. Ham,* No. 9:04-CV-1159, 2009 U.S. Dist. LEXIS 97495, 2009 WL 3486379 (N.D.N.Y. Oct.21, 2009) (Mordue, J. and Lowe, M.J.) (holding that refusing to remove restraints around an inmate's wrists after knowing that it was causing the inmate " 'extreme pain' and 'severe swelling' " was not "repugnant to the conscience of mankind") [FN5]; *Murray v. Goord,* 668 F.Supp.2d 344 (N.D.N.Y.2009) (Scullin, J. and Peebles, M.J.) (holding that punching an inmate in the testicles and shoving inmate into cement was not "repugnant to the conscience of mankind"); *Perry v. Stephens,* 659 F.Supp.2d 577, 582-83 (S.D.N.Y.2009) (stating that slapping an inmate across the face several times is not the force "of a sort repugnant to the conscience of mankind"); *compare Rembert v. Holland,* 735 F.Supp. 733, 736 (W.D.Mich.1990) (stating that no penological goal was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

furthered when an off-duty officer entered an inmate's cell, made sexual demands, and threw feces and urine on the inmate). Therefore, I recommend that the Eighth Amendment claim against Defendant Jewett be dismissed.

2. *Failure to Intervene*

**\*8** Plaintiff claims that Defendants Matthews, McCarthy, and Deleo violated his constitutional rights by failing to intervene before Defendant Jewett threw urine and feces on Plaintiff. (Am.Compl.¶ 70.) Defendants argue that this claim should be dismissed because none of the accused Defendants had a "reasonable opportunity" to intervene and should not be held liable. (Defs.'s Br. at 15-16.) Defendants are correct.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* at 501 (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994).

As to Defendants Matthews and McCarthy, Plaintiff does not allege that either Defendant Matthews or Defendant McCarthy threw the liquid substance on him, but rather that they failed to stop Defendant Jewett from doing so. (Am.Compl.¶ 17-19.) It is undisputed that Defendants Matthews and McCarthy were present in Plaintiff's cell at the time of the incident. However, given the brief and unexpected nature of the incident, both Defendants lacked reasonable opportunity to stop the alleged violation. *See*

*Cusamano v. Sobek*, 604 F.Supp.2d 416, 429 (N.D.N.Y.2009) (excusing an officer from liability "despite his presence, if the assault is 'sudden and brief,' such that there is no real opportunity to prevent it); *Parker v. Fogg*, No. 85-CV-177, 1994 U.S. Dist. LEXIS 1696, 1994 WL 49696, at *30-31(N.D.N.Y. Feb.17, 1994) (holding that an officer is not liable for failure to intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"). [FN6] The liquid throwing incident began and ended within a matter of seconds, an increment of time too "sudden and brief" to give Defendants a "realistic opportunity" to respond and intervene on behalf of the Plaintiff. *Cusamano*, 604 F.Supp.2d at 429 n. 9. For these reasons, Defendants McCarthy and Matthews cannot be held liable for their failure to intervene and the claims against them should be dismissed.

**\*9** As to Defendant Deleo, Plaintiff additionally alleges that Defendant Deleo failed to intervene. In his complaint, Plaintiff concedes that Defendant Deleo's only connection to this incident was that he "closed [Plaintiff's] cell door back from inside the [console]." (Am.Comp.¶ 19.) This claim does not rise to the level of a cognizable claim because Defendant Deleo was not in Plaintiff's cell when the incident occurred and thus had no reasonable opportunity to intervene. A defendant who is not in the vicinity of the alleged constitutional violation, especially an isolated violation that occurs within seconds, cannot be held liable because he lacked reasonable opportunity to intervene. *See Ford v. Moore*, 237 F.3d 156, 163 (2d Cir.2001); *Cusamano*, 604 F.Supp.2d at 429 n. 9. Therefore, the claims against Defendant Deleo must be dismissed.

3. *Defendant Miller*

Broadly construed, the complaint could be read as asserting a supervisory liability claim against Defendant Miller. Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield*,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

950 F.2d 880, 885 (2d Cir.1991)).[FN7] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN8] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN9] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN10] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN11]

Broadly construed, Plaintiff's complaint alleges that Defendant Miller failed to remedy his situation after learning of it. This claim is without merit because

> [i]t has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.

*10 *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008)* (Hurd, J.) (internal quotation omitted). Here, Defendant Miller was confronted with an alleged violation that had already occurred and was not ongoing. Therefore, he is not personally responsible for failing to remedy the alleged violation. Accordingly, I recommend that the Court dismiss this claim sua sponte.

4. *Defendant Griffin*

Broadly construed, Plaintiff's complaint alleges that Defendant Griffin violated his constitutional rights by failing to conduct a thorough investigation of the incident. Defendants have not addressed this claim. I recommend that it be dismissed *sua sponte* because prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341-42 (S.D.N.Y.2003). Therefore, Defendant Griffin did not violate any constitutional right even if, as Plaintiff alleges, he failed to thoroughly investigate the incident.

## C. Destruction of Personal Property

Plaintiff alleges that on January 27, 2005, Defendant Officers Thomas Farrell and T.J. Brown removed Plaintiff from his cell to obtain his personal property. (Am.Compl.¶ 23.) Plaintiff was escorted to the SHU day room where he noticed that all of his personal belongings had already been opened and spread out on the table. (Am.Compl.¶ 23.) Plaintiff remained restrained and was told to stay seated when he noticed a garbage can full of his personal items. (Am.Compl.¶ 24.); (Pl.'s Dep. 21:12-14.) These items included: thirty-five manila envelopes, 5,000 writing papers, sixty-seven bars of Dial soap, two 100-count boxes of white envelopes, two large manila envelopes with claim receipts, six large manila envelopes containing legal documents, two hair ties and two hearing aids. (Am.Compl.¶ 24.) When Plaintiff reported this incident to the area supervisor, Defendant T.J. Brown told Plaintiff, "I'll slap the living hell out of you if you keep running your mouth." (Am.Compl.¶ 25.) Defendant Farrell then stated, "Let's take that nigger back to his cell," and allegedly threatened to throw away Plaintiff's other personal items. (Am.Compl.¶ 25.) On the way back to his cell, Plaintiff complained to Sergeant Pagnuchi about his items being thrown away, and some, but not all, of the items were returned. (Pl.'s Dep. 29:1-13.)

Plaintiff alleges that Defendants Farrell and T.J. Brown violated his Fourteenth Amendment rights by throwing away several of his personal belongings. (Am.Compl.¶¶ 23-24.) Defendants argue that Plaintiff's constitutional rights were not violated because a meaningful post-deprivation remedy was available. (Defs.' Br. at 11 .)

"[A]n unauthorized intentional deprivation of property by

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York penological system. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). After the alleged property destruction occurred, Plaintiff could have pursued numerous forms of recourse, including verbally complaining to supervisors and/or submitting a formal grievance. Plaintiff verbally reported the incident to Defendant T.J. Brown, but pursued no further administrative recourse through the grievance process. (Am.Compl.¶ 24.) Thus, adequate postdeprivation remedies were available to Plaintiff after the alleged deprivation, but Plaintiff simply chose not to pursue those remedies. I therefore find that Plaintiff's due process rights were not violated and recommend that the Court dismiss this claim.

**D. Mail Interference**

*11 Plaintiff alleges that he slid three manila envelopes under his door on January 27 to be mailed in compliance with Eastern SHU outgoing mail procedures. (Am.Compl.¶ 26.) After discovering that the envelopes had never reached their destination, Plaintiff filed mail tampering complaints with the SHU staff. (Am. Compl. ¶ 27; Pl.'s Dep. 35:8-15.) Defendant Griffin conducted the investigation regarding this incident. (Am.Compl.¶ 28.) Defendants Officers Alex Torres and McCarthy later admitted to Plaintiff that they had thrown away his envelopes to "teach [Plaintiff] how to stand up for count." (Am.Compl.¶ 29.); (Pl.'s Dep. 37:3-16.) Plaintiff complained to Defendant Miller about this incident. (Pl.'s Dep. 37:17-21.)

I construe the complaint as asserting the following claims: (1) an access to courts claim; (2) a free speech claim; (3) a retaliation claim; (4) a claim that Defendant Griffin failed to investigate the matter properly; and (5) a claim of supervisory liability against Defendant Miller.

*1. Access to Courts*

Plaintiff alleges that Defendants McCarthy and Torres violated his Constitutional rights by throwing away his legal mail on January 27, 2005. (Am.Compl.¶ 26-29.)

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to affirm." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* Moreover, the Second Circuit has held that a single, isolated incidence of mail interference is not a cognizable claim under § 1983. *Govan v. Campbell,* 289 F.Supp.2d 289, 297-98 (N.D.N.Y.2003) (citing *Washington,* 782 F.2d at 1136 (prisoner states a claim where he "indicates an alleged continuing activity rather than a single, isolated instance.")).

Here, Plaintiff's complaint alleges only one incident of mail tampering. (Am.Compl.¶ 26-29.) In *Davis,* the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

Second Circuit dismissed an inmate's alleged denial of access to the courts because his evidence only established two incidents of deprivation and thereby failed to establish "an ongoing practice by prison officials of interfering with his mail." *Davis,* 320 F.3d at 352. Nothing in the record indicates that Plaintiff was subjected to more than one incident of mail interference and, as such, he does not have a cognizable claim under § 1983. Moreover, Plaintiff has failed to show any actual injury caused by this incident. Plaintiff does not allege that his access to the courts was chilled or that his ability to legally represent himself was impaired. Without actual injury, the court cannot allow for a cognizable claim under § 1983. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.). Because Plaintiff cannot establish more than one incident of mail tampering or that he suffered any actual injury as a result of the Defendants' conduct, I recommend that the Court dismiss his claim for denial of access to the courts.

2. *Free Speech*

**\*12** I construe Plaintiff's complaint as alleging that the mail tampering incident also violated his constitutional right to free speech under the First Amendment. Defendants argue that one incident of failing to send out Plaintiff's legal documents does not constitute a First Amendment claim. (Defs.' Br. at 3.)

The First Amendment protects an inmate's "right to the free flow of incoming and outgoing mail." *Dolberry v. Levine,* 567 F.Supp.2d 413, 419 (W.D.N.Y.2008) (citation omitted). However, courts in the Second Circuit have never held an isolated incident of mail tampering to violate an inmate's First Amendment rights. *Id.; Davis,* 320 F.3d at 351. Again, Plaintiff has alleged only one incident of mail tampering by Defendants and he incurred no actual injury as a result of their conduct. Based on these facts, this incident simply cannot raise a valid free speech claim under § 1983 and I recommend that the Court dismiss the claim.

3. *Retaliation*

Read broadly, I construe Plaintiff's complaint to allege that Defendant McCarthy threw out Plaintiff's legal mail in retaliation for reporting the urine and feces throwing incident earlier that day. (Am.Compl.¶ 29.) Defendants have not addressed this claim.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id. at 381-83.* Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,*

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

239 F.3d at 492).

**\*13** Here, there is no question that Plaintiff's conduct was protected by the Constitution because the First Amendment protects an inmate's "right to the free flow of incoming and outgoing mail." *Dolberry,* 567 F.Supp.2d at 419 (citation omitted). This right is well established in case law and is uncontroverted between the parties in the present matter. Because Plaintiff has an established constitutional right, the next inquiry in a claim of retaliation is whether the Defendants took an "adverse action."

The Second Circuit defines " ' adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381 (quoting *Davis,* 320 F.3d at 353, *superceded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 6, 2003)) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id.* at 381. Courts in this circuit have held that claims of mail tampering do not constitute adverse action. *See Rivera v. Pataki,* No. 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, 2005 WL 407710, at \* 19 (S.D.N.Y. Feb. 7, 2005) (holding that several incidents of "actively prevent [ing] [plaintiff] from mailing his documents ... did not constitute adverse action"); *Battice v. Phillip,* No. CV-04-669, 2006 U.S. Dist. LEXIS 53407, 2006 WL 2190565, at \*6 (E.D.N.Y. Aug. 2, 2006) ("allegations that [defendant] withheld [plaintiff's] mail ... do not constitute adverse actions."). Therefore, I recommend that the Court dismiss this claim *sua sponte.*

4. *Defendant Griffin*

Read broadly, Plaintiff's complaint alleges that Defendant Griffin violated his constitutional rights by failing to conduct a thorough investigation of the incident. Defendants have not addressed this claim. I find that this claim is subject to *sua sponte* dismissal because prisoners do not have a due process right to a thorough investigation of grievances. *Torres,* 246 F.Supp.2d at 341-42. Therefore, I recommend that the Court dismiss this claim.

5. *Defendant Miller*

I construe Plaintiff's complaint to allege Defendant Miller, in his supervisory capacity, deprived Plaintiff of his constitutional rights with regards to the mail tampering incident. Defendants have not addressed this claim against Defendant Miller.

I find that this claim is subject to *sua sponte* dismissal because Defendant Miller was not personally involved in the alleged violation. The SHU mail policy required "inmates to place all outgoing mail under their cell doors, to be picked up by the S.H.U. officers on the midnight shift and taken to the chart office." (Miller Decl. ¶ 11.) At the time of the mail tampering incident, Defendant Miller was the Superintendent of Eastern Correctional Facility. (Miller Decl. ¶ 1.) Plaintiff does not allege that Defendant Miller misplaced his mail, but rather that Defendant Miller failed look into the matter after Plaintiff complained to him. (Pl.'s Dep. 37:17-38:1.) Absent a showing that Defendant Miller personally played a role in the loss of Plaintiff's legal mail, he cannot be held liable. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) ("Absent some personal involvement by [defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983."). Because Plaintiff does not allege that Defendant Miller lost his mail, I recommend that the Court *sua sponte* dismiss the claim against Defendant Miller.

**E. Tobacco Incident**

**\*14** Plaintiff alleges that on March 7, 2005, Defendant Farrell escorted him to the recreation area and, once Plaintiff was secured, spit chewing tobacco in Plaintiff's face. (Am. Compl. ¶ 30; Pl.'s Dep. 42:14-19.) Plaintiff does not allege that any injury resulted from this incident. However he does allege that his request for medical treatment immediately after the incident was denied. (Am.Compl.¶ 30.) Plaintiff alleges that he immediately reported this incident to Deputy Winlin [FN12] and requested a sick call, but that Defendant Farrell would not allow for one. (Pl.'s Dep. 43:10-25.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

I construe the complaint as asserting: (1) an Eighth Amendment excessive force claim against Defendant Farrell; and (2) an Eighth Amendment medical claim against Defendant Farrell.

### 1. Excessive Force

Plaintiff alleges that Defendant Farrell violated his Eighth Amendment rights by spitting chewing tobacco in his face. (Pl.'s Br ., Dkt. No. 80-1 at 2.) Defendants argue that this single incident does not constitute excessive force. (Defs.' Br. at 17.) Defendants are correct. As a matter of law, a single incident of spitting does not constitute excessive force. *See Greene v. Mazzuca,* 485 F.Supp.2d 447, 451 (S.D.N.Y.2007) (citation omitted) (holding that yelling, spitting at and threatening an inmate do not "rise to the level at which prevailing doctrine sets the constitutional bar to establish cruel and unusual punishment"); *Headley v. Fisher,* No. 06 CV 6331, 2008 U.S. Dist. LEXIS 37190, 2008 WL 1990771, at *14 (S.D.N.Y. May 7, 2008) (holding that spitting in plaintiff's face, slapping and pushing twice did not give rise to the claim of excessive force).[FN13] Therefore, I recommend that the Eighth Amendment claim against Defendant Farrell be dismissed.

### 2. Denial of Medical Care

Plaintiff claims that Defendant Farrell denied him medical treatment after the tobacco incident. (Am.Compl.¶ 30.) Defendants have not addressed this issue. I find that this claim is subject to *sua sponte* dismissal.

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citation omitted).

Here, Plaintiff has not alleged and the evidence does not show that he suffered any physical injury as a result of this incident. As such, his condition fails to meet the objective prong for medical indifference in that any injury he may have suffered was not "serious" and the court need not address the second element of deprivation. For these reasons, I recommend that the claim against Defendant Farrell for medical indifference be dismissed.

### F. Grievance Restriction

**\*15** Plaintiff filed 115 grievances against Eastern staff in the two-month period between January 24, 2005 and March 24, 2005. (Defs .' Br. at 4). On March 25, 2005, Defendant Inmate Grievance Program Director Thomas Eagen served Plaintiff with a grievance restriction alleging that he had acted in bad faith by inundating the program with multiple grievances. (Am. Compl. ¶ 31; Pl.'s Dep. 45:8-11.) Defendant Eagen's grievance restriction limited the number of grievances Plaintiff was allowed to file to two per week. (Eagen Decl. at 3). Plaintiff believes that Eagen relied on false statements made by Defendants Miller, Inmate Grievance Program Supervisor Kathleen Lucas and Sergeant Theodore Lucas. (Am.Compl.¶ 31.) These Defendants allegedly reported that Plaintiff had stated, "The war is on." (Am. Compl. ¶ 31; Pl.'s Dep. 48:1-10.) Plaintiff filed a grievance with Commissioner Glenn Goord about the restrictions placed upon him by Defendant Eagen. (Pl.'s Dep. 46:1-14 .)

Plaintiff claims that his access to the grievance program was unfairly restricted, that he was denied access to the courts, and that Defendant Eagen prevented his grievances from being fully exhausted on appeal. (Am.Compl.¶ 33.) Defendants argue that this claim should be dismissed because Plaintiff has no constitutional right to file a grievance and Defendant Eagen had sufficient information to determine that Plaintiff was abusing the grievance process. (Defs.' Br. at 3-4.) Defendants are correct.

Many states, including New York, have voluntarily instituted inmate grievance programs to resolve problems between inmates and staff members. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-70 (W.D.N.Y.2005). While the First Amendment guarantees the right of access to courts, grievance programs were undertaken voluntarily and have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

no legal basis in the Constitution. Therefore these programs are not considered constitutional rights. *Cancel, 2001 WL 303713, 2001 U.S. Dist. LEXIS 3440 at *9-10*. Thus, courts have consistently held that violations of those procedures or the state's failure to enforce them does not give rise to a claim under § 1983. *Id.* at *10 (citations omitted).

Moreover, there is sufficient evidence to establish that Plaintiff was abusing the grievance program. Plaintiff filed an exorbitant amount of grievances, 115 in a two month period, most of which were deemed frivolous, which gave Defendants appropriate justification for restricting Plaintiff's access to the program. Plaintiff has no right to abuse a voluntarily instituted program and delay the valid claims of other inmates. If Plaintiff had been completely prohibited from filing grievances, he may have had a claim. However, Plaintiff was still permitted to file two grievances per week under the restriction, which is a sufficient means of redress. For the above reasons, I recommend that this claim be dismissed.

**G. Bus Incident**

Plaintiff alleges that on June 27, 2005, Defendant Officers A. Sisilli and R. Riester used excessive force on him and that he was denied medical care after the incident. (Am.Compl.¶¶ 37-40.)

**\*16** The parties agree that on June 27, 2005, Plaintiff was escorted to the Downstate Correctional Facility draft room to wait for the bus to Eastern Correctional Facility. (Am. Compl.¶ 34; Pl.'s Dep. 55:4-7.) Defendant Sisilli searched and restrained Plaintiff and ordered him to remain seated until the bus' departure. (Am.Compl.¶ 34.); (Pl.'s Dep. 55:8-18.)

Plaintiff alleges that when he began to speak to the inmate next to him, Defendant Sisilli yelled violently at Plaintiff, "Hey you fucking asshole, on the fucking noise, there's no fucking talking while I'm [tying] inmate up." (Am.Compl.¶ 35.) Plaintiff replied, "Excuse me, Officer I am not talking loud disturbing anyone, I'm [speaking] to the man [tied] up next to me quietly." (Am.Compl.¶ 35.) Defendant Officer R. Riester then told Plaintiff to, "Shut the fuck up, I don't

want to hear your mouth at all asshole." (Am.Compl.¶ 36.) Defendant Sisilli then added, "I don't care how low you are talking, keep your fucking mouth [closed]." (Am. Compl. ¶ 36; Pl's Dep. 55-56.)

According to Defendants, Defendant Sisilli gave Plaintiff several direct orders to stop talking but Plaintiff refused to stop talking and used profanities. (Sisilli Decl. ¶ 5; Riester Decl. ¶¶ 6-7.) Defendant Riester asked Plaintiff for his identification number several times. Plaintiff "refused each time, using profanities." (Riester Decl. ¶ 8.)

The parties agree that thereafter, Defendants removed all inmates except Plaintiff from the draft room. (Pl.'s Dep. 56:11-17; Sisilli Decl. ¶ 7; Riester Decl. ¶ 9.) According to Defendants, they asked Plaintiff again for his identification number. (Sisilli Decl. ¶ 8.) Plaintiff responded by saying "when we get to Eastern the chains will come off and we are going to roll." (Riester Decl. ¶ 10.) Both Defendants declare that they "then escorted the plaintiff to the bus without incident." (Sisilli Decl. ¶ 8; Riester Decl. ¶ 11.)

Plaintiff's version of events in the draft room is quite different. He alleges that Defendant Sisilli grabbed him by his hair and rammed his head into the plastic covering over the holding pen repeatedly. (Am. Compl. ¶ 37; Pl's Dep. 56:19-24.) Plaintiff turned his head to avoid injury to his face which resulted in the ramming of his shoulders into the plastic covering. (Am.Compl.¶ 37.) Plaintiff claims that Defendant Sisilli repeated this assault approximately ten to fifteen times and then threw Plaintiff to the floor where Defendant Riester began to kick Plaintiff while he was restrained. (Am. Compl. ¶¶ 37-38; Pl's Dep. 58:1-16.) According to Plaintiff, the incident lasted for anywhere between thirty and sixty seconds. (Pl.'s Dep. 58:16.) Defendant Sisilli then pulled Plaintiff from the floor by his hair, which resulted in two dreadlocks being torn from his scalp. (Am.Compl.¶ 39.) Once Plaintiff was removed from the floor, Defendant Riester began to hit him in the head with several pairs of handcuffs, causing blood to leak from Plaintiff's ear. (Am.Compl.¶ 39.) Defendant Sisilli then pulled Plaintiff completely to his feet, slammed him into a wall and dragged him onto an awaiting bus, punching him in the midsection the entire time. (Am.Compl.¶ 39.); (Pl's Dep. 61:11-14.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

**\*17** The parties also have different versions of what occurred when the bus arrived at Eastern. Plaintiff alleges that once the bus arrived at Eastern, Defendants Sisilli and Riester "hit, slapped, and punched [P]laintiff all the way down to the SHU." (Am.Compl.¶ 40.); (Pl.'s Dep. 61:11-13.) Defendants, on the other hand, declare that they accompanied Eastern sergeants and officers on Plaintiff's escort to the SHU and that during that escort Defendant Sisilli "maintained control of the plaintiff by holding the plaintiff's waist chain." (Sisilli Decl. ¶ 9; Riester Decl. ¶ 16.) Defendants declare that when they arrived at the SHU, Defendant Sisilli removed Plaintiff's transportation hardware and directed Plaintiff to put his hands in his pockets. Plaintiff did not respond. (Sisilli Decl. ¶ 10; Riester Decl. ¶¶ 17-18.) Thereafter, Eastern staff placed Plaintiff in his cell. (Riester Decl. ¶ 19.)

Plaintiff alleges that he requested medical treatment upon arriving at Eastern, which was denied. (Am.Compl.¶ 40); (Pl.'s Dep. 60:8-12.) Plaintiff was seen and treated three times the following day, June 28, 2005. (Am. Compl. ¶ 40; Gusman Decl. ¶¶ 12-14.) The first time was at 9:10 a.m. Plaintiff complained that his left ribs were broken and that there was something "leaking and moving" in his head [FN14] as a result of being hit in the head with handcuffs. (Defs.' Ex. B at 78.) The nurse who examined him noted that Plaintiff had three-inch reddened areas on both shoulders with no break of skin and half-inch abrasions on both achilles tendons. No other abrasions, contusions, or lacerations were noted. (Gusman Decl. ¶ 12; Defs.' Ex. B at 78.) Force photos were taken during that visit, which indicated bruises on Plaintiff's shoulders from the altercation. (Pl's Dep. 59:17-24.) Plaintiff saw a doctor later that day, who ordered x-rays of Plaintiff's left rib cage and audiology testing in response to Plaintiff's complaints of pain, despite a normal chest examination and no crepitation of the ribs. (Gusman Decl. ¶ 13.) Plaintiff's medical records show that the x-rays "were read as normal." (Defs .' Ex. B at 84.) Plaintiff was seen again during 7:00 p.m. sick call. Staff did not note that Plaintiff had any complaints, although he inquired about a possible scheduling conflict with an upcoming orthopedic consultation. (Gusman Decl. ¶ 14.)

I construe Plaintiff's complaint to allege the following: (1) an excessive force claim against Defendants Sisilli and

Riester; and (2) a denial of medical care claim against Defendants Sisilli and Riester.

1. *Excessive Force*

a. *Merits*

Plaintiff claims that Defendants Sisilli and Riester violated his Eighth Amendment rights by subjecting him to excessive force. (Am.Compl.¶ 71.) Defendants argue that they are entitled to summary judgment because Plaintiff did not suffer any severe injuries and the alleged incidents lasted only "a couple of seconds." (Defs'. Br. at 21-22.) Defendants' arguments are without merit.

**\*18** Plaintiff's medical examination revealed two three-inch reddened areas on his shoulders with broken skin and a half-inch superficial abrasion on his Achilles tendon. (Kerwin Ex. E.) Defendants argue that they are entitled to summary judgment because Plaintiff did not suffer any severe injuries. (Defs.' Br. at 21-22.) Defendants' characterization of Plaintiff's injuries as *de minimis* is correct. Generally, courts in this Circuit have not viewed bruises and other superficial injuries as "serious" injuries. *See Gabai v. Jacoby,* 800 F.Supp. 1149, 1155 (S.D.N.Y.1992) (holding that a bruise resulting from being pushed into a chair was not a "serious injury"); *DeArmas,* 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501, at *4 (holding that force that resulted in a bruise and an injured right knee was "*de minimis* in the legal sense of the term"); *Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking the ankles and feet of an inmate causing abrasions and minor lacerations are de minimis and insufficient to rise to the level of a constitutional violation).

However, as discussed above in Section I(B)(1) of this Report-Recommendation, the extent of injury suffered by the inmate is only "one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Hudson,* 503 U.S. at 7 (citation and quotation marks omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

In determining whether the use of force was wanton or unnecessary, it may also be proper to evaluate the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted).

Here, the parties' different versions of the events of June 27, 2005, make it impossible to decide these factors as a matter of law. Where "[t]he circumstances of the incident and assessment of fault [bear] directly on the issue of whether force used was excessive ... given the conflicting evidence ... [t]he resolution of that issue must be left to the ultimate trier of fact." *Corselli v. Coughlin,* 842 F.2d 23, 26-27 (2d Cir.1988).

Moreover, Defendants' argument that the claims against Defendants Sisilli and Riester should be dismissed because the incidents lasted only "a couple of seconds" is without merit. (Defs.' Br. at 21-22 .) While "[t]he Second Circuit has deemed brief confrontations between prisoners and guards ... insignificant for Eighth Amendment purposes," the cases cited by Defendants are distinguishable. Each of the cases involved a single push lasting no more than a few seconds. In *Bryan v. Admin. of F. C.I. Otisville,* 897 F.Supp. 134 (S.D.N.Y.1995), the prisoner was pushed once by a corrections officer and allegedly "missed steps" causing "pains in his right leg." *Bryan,* 897 F.Supp. at 135. In *Malloy v. Defrank,* No. 95-Civ.-9122, 1996 U.S. Dist. LEXIS 16151, 1996 WL 631725, at *4 (S.D.N.Y. Oct.31, 1996), an inmate was pushed once in the back.

*19 Here, Plaintiff alleges that Defendants Sisilli and Riester repeatedly beat him in the draft room, on the way to the bus, and upon arriving at Eastern. (Am.Compl.¶¶ 37-40.) Each of these incidents lasted between thirty and sixty seconds. (Pl.'s Dep. 58:16.) Thus, the assault, when viewed in total, involved numerous punches and kicks and

lasted anywhere between a minute and a half and three minutes. This constitutes a greater amount of force used over a longer period of time than either *Bryan* or *Malloy.* Therefore, I recommend that the court deny Defendants' motion for summary judgment and allow the claim of excessive force against Defendants Sisilli and Riester to proceed.

b. *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity. (Defs.' Br. at 23.)

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira,* 380 F.3d at 68-69 (citations omitted); *accord, Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). Courts may exercise their sound discretion in deciding which of the two prongs should be addressed first, in light of the circumstances in the particular case at hand. *Pearson v. Callahan,* ---U.S. ----, ----, 129 S.Ct. 808, 817, 172 L.Ed.2d 565 (2009).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity';

(2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

the right in question; and

(3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169-70 (citations omitted). This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**\*20** Defendants Sisilli and Riester are not entitled to qualified immunity with regard to Plaintiff's excessive force claim. In *Hudson,* the Supreme Court held that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson,* 503 U.S. at 9. Thus, viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants knew or should have known that their conduct violated Plaintiff's Eighth Amendment rights. Moreover, case law within this circuit has clearly established that a prison official's use of force against an inmate for reasons that do not serve a penological purpose violated the inmate's constitutional rights. *See Boddie,* 105 F.3d at 861-62; *Walsh,* 194 F.3d at 48-50. Because "qualified immunity would be defeated if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff],' " I recommend that the court decline to apply the defense of qualified immunity to this claim. *Harlow,* 457 U.S. at 815 (emphasis omitted).

2. *Denial of Medical Care*

Although it is not precisely clear against whom the claim is asserted, Plaintiff alleges that his Eighth Amendment rights were violated when he was denied immediate medical treatment after the incident. (Am.Comp.¶ 40.) Defendants argue that Plaintiff has failed to state an Eighth Amendment medical care claim. (Defs.' Br. at 12.) Defendants are correct.

Here, even liberally construing the complaint and Plaintiff's allegations, Plaintiff has not raised a triable issue of fact as to the objective element of his Eighth Amendment medical claim. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03. Plaintiff's medical examination revealed that Plaintiff had two bruises and a superficial laceration on his body. (Kerwin Ex. E.) Plaintiff's superficial injuries are not significant enough to satisfy the objective element.

Even if Plaintiff could raise a triable issue of fact as to the objective element, there is no evidence supporting a finding that any of the Defendants were deliberately indifferent. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Hathaway,* 99 F.3d at 553). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

**\*21** Here, it is undisputed that Plaintiff saw medical staff three times on the day after the incident. (Kerwin Ex. E.) Other than the superficial abrasions on Plaintiff's shoulders and achilles tendons, no injuries were noted. Despite the absence of any indications of serious injury, the doctor ordered x-rays of Plaintiff's ribs. Those x-rays "were read as normal." (Defs.' Ex. B at 84.) Nothing in the record indicates that any Defendant was deliberately indifferent to any medical need. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment medical care claim arising from the alleged June 27, 2005, use of force.

**H. Food Hatch Incident**

At 8:30 a.m. on October 10, 2005, Plaintiff was brought to the health unit from the SHU. (Defs.' Ex. B at 121.) He stated that his left shoulder had come out of its socket while he was folding a blanket. *Id.* Plaintiff was examined and no "deformity" was noted. *Id.* Tylenol was prescribed for the pain. *Id.*

Plaintiff alleges that at lunch time on that same day, he handed his lunch tray and garbage to Defendant T.J. Brown, at which point Defendant Brown allegedly pulled Plaintiff's left arm until it dislodged from its socket. (Am. Compl. ¶ 41; Pl's Dep. 63:8-21.) Plaintiff alleges that Defendant T.J. Brown then closed the "feed-up hatch" and said "It's never over." (Am. Compl. ¶ 41; Pl's Dep. 63:22-24.) Defendant T.J. Brown declares that Plaintiff's allegation "that on October 10, 2005, I pulled his arm back and forth through the feed up hatch until his shoulder fell out of its socket ... is false." (Brown Decl., Dkt. No. 75-32 ¶ 9.)

Plaintiff was seen in the medical office of the SHU the next day. Plaintiff stated that he was "not interested" in any problem with his left shoulder. (Defs.' Ex. B at 118.) On physical exam, no note was made of any problems with Plaintiff's left shoulder. *Id.*

I construe the complaint as asserting the following claims: (1) an excessive force claim against Defendant T.J.

Brown; and (2) a retaliation claim against Defendant T.J. Brown.

*1. Excessive Force*

Plaintiff alleges that Defendant T.J. Brown violated his Eighth Amendment rights by using excessive force. (Am.Compl.¶ 72.) Defendants claim that Plaintiff's excessive force claims are without merit because Plaintiff medical records indicate a prior shoulder injury and no injuries were recorded after the incident with Defendant T.J. Brown. (Defs.'Br. at 17-19.) Defendants argue further that Defendant T.J. Brown is entitled to qualified immunity. (Defs.' Br. at 23.)

*a. Merits*

As previously stated, a claim of excessive force presents the question of whether force was used as a "good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" *Hudson, 503 U.S. at 6* (citation omitted). In evaluating Eighth Amendment excessive force claims, "the absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id. at 7.* The court may additionally assess "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of a forceful response.' " *Id.* (citation omitted).

**\*22** Here, Plaintiff and Defendant T.J. Brown present two different versions of the alleged incident. Plaintiff alleges that Defendant T.J. Brown, without provocation, pulled his arm so hard that it became dislodged from its socket. Defendant, on the other hand, flatly denies that he touched Plaintiff at all. This presents a genuine issue of material fact as to whether Defendant T.J. Brown pulled on Plaintiff's arm in a "good faith effort to restore discipline" or whether that conduct was malicious.[FN15] Because an issue of material fact is present, I recommend that this claim survive summary judgment and be presented to a trier of fact.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

b. *Qualified Immunity*

Defendants argue that Defendant T.J. Brown is entitled to qualified immunity based on the facts of the case. (Defs.' Br. at 23.) Based upon clearly established case law and the evidence viewed in the light most favorable to Plaintiff, a reasonable juror could find that Defendant T.J. Brown "knew or should have reasonably known" that forcibly pulling Plaintiff's arms through a food hatch violated Plaintiff's Eighth Amendment rights. For these reasons, I recommend that the Court reject the argument that Defendant T.J. Brown is entitled qualified immunity regarding this claim.

2. *Retaliation*

Plaintiff claims that Defendant T.J. Brown's actions were retaliatory. (Am. Compl. at 20-21.) Defendants have not addressed this claim. I find that Plaintiff's allegations are sufficiently plausible to withstand *sua sponte* review. Plaintiff alleges that Defendant T.J. Brown destroyed his personal property on January 27, 2005, and that Plaintiff reported the incident to his area supervisor. (Am.Compl.¶¶ 23-25.) This is a sufficient allegation that Plaintiff was engaged in protected conduct. Plaintiff alleges that Defendant T.J. Brown then used excessive force on him, stating that "It's never over." (Am.Compl.¶ 41.) This is a sufficient allegation that Defendant T.J. Brown took adverse action that would objectively chill a person from exercising his rights. Finally, although the excessive force incident occurred more than eight months after the destruction of personal property, Defendant T.J. Brown's alleged use of the phrase "It's never over" is sufficient to make a causal connection between the protected conduct and the adverse action. Therefore, I recommend that this claim survive *sua sponte* review.

**I. Recreation Periods**

Plaintiff alleges that Defendants Miller, W. Brown, and Healy sent him out for recreation in sub-zero temperature following showers, causing his dreadlocks to freeze and giving him head colds and influenza. (Am. Compl. ¶ 51; Pl.'s Dep. 41:7-12.) Plaintiff claims that he was forced to participate in recreation in "the bitter cold below zero

weather, without adequate clothing." (Pl.'s Addendum Mem. at 2; Am. Compl. ¶ 52.) Plaintiff also alleges that he was denied winter underclothes during these recreational periods. (Am. Compl. ¶ 52.; Pl.'s Dep. 75:6-14.) When Plaintiff complained about not receiving winter clothes, Defendants Miller, W. Brown, and Healy said that DOCS stopped issuing winter clothing items to inmates and that winter underclothes were not allowed in the SHU during recreation. (Am. Compl. ¶ 52; Pl.'s Dep. 75:16-25.)

**\*23** I construe the complaint as asserting the following claims regarding these allegations: (1) an Eighth Amendment conditions of confinement claim against Defendants Miller, W. Brown, and Healy; and (2) a retaliation claim.

1. *Conditions of Confinement*

Defendants argue that Plaintiff's claims regarding conditions during recreation periods should be dismissed because the recreation period is part of an overall prison regulation that serves a reasonable penological purpose. FN16 (Defs.' Br. at 6.)

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* (citation and punctuation omitted). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson,* 503 U.S. at 9.

The Second Circuit has held that proof that the inmate was subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); *see also Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) (vacating a dismissal on the pleadings where the complaint alleged that prisoner was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

deliberately exposed to bitter cold for periods of twenty-one days or more while in solitary confinement); *Corselli,* 842 F.2d at 27 (holding that summary judgment for defendants was precluded where prisoner was subjected to bitter cold in cell for three months).

Where an inmate has not been subjected to "bitter cold" for a "prolonged period," the Second Circuit has held that summary judgment for prison officials is appropriate. In *Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003), the plaintiff was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure for his behavior. *Trammell,* 338 F.3d at 159. The Second Circuit found that summary judgment for the defendants was appropriate because the plaintiff had failed to allege that his cell was open to the elements, lacked adequate heat, or that he had been subjected to "bitter cold." *Trammell,* 338 F.3d at 165. The Second Circuit stated that it "[had] no doubt that Trammell was made uncomfortable by the deprivation of his clothing, but there [was] simply no factual dispute regarding whether the temperature in his cell posed a threat to his 'health or safety' of the sort that would disallow summary judgment in the defendants' favor." *Id.*

Here, Plaintiff alleges that "on many occasions" he was exposed to "below zero weather" for an hour at a time during recreation period. (Am.Compl.¶ 51.) Although this hour was likely very uncomfortable and was repeated often, the evidence does not show that Plaintiff was ever exposed to bitter cold temperatures for the kinds of "prolonged" periods described in Second Circuit precedent. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim on the basis that there is no triable issue of fact as to the objective element.

**\*24** Even if there were sufficient evidence to raise a triable issue of fact as to the objective element, summary judgment of this issue would be appropriate because Plaintiff cannot establish the subjective element. Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Here, there is no evidence before the Court that Plaintiff was at an excessive risk. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment conditions of confinement claim regarding recreation periods.

2. *Retaliation*

Plaintiff alleges that Defendants Miller, W. Brown, and Healy committed "retaliatory acts" when they "forced [Plaintiff] to recreation from the shower in below zero weather." (Am. Compl. at 20.)

Plaintiff does not specify for what protected conduct he believes Defendants Miller, W. Brown, and Healy were retaliating. Additionally, Plaintiff makes no claim that he was the only SHU inmate forced to attend recreation periods after his required shower. A policy that is instituted against the general prison population rather than against a certain individual fails to establish the necessary causal connection between Plaintiff's protected conduct and the adverse action taken by Defendants. Thus, the actions on the part of Defendants with regards to recreation periods cannot be considered retaliatory and I recommend that this claim should therefore be dismissed.

**J. Kosher Meals**

Plaintiff claims that Defendant Miller denied him Kosher meals.[FN17] (Am.Compl.¶ 50.) Plaintiff states that he suffered weight loss and head pain because he was forced to eat only bread, dry cereal, and water. (Am.Compl.¶ 50.)

Plaintiff alleges that the deprivation of his Kosher meals violated his First Amendment right to practice religion. (Am.Compl.¶¶ 50, 72.) Plaintiff also claims that Defendants K. Lucas, W. Brown, and Eagen violated his constitutional rights by failing to process his grievances regarding this issue. (Am.Compl.¶¶ 32-33.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

### 1. *Personal Involvement*

Plaintiff claims that Defendant Miller personally deprived him of his Kosher meals while he was at Eastern. (Am.Compl.¶ 50.) Defendants claim that Defendant Miller cannot be held liable in his supervisory capacity because he merely referred Plaintiff's complaints to his Deputy Superintendent and did not physically serve meals to Plaintiff. (Defs.' Br. at 5.) Defendants are correct.

**\*25** As discussed above in Section I(B)(3), a showing of personal involvement is necessary in order for § 1983 liability to attach. A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy the violation after learning of it through a report or appeal" or "allowed the custom or policy to continue after learning of it." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000); *see also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (quoting *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, 1995 WL 232736, at \* 4 (S.D.N.Y. Apr.19, 1995)).

Here, Plaintiff brings suit against Defendant Miller in his individual capacity, as former Superintendent of Eastern. (Am.Compl.¶ 8.) Defendant Miller declares that he referred all complaints to the Deputy Superintendent for investigation and action. (Miller Decl, Dkt. No. 75-32 ¶ 9.) This court has previously noted the well-settled principle "that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement ... [t]he same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." *Booker v. Doe,* No. 9:06-CV-73, 2008 U.S. Dist. LEXIS 76413, 2008 WL 4527601, at \*22 (N.D.N.Y. Sept. 30, 2008) (citations omitted). The only connection between Plaintiff's deprivation and Defendant Miller is that Plaintiff filed a grievance complaining that he was not being provided with Kosher meals which Defendant Miller

referred to the Deputy Superintendent. Defendant Miller had no direct or tangible connection to Plaintiff's deprivation and his "mere linkage" to the alleged conduct is insufficient to hold him liable in his supervisory capacity. Therefore, I recommend that Plaintiff's claim against Defendant Miller regarding Kosher meals be dismissed.

### 2. *Grievance Process*

Plaintiff alleges that Defendant K. Lucas failed to file a grievance that he attempted to file concerning his free access to religious freedom. (Am.Compl.¶ 32.) On October 18, 2005, Defendant Superintendent William Brown failed to act on the grievance. (Am.Compl.¶ 32.) Additionally, Defendant Eagen denied Plaintiff's appeal on November 15, 2005. (Am.Compl.¶ 32.) Plaintiff claims that these actions deprived him of the right to fully exhaust his administrative remedies through the Prisoner's Litigation Reform Act (PLRA). (Am.Compl.¶ 33.)

**\*26** I construe Plaintiff's complaint to allege that Defendants K. Lucas, William Brown, and Eagen violated his constitutional rights by failing to properly process his grievance. Defendants have not addressed this claim. However, I find that it is subject to *sua sponte* dismissal.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, \*3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at \*3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

*Mahotep v. DeLuca*, 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell*, 365 F.Supp.2d at 369-370. Thus, because Plaintiff had no right to file a grievance, the failure to process a single grievance does not rise to the level of a cognizable claim under § 1983 and I recommend that the claim therefore be dismissed.

**K. November 15 Incident**

Plaintiff alleges that on November 15, 2005, he requested an emergency sick call, complaining of chest pains and dizziness. (Am.Compl.¶ 42.) Four prison guards, including Defendants Sergeant Dawn DiCairano and Occhipinti, appeared at Plaintiff's cell and ordered him to place his hands into the hatch to be restrained. (Am.Compl.¶ 42.) Plaintiff claims that he complied with this request. (Am. Compl. ¶ 42; Pl.'s Dep. 105:13-15.)

Plaintiff alleges that after his hands were in the hatch, Defendant Occhipinti slammed the handcuffs on Plaintiff's wrists, which pinched his skin and caused him great pain. (Am. Compl. ¶ 43; Pl's Dep. 64:14-17.) Defendants Occhipinti and DiCairano each declare that after the restraints were placed on Plaintiff, he "yelled and forcibly pulled on the handcuffs, pulling Officer Occhipinti against the cell door causing [Defendant Occhipinti] to hit his right wrist." (DiCairano Decl. at 2); *see also* (Occhipinti Decl. at 2.) Plaintiff admits that after the handcuffs were placed on his wrist that he "jumped ... and I just pulled my arm through and started, like, what the hell." (Pl.'s Dep. 64:15-18.)

Plaintiff alleges that Defendant Occhipinti then pulled Plaintiff's arm through the hatch causing his face to slam into the steel door and breaking his tooth into two pieces. (Am. Compl. ¶ 44; Pl's Dep. 64:17-20.) During this time, Plaintiff's right bicep was also grated across the hatch plate causing multiple abrasions. (Am. Compl. ¶ 45; Pl's Dep. 64:17.) Defendant Occhipinti declares that he pulled back on Plaintiff's forearms so that officers could finish applying the restraints to Plaintiff. (Occhipinti Decl. at 2.)

*27 Plaintiff alleges that Defendant DiCairano yelled, "[Break] that nigger's arm, I told him we would get him, [break] his arm." (Am. Compl. ¶ 45; Pl's Dep. 66:4-13.) Defendant DiCairano denies that either she or Defendant Occhipinti used any racial slurs during this encounter. (DiCairano Decl. at 3.) Plaintiff alleges that Defendant Occhipinti continued to assault Plaintiff through the cell door until another guard finally told him to stop. (Am.Compl.¶ 45.) Defendants allege that Plaintiff spit at Defendant Occhipinti once he was removed from his cell, an allegation corroborated by several DOCS officers. (Dkt. No. 75-15.)

After this, Plaintiff was taken to the facility emergency room. (Am. Compl. ¶ 46; Dkt. No. 75-6 at 6.) Plaintiff alleges that upon seeing Plaintiff, Defendant Captain Michael Leghorn stated, "[S]tay facing the wall you stupid fucking nigger, if you move I'm going to bust your fucking head open." (Am. Compl. ¶ 46; Pl's Dep. 68:12-16.) Plaintiff alleges that Defendant Leghorn then began slamming Plaintiff's head into the wall repeatedly. (Am. Compl. ¶ 46; Pl's Dep. 67:21-24.) In a memorandum addressed to Defendant Healy on November 23, 2005, Defendant Leghorn admitted to "direct[ing] staff to have [Plaintiff] sit in a chair facing the wall," but denied using any physical force against Plaintiff or making "any racial comments." (Dkt. No. 75-18 at 11.) Defendant Leghorn did not file a declaration in support of Defendants' motion for summary judgment.

Plaintiff was eventually examined by a nurse, who found that Plaintiff's only injuries were minor lacerations on his right arm and hand. Plaintiff was then taken back to his cell. (Am. Compl. ¶ 47; Dkt. No. 75-6 at 6, 11.) Defendant Occhipinti also received medical treatment for minor abrasions to his right wrist. (Dkt. Nos. 75-15, 75-6 at 6.) Plaintiff's medical records do not note any injuries to Plaintiff's head. At his deposition, Plaintiff testified that Defendant Leghorn's conduct caused him headaches, but he admitted that he had suffered from headaches prior to the incident. (Pl.'s Dep. 68:17-20.)

Defendant DiCairano filed a use of force report stating that Plaintiff's injuries were minimal and the force used was justified in the attempt to regain control of the situation. (Dkt. No. 75-15.) The document was confirmed by Defendant W. Brown. (Dkt. No. 75-15.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

I construe the complaint as asserting the following claims:
(1) an excessive force claim against Defendant Occhipinti;
(2) a failure to intervene claim against Defendant
DiCairano; (3) an excessive force claim against Defendant
Leghorn; and (4) a claim that Defendants Occhipinti,
DiCairano, and Leghorn verbally harassed Plaintiff.

1. *Excessive Force: Occhipinti*

Plaintiff alleges that Defendant Occhipinti violated his
Eighth Amendment rights by subjecting him to excessive
force. Defendants argue that this claim should be
dismissed because "a virtually identical incident has been
found by this court to be insufficient to support an Eighth
Amendment claim" and because Plaintiff "alleges that
[D]efendant Occhipinti pulled [his] arm just once [and
this] single action is not sufficiently wanton to support an
Eighth Amendment claim." (Defs.' Br. at 19.)

**\*28** As with the alleged excessive force incident involving
Defendant T.J. Brown, discussed above in Section I(H),
Defendants cite *Holloway v. Mitchell-Oddey,* 2007 U.S.
Dist. LEXIS 74454, 2007 WL 2908923 (N.D.N.Y. Oct.4,
2007).[FN8] Here, Defendants characterize *Holloway* as a
"virtually identical" case. As mentioned above in note 11,
Senior District Court Judge Lawrence E. Kahn decided
*Holloway* after a bench trial. The plaintiff testified at trial
that when he attempted to push his food tray out the food
hatch, one officer grabbed his arm and held it while
another officer closed the hatch on the plaintiff's arm and
still another officer "began to kick aggressively at the
hatch." *Id.* at * 2. The plaintiff testified that he suffered
injuries to his arm that required ten staples to close. The
defendants testified that the plaintiff initiated the
altercation by grabbing one officer's arm and trying to pull
it through the hatch into the cell. *Id.* Also in evidence was
a letter from Prisoner Legal Services that "admit[ted] that
Plaintiff may have grabbed [the officer's] arm in the
struggle." *Id.* at * 6. Judge Kahn ruled that, based on the
evidence presented, the plaintiff had not met his burden of
proving *by the preponderance of the evidence* that the
force used against him was not a "good faith effort to
maintain or restore discipline." *Id.* at *7-8.

*Holloway* is not applicable here because the standard
Judge Kahn applied-the preponderance of the evidence-is
a trial standard, not a summary judgment standard. Here,
to survive summary judgment, Plaintiff must simply raise
a triable issue of fact that Defendants used force in
something other than a good faith effort to maintain or
restore discipline. Defendants argue that Plaintiff cannot
do so because he "alleges that [D]efendant Occhipinti
pulled [his] arm just once." (Defs.' Br. at 19.)

Defendants' argument mischaracterizes the evidence.
Plaintiff alleges that Defendant Occhipinti pulled his arm
so hard that his face slammed into the steel door, breaking
his tooth, and that Defendant Occhipinti continued to
assault Plaintiff until another guard told him to stop. (Am.
Compl. ¶¶ 44-45, Pl.'s Dep. 64:17-20.) As discussed
above in Section I(B)(1), determining whether force is
"wanton or unnecessary" or "necessary in a particular
situation" involves the weighing of several factors. Here,
a reasonable juror who credited Plaintiff's version of
events could find that Defendant Occhipinti used
excessive force. Therefore, I recommend that the Court
deny Defendants' motion for summary judgment of this
claim.

2. *Failure to Intervene*

Defendants assert that Defendant DiCairano cannot be
liable for failure to intervene. (Defs.' Br. at 20.)

As discussed above in Section I(B)(2), an officer cannot
be held liable for failure to intervene if there was not a
"reasonable opportunity" to stop the alleged use of
excessive force. *Cusamano,* 604 F.Supp.2d at 429 n. 9;
*Parker,* 1994 WL 49696 at *8. This issue can be decided
as a matter of law only if "considering all the evidence, a
reasonable jury could not possibly conclude" that the
officer had a reasonable opportunity to intervene.
*Anderson,* 17 F.3d at 557.

**\*29** Here, Plaintiff alleges that Defendant Occhipinti
continued to assault him until "another prison guard" told
him to stop. (Am.Compl.¶ 45.) The allegation that a guard
other than Defendant DiCairano had an opportunity to
intervene and did, in fact, do so raises a triable issue of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

fact that Defendant DiCairano could have stopped the assault. A reasonable juror could conclude that her inaction, coupled with her alleged use of racial epithets and encouragement of the use of force, constituted a failure to intervene. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of this claim.

3. *Excessive Force: Leghorn*

Plaintiff alleges that Defendant Leghorn violated his Eighth Amendment rights by subjecting him to excessive force. As noted above, there is no evidence that Plaintiff was injured as a result of this alleged incident. Defendants argue that the claim should be dismissed because "courts in this Circuit have dismissed Eighth Amendment claims when a plaintiff's medical records do not support plaintiff's claims of force." (Defs.' Br. at 20.) Defendants cite *Davidson v. Murray,* 371 F.Supp.2d 361 (W.D.N.Y.2005), *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 U.S. Dist. LEXIS 22660, 2002 WL 31654960 (S.D.N.Y. Nov. 22, 2002) [FN19], and *Santiago v. Campisi,* 91 F.Supp.2d 665, 674 (S.D.N.Y.2000).

In *Davidson,* a prisoner alleged that a guard who was escorting him from his cell to another part of the prison handcuffed him tightly "and twisted and yanked his wrists and arms" and then "placed his body weight onto [the prisoner's] back when he pressed [the prisoner's] face ... into a corner of an elevator." There was no evidence before the court that the prisoner ever sought medical treatment after the incident. The court granted the defendant's motion for summary judgment, finding that the prisoner had not raised a triable issue of fact as to either the objective or the subjective prong of his excessive force claim.

In *Cunningham,* a pretrial detainee was forcibly restrained by several court officers after directing a profanity-laden diatribe at a judge. The EMT who examined the Plaintiff after the incident found that the plaintiff "had no injuries or complaints." The plaintiff refused further medical attention. A week later, the plaintiff complained of neck, shoulder, lower back, and hip pain. A prison doctor found nothing significant aside from muscle pain. The doctor advised the plaintiff to return to the clinic if his symptoms

continued or worsened, but the plaintiff did not seek further medical treatment. The court granted the defendants' motion for summary judgment, finding that the plaintiff had not raised a triable issue of material fact. Specifically, the court found that the plaintiff's injuries were *de minimis,* that the force used was not repugnant to the conscience of mankind because the officers engaged in the "authorized use of force to restore order in the courtroom," and that no reasonable jury could find that the officers acted "wantonly with a sufficiently culpable state of mind ."

**\*30** In *Sanitago,* a pretrial detainee alleged two excessive force incidents by an officer. In the first, the officer "reached a hand through a prison gate that separated him from plaintiff and brushed underneath plaintiff's eyes to near his nose." The detainee alleged that, by doing so, the officer "intended to jab both of his eyes." In the second incident, the officer "sought him out and assaulted him without provocation" by slapping him once on the jaw with an open hand. The plaintiff did not report any injuries until ten days after the second incident. Upon examination, no swelling, tenderness, or evidence of any injury was noted. The defendant moved for summary judgment. The court found that the detainee had satisfied his burden for the subjective inquiry by maintaining that he "was minding his business when the alleged attacks took place," thus raising a triable issue of fact that any force used was not applied in good faith. *Id.* However, the court granted the defendant's motion for summary judgment because any force used was *de minimis* and not repugnant to the conscience of mankind.

Defendants argue, essentially, that the Court should grant summary judgment because Plaintiff's testimony is the only evidence in the record that supports a finding that the alleged attack by Defendant Leghorn occurred. In general, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

(E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554. Here, I find that it is appropriate to conclude that no reasonable jury would credit Plaintiff's testimony. Plaintiff's medical records indicate no damage to his head, even though he was examined shortly after the alleged attack. Plaintiff's testimony that the only injury he suffered as a result of having his head allegedly repeatedly rammed into a wall was the exacerbation of previously-existing headaches is implausible. If the mere allegation of use of force and racial epithets was sufficient, without medical evidence of even a *de minimis* injury, to raise a triable issue of fact, prisoners could fabricate Eighth Amendment claims far too easily. I therefore recommend that the Court grant Defendants' motion for summary judgment and dismiss the excessive force claim against Defendant Leghorn.

#### 4. *Verbal Threats*

**\*31** Plaintiff claims that while Defendant Occhipinti was pulling Plaintiff's arms through the feed up hatch, Defendant DiCairano yelled "[break] that nigger's arm, I told him we would get him back, [break] his arm." (Am.Compl.¶ 45.) Defendant DiCairano denies that either she or Defendant Occhipinti used any racial slurs during this encounter. (DiCairano Decl. at 3.)

"Verbal harassment itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." *DeJesus v. Tierney,* No. 9:04-CV-298, 2006 U.S. Dist. LEXIS 22949, 2006 WL 839541, at \*33 (N.D.N.Y. Mar.28,2006) [FN20]; *see also Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"). Here, Plaintiff's injuries were caused by Defendant Occhipinti, not Defendant DiCairano. Because Plaintiff did not suffer any injuries as a result of Defendant DiCairano verbal abuse, Plaintiff cannot sustain a claim under § 1983 and I recommend that the claims against Defendant DiCairano be dismissed.

Plaintiff alleges that after he was taken to the prison hospital, Defendant Leghorn stated, "stay facing the wall you stupid fucking nigger, if you move I'm gonna bust your fucking head open," and subsequently slammed Plaintiff's head into the wall repeatedly. (Am.Compl.¶ 46.) Plaintiff underwent a use of force examination after this incident which did not reveal any injury to Plaintiff's head. (Dkt. No. 75-19 at 28.) Absent physical injury, verbal threats and abuse are insufficient to support a constitutional violation. *See Ramirez,* 921 F.Supp. at 210. Because no actual injuries were recorded and Plaintiff does not allege that any injury resulted from the incident, Defendant Leghorn's alleged behavior does not rise to the level of a cognizable claim under § 1983 and I recommend that the claim therefore be dismissed.

### L. Shoulder Surgery

Plaintiff was scheduled to have shoulder surgery and broken screw removal on May 25, 2006. (Am.Compl.¶ 53.) However, on May 13, 2006, Assistant Commissioner Diane Van Buren [FN21] and W. Brown ordered Defendants Gusman and Doctor Inaganti to cancel Plaintiff's's shoulder surgery so that he could be transferred to the Five Points Correctional Facility. (Am.Compl.¶ 54.) Defendants Gusman and Inaganti cancelled the surgery despite the fact that the surgery had initially been ordered by Mr. Holder on November 16, 1998. (Am.Compl.¶ 53, 55.); (Pl's Dep. 78:7-9.) Plaintiff was told that his surgery was cancelled because he "wasn't in [his] right state of mind." (Pl's Dep. 78:12-15.) As a result of this cancellation, Plaintiff suffered daily excruciating pain and the continual dislocation of his shoulder while sleeping until he later received the surgery at Five Points Correctional Facility. (Am. Compl. ¶ 57; Pl's Dep. 77:9-11.)

**\*32** Plaintiff claims that Defendants violated his Eighth Amendment rights by cancelling his surgery. (Pl.'s Br. at 5-6.) Defendants argue that since Plaintiff's surgery was merely postponed and not cancelled, Plaintiff's Eighth Amendment rights were not violated. (Defs.' Br. at 12.) Moreover, Defendants argue that the decision to postpone the surgery based upon Plaintiff's physical and mental state was within the medical judgment of Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

Gusman and Inaganti and therefore cannot be challenged. (Defs.' Br. at 12.)

An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.") However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

In his complaint, Plaintiff asserts that his shoulder surgery scheduled for May 25, 2006 was ordered by Dr. Johnathan Holder in November of 1998. (Am.Compl.¶ 53.) Plaintiff claims that this injury constituted a "serious medical need" that required "appropriate, if not immediate, medical attention." (Dkt. No. 80-2 at 5.) However, Plaintiff himself acknowledges that this surgery was "recommended" and not required. (Dkt. No. 80-2 at 5.) In *Green,* the court refused to find an Eighth Amendment violation where a prisoner's surgery was cancelled for medical reasons. *Green v. Portuondo,* No. 97 Civ. 2639(AKH), 2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *2 (S.D.N.Y. Dec.11, 2000).[FN22] The *Green* court noted that the plaintiff's medical condition at the time of the cancellation changed the appropriate course of treatment and that it was in the doctor's discretion to change the course of treatment. *Green,* 2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *4.

Here, Defendants had noticed that Plaintiff was mentally unfit around the time of the surgery and cancelled the surgery because previously a mentally ill inmate had committed suicide after receiving surgery. (Dkt. No. 75-28 at 10.) "Disagreement as to the appropriate course of treatment [does not] create a constitutional claim." *Green,*

2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *4 (citation omitted). Plaintiff's claim is nothing more than a dispute over the course of treatment, more specifically a dispute over the timing of Plaintiff's surgery, and therefore is insufficient to state a claim for medical indifference. Moreover, Defendants claim that the surgery was merely postponed and not cancelled for medical reasons. (Defs.' Br. at 12.) Thus, Defendants did not completely deprive Plaintiff of his recommended treatment, they merely made a decision to reschedule it for a later date that would be most beneficial to Plaintiff's health.

**\*33** Plaintiff also alleges that Defendant W. Brown ordered the surgery's cancellation and should be held liable in that respect. (Am.Compl.¶ 56.) However, in holding that the postponement of the elective surgery itself was not a violation of Plaintiff's Eighth Amendment rights, the court need not address the issue with respect to Defendant W. Brown and I recommend that the claim be dismissed.

**M. Claims Regarding Treatment of Plaintiff's Vision**

While housed at Eastern, from January 24, 2005 until May 23, 2006, Plaintiff claims that he was "treated as an animal," and deprived of adequate medical care. (Am.Compl.¶ 48.) More specifically, Plaintiff accuses Defendant Gusman of failing to treat him or allow for treatment by others for the vision impairment suffered by Plaintiff as a result of the constant lighting in the SHU.[FN23] (Am.Compl.¶ 48.)

I construe Plaintiff's complaint to allege a denial of adequate medical care in violation of the Eighth Amendment. Defendants argue that Plaintiff has failed to establish that the medical care provided was improper. (Defs.' Br. at 13.)

Plaintiff alleges that Defendant Gusman "[failed] to treat, and/or refer Plaintiff to an outside specialist for his vision impairment." (Am.Compl.¶ 48.) Defendant Gusman stated that "Plaintiff's complaints of watery, burning and/or painful eyes were addressed continuously" by both himself and members of his staff. (Gusman Aff. at 2.) The Eastern medical staff noted that there was no medical problem

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

with Plaintiff's eyes, however he was still given eye drops and pain medication to address his discomfort. (Gusman Aff. at 2.) Based upon the examination of Plaintiff, Defendant Gusman determined that a consultation was not required or justified. (Gusman Aff. at 2.) "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Morrison v. Mamis,* 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639, at *7 (S.D.N.Y. Dec.18, 2008) (citing *Chance,* 143 F.3d at 703) FN24. Thus, Plaintiff's claims of inadequate treatment merely amount to a difference in opinion between Plaintiff and Defendant Gusman as to how Plaintiff's eye condition should be treated. Therefore, I recommend that the court dismiss the claim against Defendant Gusman.

**N. Conditions of Confinement**

1. *Constant Cell Illumination*

While in the SHU, Plaintiff's cell was illuminated twenty-four hours a day. (Am.Compl.¶ 48.) This constant illumination allegedly caused Plaintiff to "see colorful blurry spots." (Am.Compl.¶ 48.)

I construe Plaintiff's complaint to allege cruel and unusual treatment in violation of the Eighth Amendment. Defendants argue that the SHU rules regarding lighting are constitutional and part of an overall prison regulation which serves an important penological concern. (Defs.'Br. at 6.)

**\*34** "The Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones." *Harper v. Showers,* 174 F.3d 716, 719 (5th Cir.1999) (citation omitted). Therefore, a retaliatory action undertaken by prison officials that is inhumane in nature can violate the rights of prisoners. Here, Plaintiff alleges that Defendants forced him to live in a cell where the lights were on twenty-four hours a day and that this caused him "physical and psychological harm." (Pl.'s Mem. at 3.)

Constant illumination of inmate cells can be considered an adverse action in that it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381(citation omitted). Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights. *See Harper,* 174 F.3d at 720; *Chavarria v. Stacks,* 102 Fed. Appx. 433, 436 (5th Cir.2004). While Plaintiff does not specifically allege sleep deprivation, "physical and psychological harm" caused by constant lighting in his cell can be read broadly to encompass such harm. In addition, Plaintiff claims that he "began to see colorful blurry spots as a result" of this treatment. (Am.Compl.¶ 48.) This evidence, when coupled with potential sleep deprivation, is sufficient for a reasonable juror to conclude that Plaintiff did suffer some type of actual harm as a result of the lighting conditions in the SHU Thus, Plaintiff has demonstrated that he had a protected constitutional interest.

However, Plaintiff has failed to demonstrate a causal connection between his conduct and the adverse action of leaving the lights on in the SHU twenty-four hours a day since this policy applied to all inmates in the SHU, not just Plaintiff. (Def.'s Br. at 6.) Therefore, Plaintiff cannot sustain a claim of retaliation since the adverse action was not directed at him, but rather the entire SHU population.

Moreover, constant illumination is related to a legitimate penological concern. In *Chavarria,* the Fifth Circuit held that constant illumination did not violate an inmate's rights because the practice was "reasonably related to the penological interest of guard security." *Chavarria,* 102 Fed. Appx. at 436. In that case, the guards had informed the prisoners lights were kept on in the administrative segregation area for security purposes and were able to demonstrate that instituting a policy of dimming and brightening the lights when guards passed would be more disruptive to inmate sleep than constant illumination. *Id.* at 437.

At Eastern, inmates are placed in the SHU because the correctional staff has determined "that the inmates' presence in the general population would pose a threat to the safety and security of the facility." (Dkt. No. 75-30 at 2.) Eastern's SHU inspection guidelines require unit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

officers to conduct rounds every thirty minutes to ensure prisoner's safety and guard against misconduct. (Dkt. No. 75-30 at 17.) "A prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological interests' " and deference is to be given to prison administrators in making these rules. *Lewis v. Casey*, 518 U.S. 343, 361, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citation omitted). Therefore, Defendants had a legitimate penological interest in protecting both guards and inmates by keeping the lights constantly illuminated in the SHU, a place where some of the most dangerous criminals in the facility were housed.

**\*35** Plaintiff cites *LeMaire v. Maass,* 745 F.Supp. 623 (D.Or.1990), to support his claim that constant lighting does not serve a penological interest. However, in *LeMaire,* the inmate had expert psychiatric testimony that twenty-four hour day lighting "makes sleep difficult and exacerbates the harm." *LeMaire,* 745 F.Supp. at 636. Plaintiff has offered no such expert testimony in the present case. Additionally, the defendants in *LeMaire* failed to cite any legitimate penological justification for their conduct. *Id.* at 636. Again, Defendants here have a legitimate justification for their actions and that justification has been recognized by other federal courts.

For the above reasons, Plaintiff's claims of retaliatory lighting in the SHU should be dismissed because Plaintiff failed to meet his burden of proof.

2. *Inadequate Ventilation*

Plaintiff claims that his cell did not have adequate ventilation causing him breathing difficulties, sore throats, chest pains and headaches on numerous occasions. (Am.Compl.¶ 49.); (Pl's Dep. 72:11-19.) Again, Plaintiff alleges that these conditions resulted from orders mandated by Defendants Miller, W. Brown and Healy. (Am.Compl.¶ 49.) Plaintiff complained to Dr. Gusman about the ventilation issues and was informed that the current ventilation conditions were for security purposes. (Pl's Dep. 73:2-6.) Plaintiff also filed grievances complaining about the ventilation system. (Pl's Dep. 73:12-13.)

I construe this claim to allege cruel and unusual treatment in violation of the Eighth Amendment. Defendants argue that the ventilation system is constitutional because it is part of an overall prison regulation which serves an important penological concern. (Defs.' Br. at 6.)

This court has previously held that:

> [C]omplaints of (1) poorly or non-functional ventilation units, (2) poor air quality and breathing conditions, (3) poor cleaning and sanitary services to clean the resulting dust which was not properly circulated from the cells ... suffice to constitute a violation as they result in the deprivation of a single, identifiable need, air with a quality which is breathable and does not result in nose bleeds, headaches, and colds.

*Hamilton v. Smith,* No. 06-CV-805 (GTS/DRH), 2009 U.S. Dist. LEXIS 91032, 2009 WL 3199531, at *16 (N.D.N.Y. Jan.13, 2009).[FN25] The caveat, however, is that the plaintiff must be able to prove that these conditions exist. Hamilton, 2009 U.S. Dist. LEXIS 91032, 2009 WL 3199531, at *17. Additional inmate corroboration with the alleged complaints constitutes sufficient proof in this district. *Id.*

The DOCS Directive for SHU confinement states that "[e]ach S.H.U. cell ventilation grate shall be thoroughly inspected and cleaned prior to occupancy in order to ... ensure its good condition." (Dkt. No. 75-30 at 17.) Additionally, the Directive requires that staff members periodically inspect the gate to "ensure that the inmate is keeping the grate clean." (Dkt. No. 75-30 at 17.) Thus, it appears that DOCS had a policy in place at the time of Plaintiff's confinement to ensure that inmates had adequate ventilation in compliance with their constitutional rights. However, Plaintiff has failed to offer any corroboration that the conditions he describes actually existed, and therefore he does not meet his burden of proof for retaliation.

**\*36** In addition, Plaintiff has failed to allege that the inadequate ventilation was a retaliatory act against him.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

The ventilation policy applied to all inmates in SHU confinement, not just Plaintiff. Moreover, Plaintiff has not established that Defendants even knew of the alleged ventilation problem because the record does not indicate that he filed any grievances on the matter or complained to staff members. A defendant cannot commit a retaliatory act if he or she is unaware of the alleged condition that a plaintiff claims constitutes retaliation. Thus, I recommend that the court grant Defendant's motion for summary judgment on this issue.

**O. Misbehavior Reports and Disciplinary Hearings**

Plaintiff alleges that ten misbehavior reports and the disciplinary hearings that followed violated his constitutional rights.[FN26] The ten reports of which he complains are: (1) a February 15 report by Defendant Doctor Mikhail Gusman that resulted in a 30-day SHU sentence imposed by Defendant Griffin (Am.Compl.¶ 59); (2) a March 1 report by Defendant Griffin that resulted in six months of lost good time credits imposed by Defendant Healy (Am.Compl.¶ 60); (3) a March 2 report filed by Officer Hetcher [FN27] that resulted in four months of lost good time credits imposed by Defendant Healy (Am.Compl.¶ 61); (4) a June 10 report by Officer Donnelly [FN28] that resulted in a 120-day SHU sentence imposed by Defendant Griffin (Am.Compl.¶ 62); (5) a report filed by Defendants Sisilli and Riester after the bus incident on June 27 that resulted in a 150-day SHU sentence and six months of lost good time credits imposed by Defendant Griffin (Am. Compl. ¶ 63; Dkt. No. 75-11 at 1); (6) an October 11 report by Officer Tuero [FN29] that resulted in a 120-day SHU sentence and six months of lost good time credits imposed by Defendant Healy (Am. Compl. ¶ 64; Dkt. No. 75-12 at 1); (7) an October 12 report by Officer Tuero that resulted in a 90-day SHU sentence and six months of lost good time credits imposed by Defendant Healy (Am. Compl. ¶ 65; Dkt. no. 75-13 at 1); (8) an October 15 report by Defendant Occhipinti that Plaintiff alleges resulted in a 60-day SHU sentence imposed by Defendant Healy [FN30] (Am. Compl. ¶ 66; Dkt. No. 75-14 at 1); (9) an October 16 report by Officer Delgado [FN31] that resulted in a 60-day SHU sentence and three months of lost good time credits imposed by Defendant Healy (Am.Comp.¶ 67); and (10) a November 15 report filed by Defendants DiCairano and Occhipinti after the emergency sick call incident that resulted in a 90-day SHU sentence imposed by Defendant Healy

(Am.Compl, ¶ 68). He further alleges that Defendant Selsky violated his constitutional rights by affirming these ten disciplinary convictions. (Am.Compl.¶¶ 58-68.) Plaintiff claims that, as a result of these reports, he was unconstitutionally held in the SHU and suffered physical, mental and spiritual pain. (Am.Compl.¶ 58.)

*1. October 15 Report by Defendant Occhipinti*

**\*37** Before discussing the merits of Plaintiff's claims regarding the misbehavior reports and disciplinary hearings, I must resolve a factual issue regarding the October 15 report by Defendant Occhipinti.

Plaintiff alleges in his amended complaint and testified at his deposition that on October 15, 2005, Defendant Occhipinti filed a misbehavior report against Plaintiff charging him with violating a direct order and interference. (Am. Compl. ¶ 66; Pl's Dep. 98:16-99:4.) Plaintiff alleges in his amended complaint that Defendant Healy conducted a hearing on this misbehavior report on October 28, 2005. (Am. Compl. ¶ 66; Pl's Dep. 99:6-9.)

Defendants assert that no hearing was held on October 28, 2005. (Defs.' Br. at 8.) Defendant Healy declares that he is "not aware of presiding at a disciplinary hearing involving plaintiff on October 28, 2005" and believes that the date in Plaintiff's amended complaint was an error. (Healy Decl. at 3.) There is no mention of an October 28 hearing anywhere in Plaintiff's inmate disciplinary hearing record. (Dkt. No. 75-17 at 1.) There is only one oblique reference to even the possibility of a hearing on the October 15 report: Plaintiff requested that Lester Robinson testify on his behalf in connection with several misbehavior reports filed in October, including the October 15 report. Robinson signed a form refusing to testify. (Dkt. No. 80-5 at 95, 97, 101.) This is not evidence that a hearing occurred. Rather, it shows only that the inmate refused to testify if a hearing resulted.

Based upon the evidence before the court, it appears that a misbehavior report was filed, but that no disciplinary hearing was held regarding the incident. Therefore, I recommend that any claim against Defendant Healy based on the alleged October 28 hearing be dismissed. I will

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

address Plaintiff's retaliation claim against Defendant Occhipinti regarding this report below.

2. *Heck v. Humphrey*

Although Defendants have not addressed this issue, it appears that several of Plaintiff's claim regarding misbehavior reports and disciplinary hearings are barred by the rule in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). I will address this issue *sua sponte.*

a. *March 1 and 2 Misbehavior Reports*

The sole sanction that Defendant Healy imposed on Plaintiff as a result of the March 1 and 2 reports was a loss of good time credits. (Dkt. Nos. 75-8 and 75-9.) Although Defendants have not addressed this issue, I find that Plaintiff's claims regarding these misbehavior reports and the hearings that followed them are barred by the rule in *Heck v. Humphrey.*

In *Heck,* the Supreme Court held that "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus.*" *Heck,* 512 U.S. at 486-87.

**\*38** In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Supreme Court extended the *Heck* rule to prisoners' challenges to prison disciplinary proceedings that resulted in a loss of good time credits. The Court held that a prisoner seeking damages and declaratory relief regarding procedures used in a disciplinary hearing that resulted in a loss of good time credit is required to show that the disciplinary sentence has been reversed, declared invalid, or called into question by a federal court.

Here, Plaintiff challenges the March 1 and 2 misbehavior reports and the disciplinary hearings that followed them. Those hearings resulted solely in a loss of good time credits. Plaintiff has not shown that these disciplinary sentences have been reversed, declared invalid, or called into question by a federal court. Therefore, Plaintiff's claims regarding the March 1 and 2 misbehavior reports and the hearings that followed are barred by *Heck.* I will therefore not address them further.

b. *June 27, October 11, October 12, and October 16 Misbehavior Reports*

As a result of the misbehavior reports filed on June 27, October 11, October 12, and October 16, Plaintiff received a "mix" of punishments, in each instance receiving a SHU sentence and a loss of good time credits. In mixed-sanction cases such as these, "a prisoner can, without demonstrating that the challenged disciplinary proceedings or resulting punishments have been invalidated, proceed separately with a § 1983 action aimed at the sanctions or procedures that affected the conditions of his confinement ... if he agrees to abandon forever any and all claims he has with respect to the sanctions that affected the length of his imprisonment." *Peralta v. Vasquez,* 467 F.3d 98, 100 (2d Cir.2006). In other words, where a prisoner has received a mix of punishments, he may challenge them in federal court if he agrees to drop any claim regarding the loss of good time credits.

Here, Plaintiff has not shown that these disciplinary sentences have been reversed, declared invalid, or called into question by a federal court. Nor has Plaintiff agreed to drop any claim regarding the loss of good time credits that he incurred as a result of these misbehavior reports and disciplinary hearings. Therefore, he may not challenge these disciplinary sentences in federal court and I recommend that the Court *sua sponte* dismiss the claims. I will address Plaintiff's claims regarding these misbehavior reports on the merits, as well, in the event that Plaintiff agrees to drop his claims regarding good time credits or the Court does not adopt my recommendation to dismiss the claims *sua sponte* under *Heck.*

3. *Claims That Defendants Filed False Misbehavior Reports to Retaliate Against Plaintiff*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

Plaintiff claims that Defendants Gusman, Sisilli, Riester, Occhipinti, and DiCairano filed false misbehavior reports against him.[FN32] A "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. I will therefore address each misbehavior report separately to determine whether Plaintiff has raised a triable issue of fact that the report was issued in retaliation. The standard applicable to claims of retaliation is set forth in detail above in Section I(D)(3).

a. *Gusman (February 15 report)*

**\*39** Plaintiff claims that Defendant Gusman filed the February 15 misbehavior report to retaliate against Plaintiff for filing grievances against him. (Am. Compl. ¶¶ 59, 62-63; Dkt. No. 75-7 at 2.) Defendants have not addressed this claim. I will address the claim *sua sponte.*

Plaintiff engaged in protected conduct by filing a grievance against Defendant Gusman. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). However, there is no causal connection between Plaintiff's protected conduct and Defendant Gusman's misbehavior report because Plaintiff did not file the grievance against Defendant Gusman until June 15, 2006. This was well *after* Gusman issued the February 15 misbehavior report. (Dkt. No. 75-28.) Thus, I recommend that the retaliation claim against Defendant Gusman be dismissed.

b. *Sisilli and Riester* (June 27 report)

Defendants Sisilli and Riester filed a misbehavior report against Plaintiff after the June 27 bus incident. Plaintiff claims that Defendants Sisilli and Riester filed the report in retaliation for Plaintiff's history of filing grievances.

(Pl.'s Dep. 88-89.) Read broadly, the complaint could also be construed as asserting a claim that Defendants Sisilli and Riester field the misbehavior report to cover up their alleged use of excessive force. Defendants have not addressed either claim. As discussed above, I find that Plaintiff's claims regarding the June 27 misbehavior report and the disciplinary hearing that followed are barred by *Heck.* However, I will review the retaliation claims *sua sponte* in the event that the Court does not adopt my recommendation regarding *Heck.*

i. Retaliation for Previous Grievances

Plaintiff alleges that Defendants Sisilli and Riester filed the misbehavior report to retaliate against him for his previous filing of grievances. I find that, even if not barred by *Heck,* this claim is not sufficiently well pleaded to survive *sua sponte* review.

Plaintiff has sufficiently alleged that he engaged in protected speech or conduct. Filing a grievance is constitutionally protected conduct. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Thus, Plaintiff's actions of filing grievances were constitutionally protected and satisfies the first prong of the retaliation claim.

Plaintiff has also sufficiently pleaded that Defendants Sisilli and Riester took adverse action against him. "[I]n the prison context we have previously defined adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (internal quotations and citation omitted.) The Second Circuit, in *Gill,* found adverse action where defendants filed a false misbehavior report and plaintiff was imposed a sentence as a result of that report. *Id.* The situation here is analogous in that Defendants did file a misbehavior report and Plaintiff received SHU confinement as a result. Thus, this misbehavior report passes the second prong of the retaliation inquiry and constitutes adverse action because it is the type of action "that would deter a person of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

**\*40** However, Plaintiff cannot establish any causal connection between his protected conduct and the adverse action by Defendants Sisilli and Riester. Neither Defendant Sisilli or Riester was named in any of Plaintiff's previous grievances. Plaintiff claims that Defendants Sisilli and Riester knew of the urine throwing incident with Defendant Jewett because "everybody talks about everybody's business." (Pl.'s Dep. 88-89.) Plaintiff additionally claims that these Defendants knew about his previous complaints at Eastern because they were not going to tolerate Plaintiff "running [his] mouth." (Pl.'s Dep. 89:1-21.) These are purely conclusory statements and cannot serve as a "causal connection" between the misbehavior report and Plaintiff's conduct. The Second Circuit has refused to find a misbehavior report retaliatory where the defendant was not named in plaintiff's original grievance and the misbehavior report was filed approximately ten weeks after the grievance was filed. *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009). Here, the urine incident grievance involved neither Defendants Sisilli nor Riester and their misbehavior report was filed nearly twenty-one weeks after the grievance. Therefore, I recommend that the Court *sua sponte* dismiss the claim that this misbehavior report was filed in retaliation for Plaintiff's previous grievances, both on the merits and because it is barred by *Heck.*

### ii. Cover-Up

The complaint can also be construed as alleging that Defendants Sisilli and Riester filed the misbehavior report to cover up their use of excessive force. A claim of retaliation under § 1983 can be supported by a showing that corrections officers filed a false misbehavior report to "cover up" an assault. *See Snyder v. McGinnis,* No. 03-CV-0909, 2004 U.S. Dist. LEXIS 17976, 2004 WL 1949472, at \*8 (W.D.N.Y. Aug. 31, 2004). This case presents conflicting testimony as to whether Defendants Sisilli and Riester actually assaulted Plaintiff. Such conflicting testimony could give rise to a potential "cover up" on behalf of Defendants Sisilli and Riester that requires further review. Because Plaintiff has successfully linked this misbehavior report to the alleged assault occurring that day, I find that, if the Court finds it is not barred by *Heck,* this claim should survive *sua sponte* review and not be dismissed.

### c. *Occhipinti* (October 15 report)

Plaintiff claims that Defendant Occhipinti filed the October 15 misbehavior report to retaliate against him. The record does not reveal any incident between Defendant Occhipinti and Plaintiff in the days before the report was filed. At his deposition, Plaintiff was unable to recall the incident, but merely stated that there was always a problem between Defendant Occhipinti and himself. (Pl.'s Dep. 99:1-15.) This is insufficient to raise a triable issue of material fact. Thus, I recommend that Plaintiff's claim of retaliation against Defendant Occhipinti for the October 15 misbehavior report be dismissed *sua sponte.*

### d. *Occhipinti and DiCairano* (November 15 report)

**\*41** Defendants Occhipinti and DiCairano filed a misbehavior report against Plaintiff after the November 15 emergency sick call incident. Plaintiff claims that Defendants retaliated against him by filing this report. (Am. Compl. at 19-20.) Defendants have not addressed this argument. As with Defendants Sisilli and Riester, there is a triable issue of fact that Defendants Occhipinti and DiCairano filed the misbehavior report to "cover up" their own use of excessive force. Therefore, I recommend that Plaintiff's retaliation claim against Defendants Occhipinti and DiCairano survive *sua sponte* review.

### 4. *Claims That Defendants Griffin and Healy Violated Plaintiff's Right to Procedural Due Process During Disciplinary Hearings*

Plaintiff alleges that Defendants Griffin and Healy violated his right to procedural due process by denying him witnesses, proceeding with hearings in his absence, and finding him guilty of disciplinary violations without sufficient evidence. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000). Defendants argue that Plaintiff's due process claims should be dismissed because he was not deprived of a liberty interest and, even if he was, he received all the process he was due. (Defs.' Br. at 7-10.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

a. *Liberty Interest*

As a preliminary matter, Defendants argue that Plaintiff's claims against Defendants Griffin and Healy should be dismissed because he was not deprived of a liberty interest. (Defs.' Br. at 9.)

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 483-86, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (alteration in original)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Id.* (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

The SHU sentences Plaintiff received as a result of the February 15, October 12, October 16, and November 15 reports (30 days, 90 days, 60 days, and 90 days) fall within the "short range" of disciplinary confinement and thus implicate a liberty interest only if "the conditions were more severe than the normal SHU conditions.[FN33]" *Palmer,* 364 F.3d at 65. The sentences Plaintiff received as a result of the June 10, June 27, and October 11 misbehavior reports (120 days, 150 days, 120 days) fall within the "intermediate duration" of confinement which requires "a detailed record of the conditions of the confinement relative to ordinary prison conditions." *Palmer,* 364 F.3d at 64-65. This "detailed record" must contain "information as to the actual conditions in both [SHU] segregation and for the general population." *Davis v. Barrett,* 576 F.3d 129, 135 (2d Cir.2009).

*42 Defendants, citing the Declaration of Defendant W. Brown, argue that "the conditions in Eastern's SHU significantly mirror those imposed on the general population at Eastern." (Defs.' Br. at 10.) In the paragraph

of the declaration cited by Defendants, Defendant W. Brown states that:

Unlike other inmates in the general population at Eastern, SHU inmates are confined to their cells twenty-three hours per day. SHU inmates lose privileges as required by NYSDOCS Directive 4933, in addition to any loss of privileges imposed by a hearing officer as a result of a disciplinary hearing. SHU inmates are permitted to participate in programming in the form of cell study, but are not permitted to leave SHU to attend programs. In all other respects, the conditions of Eastern SHU inmates and those of the general population are the same.

(W. Brown Decl., Dkt. No. 75-32 ¶ 13.) Directive 4933, which is 34 pages long, describes in detail the policies applicable to SHU inmates. (Kerwin Decl. Ex. AA, Dkt. No. 75-33.) SHU inmates are allowed to possess only prescribed personal items: all other personal property is confiscated and stored elsewhere until the inmate is released from the SHU. *Id.* at 9-10. SHU inmates are allowed one nonlegal visit per week. *Id.* at 11. Phone calls are prohibited except for emergency calls and legal calls approved by the superintendent. *Id.* After serving 30 consecutive days free of disciplinary sanctions, SHU inmates are allowed some additional items and privileges. *Id.* SHU inmates' access to law library materials is limited. *Id.* at 14. SHU inmates are not allowed visits from inmate religious advisors and are not allowed to attend congregate religious services. *Id.* SHU inmates are placed in mechanical restraints prior to exiting their cells. *Id.* at 16.

I find that the conditions mandated by Directive 4933 combined with Plaintiff's allegations regarding the treatment he received in the SHU are sufficient to raise a triable issue of fact that Plaintiff was subject to atypical and significant hardship during his SHU sentences. Therefore, I recommend that the Court reject Defendants' argument that Plaintiff was not deprived of a liberty interest.

b. *Process Due*

Due process is satisfied if an inmate facing disciplinary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell,* 418 U.S. 539, 563-67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004).

Plaintiff argues that he was denied due process because (1) Defendants Griffin and Healy refused to call witnesses whom Plaintiff requested; (2) in some instances, Plaintiff was not present at the hearing; and (3) the decisions by Defendants Griffin and Healy were not supported by "some evidence." Defendants argue that Plaintiff's claims against Defendants Griffin and Healy should be dismissed because he received all the process he was due. (Defs.' Br. at 7-10.)

i. Hearing on February 15 report

**\*43** Plaintiff argues that Defendant Griffin deprived him of due process during the hearing on Defendant Gusman's February 15 misbehavior report by denying Plaintiff's requests for witnesses and basing his determination on insufficient evidence. (Am.Compl.¶ 59.)

In the February 15 report, Defendant Gusman charged Plaintiff with making threats. (Am. Compl. ¶ 59; Dkt. No. 75-6.) Defendant Gusman stated that Plaintiff told him that he "was a member of a gang from Brooklyn and that they would take care of [him]." (Dkt. No. 75-6 at 4.) This alleged threat was confirmed by Sergeant Pagaluighi.[FN34] (Dkt. No. 75-6 at 4.)

Plaintiff requested that inmates Smith and Banner testify at the hearing on this misbehavior report. (Dkt. No. 75-6.) Inmate Smith refused to testify on Plaintiff's behalf. (Dkt. No. 75-6.) Defendant Griffin did not allow inmate Banner to testify because Banner was not present during the incident and would only offer hearsay testimony. (Dkt. No. 75-6.)

Plaintiff alleges that Defendant Griffin deprived him of due process by refusing Plaintiff's request for inmates Smith and Banner to appear as witnesses. Plaintiff's claim is without merit as a matter of law. An inmate's right to call witnesses is not the same as a defendant's in a criminal trial, but rather is qualified by the circumstances of prison life. *Wolff,* 418 U.S. at 566-67. Hearing officers have no power to force an inmate to testify and an "inmate has no constitutional right of confrontation." *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993). "Although the *Wolff* Court did not explicitly mention 'futility' as a valid basis for refusing to call a witness ... it did refer to 'lack of necessity.' " *Silva,* 992 F.2d at 22. "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him" and it would be futile to do so. *Id.* Disciplinary hearing officers also have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case. *Wolff,* 418 U.S. at 566-67.

Because Defendant Griffin lacked the power to compel Smith's testimony, Smith's testimony no longer was a "necessity" and his absence did not violate due process under *Wolff.* Additionally, Defendant Griffin's denial of inmate Banner also does not constitute a due process violation. "A hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). Thus, Defendant Griffin's exclusion of hearsay testimony from an inmate not present during an incident was proper in that it excluded irrelevant and inadmissible evidence from the proceeding.

Defendant Griffin relied upon the following evidence in finding Plaintiff guilty: Defendant Gusman's misbehavior report and personal testimony; the testimony of Nurse Aversano, Officer Farrell, Sergeant Pagaluighi, and Plaintiff; and the grievance report filed by Plaintiff after the incident. All five witnesses, including Plaintiff, testified that Plaintiff told Defendant Gusman that he was "a member of a gang from Brooklyn." Defendant Gusman and Nurse Aversano testified that they heard Plaintiff threaten Defendant Gusman. Officer Farrell testified that Plaintiff "appeared irritated" during the incident. (Dkt. No. 75-6.)

**\*44** Due process in this context requires only that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

hearing officer's decision not be "arbitrary." *Wolff,* 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (emphasis in original) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)). Here, Defendant Griffin's decision was based on some evidence. Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Griffin regarding the February 15 misbehavior report be dismissed.

ii. Hearing on June 10 report

Plaintiff alleges that Defendant Griffin deprived him of due process during the hearing on the June 10 report by denying him witnesses and finding him guilty. (Am.Compl.¶ 62.)

In the June 10 report, Officer Donnelly charged Plaintiff with violating a direct order and refusing to follow facility regulations and staff directions regarding movement within the facility. (Dkt. No. 75-9 at 4.) Officer Donnelly reported that as he was escorting Plaintiff to his cell, Plaintiff abruptly stopped, spun around, and did not resume walking when ordered. *Id.*

Plaintiff requested that Officers Sipley, Minuck, Bock, Tuero, Bauder, Leucks, Captain Coleman, and Defendant Healy testify at his hearing. (Dkt. No. 75-9.) All requested witnesses did testify. (Dkt. No. 75-9.)

The hearing records indicate that Defendant Griffin relied upon the following evidence: the misbehavior report written by Officer Donnelly and testimony from Officers Coleman, Leucks, Minuck, Butler, Tuero, Sipley, Sergeant Bock, and Defendant Healy. (Dkt. No. 75-9.) Each officer testified that they heard Officer Donnelly give a direct order and observed Plaintiff being noncompliant, with the exception of Officer Butler who testified that he did not see anything. (Dkt. No. 75-10.) This evidence was sufficient to support Defendant Griffin's decision. Therefore, I recommend that Plaintiff's procedural due

process claim against Defendant Griffin regarding the June 10 misbehavior report be dismissed.

iii. Hearing on June 27 report

Plaintiff alleges that Defendant Griffin violated his right to procedural due process during the hearing on the June 27 misbehavior report by denying his request for witnesses and finding him guilty. (Am.Compl.¶ 63.) As discussed above, I recommend that this claim be dismissed because it is barred by *Heck.* However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

In the June 27 misbehavior report, which Defendants Sisilli and Riester filed after the bus incident, Plaintiff was charged with violent conduct, creating a disturbance, interfering with an employee, two counts of refusing a direct order, and harassment. (Dkt. No. 75-10 at 1.)

**\*45** The record indicates that Plaintiff requested as witnesses twenty-one inmates who were present on the bus during the incident. (Dkt. No. 75-10.) The twenty-one inmates Plaintiff requested as witnesses each refused to testify, citing, among many things, that they did not witness the situation, had no idea the incident occurred, or did not know Plaintiff. (Dkt. No. 75-10.) Because, as discussed above, Defendant Griffin has no power to compel inmate witnesses to testify at a disciplinary hearing, the inmates' refusal to testify cannot be held against him as a violation of due process. *Silva,* 992 F.2d at 22.

The record indicates that Defendant Griffin relied on the following materials when making his decision: the misbehavior reports filed by Defendants Sisilli and Riester; the testimony of Defendant Sisilli, Defendant Riester, Officer Bauder, and Plaintiff; the refusal to testify forms of the other 21 inmates aboard the bus; and memoranda submitted by officers at Downstate and officers who were present at Eastern when Plaintiff and Defendants arrived. (Dkt. No. 75-10.) Defendants Sisilli and Riester each testified to the fact that Plaintiff refused orders and created a disturbance on the bus. (Dkt. No. 75-10.) Plaintiff testified that he was not given a direct order and did not threaten or harass the corrections

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

officers. (Dkt. No. 75-10.) Officer Zorn submitted a memorandum stating that he heard Plaintiff shouting at transportation staff while being prepared for transport. (Dk. No. 75-10.) Officer Bradley and Captain Coleman each submitted separate memoranda detailing the events that occurred once Plaintiff arrived at Eastern, explicitly stating that no force was used on Plaintiff as he was escorted to the SHU. (Dkt. No. 75-10.) This evidence was sufficient to support Defendant Griffin's decision. Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Griffin regarding the June 27 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

iv. Hearing on October 11 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the October 11 misbehavior report by denying his request for witnesses, conducting the hearing in his absence, and finding him guilty. (Am.Compl.¶ 64.) As discussed above, I recommend that this claim be dismissed because it is barred by *Heck.* However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

In the October 11 report, Officer Tuero charged Plaintiff with violent conduct, refusing a direct order, and making threats. (Dkt. No. 75-11.) Officer Tuero reported that on October 11, 2005, C.O. R. Smith gave Plaintiff a five-minute warning to finish showering. (Dkt. No. 75-11 at 4.) Plaintiff responded, " 'I'll finish when I'm ready, Fuck you bitch, Faggot.' " *Id.* Approximately five minutes later, C.O. Smith and J. Wetherbee instructed Plaintiff to finish showering to which Plaintiff responded, " 'What are you looking at me for[?][Y]ou want to see my dick? Take me out of the shower.' " *Id.* Plaintiff then told C.O. Wetherbee, " 'I've been locked down for 20 [years]. I will fuck a pretty thing like you in the ass.' " *Id.* After several orders Plaintiff complied and was escorted to his cell from which he yelled " 'Crack my door, you can split my head wide open. I don't give a fuck. I will kill all you motherfuckers,' " while banging on his cell door. *Id.* at 4-5.

**\*46** Plaintiff requested that inmates Robinson and

Corresquillo serve as witnesses at the hearing on the report. (Dkt. No. 75-11.) The record includes an "Assistant Form" that is signed by Plaintiff and Sgt. R. McGrath, who assisted Plaintiff in connection with the charges. Dkt. No. 75-12, at 17. The form indicates that Sgt. McGrath met with Inmates Corresquillo and Robinson before the hearing. *Id.* at 17. The form also indicates these inmates agreed to testify as potential witnesses, and when asked whether they heard Plaintiff threaten to kill C.O. Tuero and whether they heard C.O. Smith give Plaintiff a five-minute warning to come out of the shower, they responded "no" to both questions. *Id.* at 17.

Inmate Corresquillo did testify at Plaintiff's hearing. (Dkt. No. 75-11.) Inmate Robinson refused to testify. *Id.* at 2, 6-7. A form signed by Inmate Robinson indicates that he refused to testify because "[a]ny reports written on any date involving Inmate Tafari [are] none of my business." *Id.* at 7. As discussed above, a hearing officer has no power to compel an inmate to testify. Therefore, Defendant Healy did not violate Plaintiff's due process rights by refusing to compel inmate Robinson's presence.

Plaintiff did not appear at the hearing. Plaintiff alleges that Defendant Healy accepted "denial to attend the hearing form without personal ascertain (sic)." (Am.Compl.¶ 64.) Extremely liberally construed, the complaint appears to allege that Defendant Healy violated Plaintiff's procedural due process rights by refusing to allow Plaintiff to attend the disciplinary hearing.

New York regulations require an inmate to attend a hearing "unless he or she refuses to attend, or is excluded for reasons of institutional safety or correctional goals." 7 N.Y.C.R.R. § 254.6(a)(2) (2010). "Under ordinary circumstances, when an inmate voluntarily waives his appearance before a disciplinary hearing officer, he cannot then attack the adjudication as violative of his constitutional rights. An inmate's refusal to attend a disciplinary hearing waives his due process objections ... only when it occurs 'through no fault of prison officials.' " *Howard,* 768 F.Supp. at 1006 (citations omitted) (denying defendants' motion for summary judgment of due process claim where prisoner refused to attend hearing because officers arrived at his cell at an unusual time of night to escort him to the hearing and used strange

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

terminology to refer to the hearing).

Here, Defendant Healy's written disposition form indicates that Plaintiff "refused to attend." (Dkt. No. 75-12 at 3.) The record indicates that Plaintiff refused to sign the form titled "Inmate Refusal to Attend Hearing" or to provide his reasons for the refusal to attend the hearing. (Dkt. No. 75-12 at 27.) This refusal was witnessed by two correctional officers. (*Id.;* Healy Decl. at 3.) There is no evidence in the record that Plaintiff refused to appear "through [the] fault of prison officials." Therefore, I recommend that the Court dismiss Plaintiff's claim that his absence from the hearing violated his right to due process.

**\*47** Plaintiff alleges that Defendant Healy wrongfully found him guilty. Defendant Healy relied on the testimony of Plaintiff's requested witness, inmate Corresquillo, and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state." (Dkt. No. 75-11 at 3.) Defendants have not provided copies of this testimony.[FN35]

The record also contains a copy of a log dated October 11, 2005. Dkt. No. 75-12 at 20. The log indicates that Plaintiff was given five minutes to come out of the shower, but he refused and cursed at Officers Smith, Wetherbee, and Tuero. *Id.* This evidence was sufficient to support Defendant Healy's finding. Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Healy regarding the October 11 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

v. Hearing on October 12 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the October 12 misbehavior report by denying his request for witnesses, conducting the hearing in his absence, and finding him guilty. (Am.Compl.¶ 65.) As discussed above, I recommend that this claim be dismissed because it is barred by *Heck.* However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

On October 12, 2005, Officer Tuero charged Plaintiff with

making threats and harassment. (Dkt. No. 75-12 at 4.) Officer Tuero reported that on October 12, 2005, Plaintiff was being interviewed by an Office of Mental Health employee, Psych.Rudder, in the SHU TV room. (Dkt. No. 75-12 at 4.) Plaintiff shouted at Officer Tuero, " 'Fuck you, you fat fucking lying bitch" and stuck up his middle finger. *Id.* Plaintiff then grabbed his "penis area" and shouted, " 'Suck my dick.' " *Id.* This conduct forced Psych. Rudder to end the interview and Plaintiff was escorted to his cell, during which time Plaintiff called Officer Tuero "a fat bitch" and called Sgt. Pagaluighi a "fat fucking faggot' " and then stated, " 'I'll kill you.' " *Id.* Plaintiff then told Officer Tuero that he would "kick [her] ass" and "kick [her] husband's [ ] ass." *Id.*

Plaintiff requested Psych. Rudder as a witness. (Dkt. No. 75-12 .) Plaintiff also requested that inmates Robinson, Corresquillo, and Price serve as witnesses at this hearing. (Dkt. No. 75-12.) Inmates Robinson, Corresquillo, and Price were interviewed prior to the hearing as potential witnesses. (Dkt. No. 75-12.) In the inmate interviews, each inmate answered the question, "Did you hear or see Tafari harass or threaten C.O. A. Tuero on October 12, 2005?" in the negative. (Dkt. No. 75-12.)

Psych. Rudder testified at the hearing. (Dkt. No. 75-12.) Inmate Robinson signed a refusal-to-testify form, indicating that he refused to testify because "[a]ny reports written on any date involving Inmate Tafari [are] none of my business." *Id.* at 6. The record contains two refusal to testify forms stating that inmates Corresquillo and Price refused to testify. The forms indicate that the inmates refused to sign. Although a space is provided for the information, the forms do not indicate that a DOCS employee specifically asked the inmates why they were refusing to provide further information. (Dkt. No. 75-12 at 12-13.) The record suggests that Officers Lapp and Wenzi testified at the hearing regarding the inmates' refusal to testify. *Id.* at 8. Because, as discussed above, hearing officers do not have the power to compel witness testimony, I find that Defendant Healy did not violate Plaintiff's due process rights by failing to compel inmates Robinson, Corresquillo, and Price to testify.

**\*48** Plaintiff did not attend the October 27, 2005, hearing in connection with the incident report filed on October 12. (Dkt. No. 75-12.) Plaintiff's signature is absent from his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

refusal to attend the hearing form or any other form that required Plaintiff's signature used in connection with that hearing. (Dkt. No. 75-12 at 2-3, 8, 11-13, 15.) Defendant Healy declares that Plaintiff not only refused to attend the hearings, but also refused to sign the refusal forms. (Healy Decl. ¶ 3.) Because there is no evidence in the record that Plaintiff's absence was the fault of prison officials, I recommend dismissing Plaintiff's claim that Defendant Healy violated his due process rights by proceeding with the hearing in his absence.

Defendant Healy stated that he relied on Officer Tuero's written report, the testimony of Psych Rudder, and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state" in finding Plaintiff guilty. (Dkt. No. 75-12 at 2.) This evidence was sufficient to support Defendant Healy's decision. Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Healy regarding the October 12 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

vi. Hearing on October 16 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the October 16 misbehavior report by denying his request for witnesses, conducting the hearing in his absence, and finding him guilty. (Am.Compl.¶ 67.) As discussed above, I recommend that this claim be dismissed because it is barred by *Heck.* However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

In the October 16 report, Officer Delgado charged Plaintiff with harassment and possessing an unauthorized article in an unauthorized area. (Dkt. No. 75-13 at 4.) Officer Delgado reported that on October 16, 2005, while "giv[ing] out law library supplies in SHU," she "noticed" Plaintiff smoking. *Id.* Plaintiff heard Officer Delgado inform another officer that Plaintiff was smoking. *Id.* Plaintiff "acknowledged that he was smoking," and said, " 'Yea bitch I'm smoking,' " and then called Delgado " 'a fucking bitch' " and " 'bitch ass faggot.' " *Id.* Delgado issued Plaintiff his legal materials and proceeded with her rounds. *Id.*

Plaintiff requested only one witness, inmate Robinson, to testify at his hearing. (Dkt. No. 75-14.) Inmate Robinson refused to testify on Plaintiff's behalf and signed the refusal form. (Dkt. No. 75-14.) Thus, there is no constitutional violation because Defendant Healy had no duty to compel his testimony. *Silva,* 992 F.2d at 21-22.

Plaintiff alleges that Defendant Healy accepted Plaintiff's denial to attend the hearing form without verifying the refusal with Plaintiff. (Am.Compl.¶ 67.) It is uncontested that Plaintiff did not attend the October 26, 2005, hearing in connection with the incident report filed on October 12. (Dkt. No. 75-14; Pl.'s Dep. 101:9-13.) Plaintiff did not sign any of the forms required for refusal or any other document resulting from that hearing. (Dkt. No. 75-14 at 2-3, 6-7, 9.) Defendant Healy stated that Plaintiff refused to attend the hearing and his refusal was witnessed by two corrections officers. (Healy Decl. ¶ 3.) Because there is no evidence in the record that Plaintiff's absence was the fault of prison officials, I recommend dismissing Plaintiff's claim that Defendant Healy violated his due process rights by proceeding with the hearing in his absence.

*49 Defendant Healy relied on Officer Delgado's written report and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state" to find Plaintiff guilty of the disciplinary charges. (Dkt. No. 75-13 at 2.) This evidence was sufficient to support Defendant Healy's decision. Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Healy regarding the October 16 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

vii. Hearing on November 15 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the November 15 misbehavior report by denying his request for witnesses and finding him guilty. (Am.Compl.¶ 68.)

In a misbehavior report filed after the November 15 sick call incident, Defendant DiCairano charged Plaintiff with violent conduct, assault on staff, committing an unhygienic act, interfering with an employee, and refusing a direct

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

order. (Dkt. No. 75-14 at 1 .)

The record indicates that Plaintiff requested that ten inmates be interviewed as potential witnesses. (Dkt. No. 75-14.) All of the inmates were interviewed and, of those ten inmates, five agreed to testify on Plaintiff's behalf. (Dkt. No. 75-14.) There is no violation of due process for those inmates who refused to testify in Plaintiff's hearing because Defendant Healy has no power to compel their testimony. *Silva,* 992 F.2d at 22. With regard to the inmates who agreed to testify, the hearing record does not state why they were not permitted to testify. (Dkt. No. 75-14.) Defendant Healy's declaration does not explain why the witnesses did not testify. In fact, the only statement in Defendant Healy's declaration about this hearing is that "I ... served as the hearing officer at plaintiff's December 5, 2005, disciplinary hearing." (Healy Decl. ¶ 6.) This is in contrast to Defendant Healy's declaration regarding the other hearings, in which he described who did and did not testify and why. (Healy Decl. ¶¶ 4-5, 7-8.) "Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify." *Tapp v. Tougas,* 2008 U.S. Dist. LEXIS 82973, 2008 WL 4371766, at *38-39 (N.D.N.Y. Aug.11, 2008) (citing *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)).[FN36] Without a showing that Defendant Healy had a "rational basis" for excluding the testimony as "irrelevant or unnecessary," a violation of Plaintiff's due process rights is implicated. *Kalwasinski,* 201 F.3d at 109. Therefore, I recommend that Plaintiff's claim that Defendant Healy violated his due process rights at the hearing on the November 15 misbehavior report survive summary judgment.

5. *Claims That Defendants Griffin and Healy Retaliated Against Plaintiff*

Plaintiff alleges that Defendants Griffin and Healy, by denying him due process during disciplinary hearings, committed "retaliatory acts." (Am. Compl. at 19-20.) Defendants have not addressed this claim.

**\*50** The complaint does not contain any facts suggesting why Plaintiff believes that Defendants Griffin and Healy retaliated against him. Other than the conclusory allegation buried within one paragraph at the end of the

amended complaint that these Defendants acted in retaliation, the record is devoid of any details about this claim. (Am. Compl. at 19-20.) These retaliation claims are classic examples of the concerns that the Second Circuit expressed in *Flaherty* and *Dawes* (discussed above in Section I(D)(3)) regarding the ease with which retaliation claims can be fabricated. I find nothing in the record to support Plaintiff's claims. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's retaliation claims against Defendants Griffin and Healy.

6. *Defendant Selsky*

Plaintiff alleges that Defendant Selsky violated his constitutional rights by affirming the results of his disciplinary hearings. (Am.Compl.¶ 58.) The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation. *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Therefore, I recommend that all of Plaintiff's claims against Defendant Selsky be dismissed for lack of personal involvement.

**P. Pendent State Claims**

Broadly read, Plaintiff's complaint alleges that actions of some Defendants constituted the tort of assault and battery under New York law. (Am.Compl.¶¶ 70-74.) Defendants claim that New York State Corrections Law § 24 absolves them of liability for state law claims in federal court.(Def.'s Br. at 25.) Section 24 of New York's Correction Law provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

employee of the department shall be brought and maintained in the court of claims as a claim against the state.

Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997, 513 N.Y.S.2d 528 (3d Dep't 1987). "In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker,* 77 F.3d at 15.

**\*51** In 2009, the United States Supreme Court held that § 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions. *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, at least two judges in this District have observed that because *Haywood'* s focus is on concerns about civil rights claims and the Supremacy Clause, the decision "does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, 2010 WL 502762, at \* 18 (N.D.N.Y. Feb.8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, 2009 WL 3049613, at \*5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. and Treece, M.J .).[FN37] Therefore, I recommend that Defendants' motion for summary judgment be granted with respect to Plaintiff's pendent state claims.

## II. PLAINTIFF'S MOTION TO AMEND

On April 9, 2008, plaintiff sought leave to file an amended complaint naming four additional defendants. (Dkt. No. 52.) The proposed amended complaint identified the two "John Doe" defendants and named two additional defendants (Deleo and Matthews) based upon information obtained in discovery indicating that these two individuals (and not defendant Torres) were involved in the January

27, 2005, urine-and-feces throwing incident. *Id*. at 1-2.[FN38] Upon due consideration, the Court granted plaintiff's motion to amend. (Dkt. No. 56.)

Plaintiff now moves to file a second amended complaint. (Dkt. No. 84.) Specifically, he seeks to amend his complaint to assert claims arising out of disciplinary proceedings in December, 2005. (Dkt. No. 87.) In his proposed amended complaint, plaintiff includes these new allegations in paragraphs 69 and 70. See Dkt. No. 84-2 at 19-20. In paragraph 69, plaintiff references a misbehavior report issued on December 17, 2005, by CO Carrasquillo, who is not a defendant in this action. Paragraph 70 relates to a misbehavior report filed on December 17, 2005, by Sgt. Krein, who is not a defendant in this action, and the disciplinary hearing on those charges held on December 27, 2005.[FN39] Both of the December 2007 disciplinary hearings were conducted by Hearing Officer Drown, who is not a defendant in this action. Plaintiff alleges that Defendant Selsky affirmed Drown's decisions "knowing of the violations." Because Plaintiff does not seek to add Carasquillo, Krein, or Drown as Defendants, it appears that Plaintiff wishes to amend his complaint solely to assert that Defendant Selsky violated his constitutional rights by failing to administratively reverse Drown's determinations .[FN40] This assumption is bolstered by Plaintiff's motion to amend, which states that Plaintiff wishes to "to add the two ... dispositions ... to this complaint *against defendant Donald Selsky."* (Dkt. No. 84 ¶ 3.)

Defendants have opposed the motion and filed a court-ordered sur-reply. (Dkt. Nos. 86 and 90.) Plaintiff has responded to Defendants' briefs. (Dkt. No. 91.)

## A. Legal Standard Governing Motions to Amend

**\*52** The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court and the court's decision is not subject to review on appeal except for abuse of discretion. *Nettis v. Levitt,* 241 F.3d 186, 192 (2d Cir.2001). A motion to amend a pleading is governed by Rule 15 of the Federal Rules of Civil Procedure, which states that leave to amend shall be "freely given when justice so requires." Fed. R. Civ. Proc. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

Cir.1993). A motion to amend may properly be denied where the non-moving party has demonstrated prejudice or bad faith, or where the requested relief would be futile. *Foman, supra,* 371 U.S. at 182. As the Second Circuit has ruled:

> In determining what constitutes "prejudice," we consider whether the assertion of the new claim would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."

*Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993) (citation omitted). A proposed amended complaint seeking to assert a claim that is barred by the statute of limitations is futile and must be denied. *Malesko v. Correctional Services Corp.,* 229 F.3d 374, 382-84 (2d Cir.2000), *rev'd on other grounds,* 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); *Davis v. Trojer,* No. 99 Civ. 11056, 2001 U.S. Dist. LEXIS 10193, 2001 WL 829872, at *3 (S.D.N.Y. July 20, 2001).[FN41] Similarly, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted).

**B. Analysis**

The Court finds that granting leave to amend at this time would result in "undue prejudice to the opposing parties," thereby warranting the denial of plaintiff's motion to amend. See *Foman,* 371 U.S. at 182. The Second Circuit has stated that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker v. Columbia Pictures Industries,* 204 F.3d 326, 340 (2d Cir.2000). The deadline for filing non-dispositive motions is long expired; indeed the dispositive motion filing deadline was November 13, 2008. (Dkt. No. 72.) Moreover, any claims plaintiff might have wished to assert relating to these two disciplinary proceedings existed at the time he filed his first motion to amend in April 2008. Plaintiff offers no explanation for

his failure to include these claims in that amended complaint.

Moreover, amendment would be futile. As discussed above in Section I(O)(5), Plaintiff's allegations that Defendant Selsky violated his constitutional rights by affirming disciplinary convictions fails to state a claim under 1983. Therefore, Plaintiff's motion to amend is denied.

**III. PLAINTIFF'S MOTION TO APPOINT COUNSEL**

**\*53** Plaintiff moves for the appointment of counsel. (Dkt. No. 93.) Defendants have not opposed the motion.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392-93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. Among these factors are:

> The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (citing *Hodge,* 802 F.2d at 61).

A review of the file reveals that (1) the case does not present novel or complex issues and (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action. For example, as discussed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

above, several of Plaintiff's claims should survive Defendants' motion for summary judgment. While it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by pro se litigants, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez*, 899 F.Supp. at 974. Furthermore, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference*. Finally, this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 75) be **GRANTED IN PART AND DENIED IN PART.**

It is **RECOMMENDED** that Defendants' motion be granted as to the following claims: (1) the Eighth Amendment excessive force claim against Defendant Jewett; (2) the failure-to-intervene claims against Defendants McCarthy, Matthews, and Deleo; (3) the due process claim against Defendants Farrell and T.J. Brown regarding the destruction of personal property; (4) the access-to-courts claim against Defendants McCarthy and Torres; (5) the free speech claim against Defendants McCarthy and Torres; (6) the excessive force claim against Defendant Farrell regarding the tobacco-spitting incident; (7) the claim that Defendants Eagen, Miller, K. Lucas, and T. Lucas wrongfully restricted Plaintiff's ability to file grievances; (8) the Eighth Amendment medical care claim against Defendants Sisilli and Riester; (9) the Eighth Amendment conditions of confinement claim against Defendants Miller, W. Brown, and Healy regarding recreation periods; (10) the retaliation claim against Defendants Miller, W. Brown, and Healy regarding recreation periods; (11) the First Amendment claim against Defendant Miller regarding Kosher meals; (12) the claim that Defendants DiCairano and Leghorn violated Plaintiff's constitutional rights by using racial epithets; (13) the Eighth Amendment excessive force claim against Defendant Leghorn; (14) the Eighth Amendment medical care claims against Defendants W. Brown, Gusman, and Inaganti regarding Plaintiff's shoulder surgery; (15) the

Eighth Amendment medical care claim against Defendant Gusman regarding Plaintiff's vision issues; (16) the claims regarding constant cell illumination and ventilation in the SHU; (17) any claim against Defendant Healy for conducting a disciplinary hearing on October 28, 2005; (18) all claims against Defendant Selsky; and (19) Plaintiff's pendent state law claims. These claims should be dismissed; and it is further

**\*54 RECOMMENDED** that Defendants' motion be denied as to the following claims: (1) the Eighth Amendment excessive force claim against Defendants Sisilli and Riester; (2) the Eighth Amendment excessive force claim against Defendant T.J. Brown; (3) the Eighth Amendment excessive force claim against Defendant Occhipinti; (4) the failure to intervene claim against Defendant DiCairano; and (5) the procedural due process claim against Defendant Healy regarding the hearing on the November 15 misbehavior report. These claims should proceed to trial; and it is further

**RECOMMENDED** that the Court dismiss the following claims *sua sponte:* (1) the supervisory liability claims against Defendant Miller regarding the urine-and-feces throwing incident and the mail tampering incident; (2) the failure-to-investigate claims against Defendant Griffin regarding the urine-and-feces throwing incident and the mail tampering incident; (3) the retaliation claim against Defendants McCarthy and Torres regarding the mail tampering incident; (4) the Eighth Amendment medical care claim against Defendant Farrell regarding the tobacco-spitting incident; (5) the claim that Defendants K. Lucas, W. Brown, and Eagen failed to properly process Plaintiff's grievances regarding the denial of Kosher meals; (6) the retaliation and due process claims against Defendants Gusman, Griffin, Healy, Sisilli, and Riester regarding the March 1, March 2, June 27, October 11, October 12, and October 16 misbehavior reports and the disciplinary hearings that followed them; (7) the retaliation claim against Defendant Occhipinti regarding the October 15 misbehavior report; and (8) the retaliation claims against Defendants Griffin and Healy based upon their conduct during disciplinary hearings; and it is further

**RECOMMENDED** that the Court find that the following claims survive *sua sponte* review: (1) the retaliation claim against Defendant T.J. Brown; and (2) the retaliation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

claim against Defendants Occhipinti and DiCairano. These claims should proceed to trial; and it is further

**ORDERED** that Plaintiff's motion to file a second amended complaint (Dkt. No. 84) is **DENIED;** and it is further

**ORDERED** that Plaintiff's renewed motion to appoint counsel (Dkt. No. 93) is **DENIED WITHOUT PREJUDICE;** and it is further

**ORDERED** that the Clerk serve copies of *Fackler v. Dillard,* No. 06-10466, 2006 U.S. Dist. LEXIS 61480, 2006 WL 2404498 (E.D.Mich. Aug.16, 2006); *Benitez v. Ham,* No. 9:04-CV-1159, 2009 U.S. Dist. LEXIS 97495, 2009 WL 3486379 (N.D.N.Y. Oct.21, 2009); *Morrison v. Mamis,* 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639, at *7 (S.D.N.Y. Dec.18, 2008); *Hamilton v. Smith,* No. 06-CV-805 (GTS/DRH), 2009 U.S. Dist. LEXIS 91032, 2009 WL 3199531, at *16 (N.D.N.Y. Jan.13, 2009); *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, 2010 WL 502762 (N.D.N.Y. Feb.8, 2010); *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, 2009 WL 3049613 (N.D.N.Y. Sept.18, 2009); and *Davis v. Trojer,* No. 99 Civ. 11056, 2001 U.S. Dist. LEXIS 10193, 2001 WL 829872, at *3 (S.D.N.Y. July 20, 2001) on Plaintiff in accordance with the Second Circuit's decision *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

FN1. My thanks to Kara J. Krueger, a second year student at Syracuse University College of Law, for her assistance in researching and drafting the Report-Recommendation on Defendants' motion for summary judgment.

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

FN3. In the declaration he filed in support of Defendants' motion for summary judgment, Defendant Miller does not mention whether or not Plaintiff showed him soiled sheets.

FN4. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 75.)

FN5. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN6. Defendants served a copy of this case on Plaintiff with their moving papers. (Dkt. No. 75-37.)

FN7. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN8. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN9. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN10. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

**FN11.** The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* ---F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, 2009 WL 4824669, at* 10-11 (S.D.N.Y. Dec. 15, 2009). However, without precedential guidance from the Second Circuit or this District, this Court is persuaded that here, where Plaintiff's claim is based upon deliberate indifference, the *Colon* categories apply.

**FN12.** Plaintiff has not named Deputy Winlin as a defendant in this action.

**FN13.** Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 75-37.)

**FN14.** Plaintiff's issues with his ears predated the June 28 incident. On May 10, May 26, and June 12, he complained of right ear pain, deafness, and discharge. (Defs.' Ex. B. at 53, 65, 67, 68.) Plaintiff requested audiology testing on June 15. (Defs.' Ex. B. at 79.)

**FN15.** Defendants characterize *Holloway v. Mitchell-Oddey,* No. 9:05-CV-0206, 2007 U.S. Dist. LEXIS 74454, 2007 WL 2908923 (N.D.N.Y. Oct.4, 2007) as holding that Plaintiff's allegations, as a matter of law, do not state an excessive force claim. (Defs.' Br. at 17-18 .) The case is inapplicable here because it was decided after a bench trial rather than on summary judgment. Accordingly, Judge Kahn's ruling for the defendants was based on his finding that the plaintiff had not proved *by a preponderance of the evidence* that he was subjected to excessive force. Here, the standard the Court is required to apply is whether there is a *triable issue of fact.*

**FN16.** Defendants address Plaintiff's conditions-of-confinement claim regarding his

exposure to bitter cold during the recreation period in a section of their brief titled "Miscellaneous Alleged Incidents of Retaliation." (Defs.' Br. at 5-7.) They argue that "the SHU rules regarding ... winter underwear and recreation schedule were ... rationally related to important penological concerns, and therefore constitutional in and of themselves." (Defs.' Br. at 6.) Those rules state that the "[i]nmates confined in the SHU must be permitted one hour of outdoor exercise daily ... despite weather conditions. If during the exercise period the weather significantly deteriorates, the inmate may request and shall be permitted to return to his/her cell." (Dkt. No. 75-29 at 13.) Under the rule, SHU inmates are not permitted to have winter underclothes, but all SHU inmates are provided with winter outer clothes for use during recreation periods. (W. Brown Decl., Dkt. No. 75-32 ¶ 7.) Inmates are also required to shower a minimum of two times per week as part of the SHU's personal hygiene requirement. (Dkt. No. 75-29 at 14.) Plaintiff does not challenge those rules. Rather, Plaintiff alleges that the required showers were ill-timed to precede rather than follow recreation, that he was ordered to go outside for recreation in below zero weather, and that he was not provided with appropriate winter clothing.

**FN17.** In a grievance dated March 21, 2005, Plaintiff alleged that Defendant Miller told him that "niggers are not allowed to be Jewish, and if you keep requesting ... this meal, I'm gonna see to it that you will be transferred." (Pl.'s Ex. I, Dkt. No. 80-4 at 74.) Plaintiff's amended complaint does not mention this allegation and Plaintiff did not raise it at his deposition. In his Statement of Disputed Facts filed in opposition to Defendants' motion for summary judgment, Plaintiff states that the issue regarding Kosher meals is "[w]hether the Plaintiff was denied Kosher meals by the defendants." (Dkt. No. 80 at 2.) Plaintiff does not appear to be asserting that Defendant Miller personally racially discriminated against him. Therefore, I decline to address this issue.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

FN18. Defendants served a copy of this unpublished case on Plaintiff with their moving papers. (Dkt. No. 75-37.)

FN19. Defendants served a copy of this unpublished case on Plaintiff with their moving papers. (Dkt. No. 75-37.)

FN20. Defendants served a copy of this unpublished case on Plaintiff with their moving papers. (Dkt. No. 75-35.)

FN21. Plaintiff originally named Van Buren as a defendant, but later requested that she be dismissed. The Court granted this request on August 13, 2009. (Dkt. No. 89.)

FN22. Defendants served a copy of this unpublished case on Plaintiff with their moving papers. (Dkt. No. 75-36.)

FN23. In addition to this claim against Defendant Gusman, Plaintiff testified at his deposition that in February 2005 Defendant Farrell took the glasses that Plaintiff was issued for his medical condition. (Pl's Dep. 71:2-11.) This allegation does not appear in Plaintiff's amended complaint. Defendants have not addressed it. I find that it is not properly before the Court and decline to address it.

FN24. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN25. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN26. Each report was filed in 2005.

FN27. Plaintiff did not name Officer Hetcher as a defendant in this action.

FN28. Plaintiff did not name Officer Donnelly as a defendant in this action.

FN29. Plaintiff did not name Officer Tuero as a defendant in this action.

FN30. As discussed below, the evidence before the Court indicates that no disciplinary hearing was conducted regarding this misbehavior report.

FN31. Plaintiff did not name Officer Delgado as a defendant in this action.

FN32. Plaintiff also claims that Defendant Griffin's March 1 misbehavior report was false. (Am.Compl.¶ 58.) In the March 1 report, Defendant Griffin charged Plaintiff with two counts of making threats, one count of violating a direct order, one count of creating a disturbance, and two counts of harassment. (Am. Compl. ¶ 60; Pl's Dep. 83:7-17.) He did so after Plaintiff had to be removed from the hearing room because he called Griffin a "coward ass bitch" and threatened to "stab him with a knife." (Dkt. No. 75-8 at 4.) This incident was corroborated by Corrections Officer Koehler. (Dkt. No. 75-8 at 2.) Defendants have not addressed Plaintiff's claim that the report was retaliatory. As discussed above, this claim is barred by *Heck* because the sole punishment Plaintiff received as a result of the report was six months of lost good time credits. Even if this claim were not barred by *Heck,* I would find it subject to *sua sponte* dismissal. Plaintiff does not allege any protected conduct for which Defendant Griffin could have plausibly retaliated. The only incident involving both Plaintiff and Defendant Griffin in proximity to the filing of the misbehavior report is the March 1, 2005 hearing. At this hearing, Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)
(Cite as: 2010 WL 2044705 (N.D.N.Y.))

allegedly threatened and harassed Defendant Griffin. These actions do not qualify as protected speech or conduct, because Plaintiff has no constitutionally protected right to threaten a staff member with physical violence. *R.A. V. v. St. Paul,* 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("threats of violence are outside the First Amendment"). Therefore, Plaintiff cannot satisfy the first element of a retaliation claim.

FN33. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

FN34. Plaintiff did not name Sergeant Pagaluighi as a defendant in this action.

FN35. The record indicates that Plaintiff was not permitted to review the testimony of the OMH staff-person and that the testimony was taken on a separate confidential tape. Dkt. No. 75-12 at 9.

FN36. Defendants served a copy of this unpublished case on Plaintiff with their moving papers. (Dkt. No. 75-35.)

FN37. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN38. Defendants opposed the requested amendments. (Dkt. No. 54.)

FN39. Plaintiff was sentenced to 42 months SHU confinement.

FN40. According to plaintiff the Court of

Appeals affirmed these determinations in June and October, 2007.

FN41. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

N.D.N.Y.,2010.
Tafari v. McCarthy
--- F.Supp.2d ----, 2010 WL 2044705 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael McQUEEN, Plaintiff,
v.
COUNTY OF ALBANY; Thomas Wigger,
Superintendent, Albany County Correctional Facility;
and Correctional Medical Services, Defendants.
**No. 9:08-CV-799.**

Jan. 28, 2010.

Michael McQueen, Stormville, NY, pro se.

Napierski, Vandenburgh & Napierski, L.L.P., Shawn F. Brousseau, Esq., of Counsel, Albany, NY, for Defendants County of Albany and Thomas Wigger.

Thuillez, Ford, Gold, Butler & Young, L.L.P., Kelly Monroe, Esq., of Counsel, Albany, NY, for Correctional Medical Services.

Michael McQueen, Dannemora, NY, pro se.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Michael McQueen, brought this civil rights action in July 2008, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated December 22, 2009, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendants' motions for summary judgment (Docket Nos. 19 and 22) be granted in relevant part, and that all of plaintiff's claims against defendants be dismissed, with prejudice with respect to

plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court. The plaintiff has filed objections to the Report-Recommendation. Defendants County of Albany and Thomas Wigger have filed a response to the plaintiff's objections to the Report/Recommendation claiming, among other things, that the objections were filed untimely. Defendant Correctional Medical Services has filed a response to the plaintiff's objections to the Report/Recommendation also claiming, among other things, that the objections were filed untimely.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected and to which the defendants have filed responses, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motions for summary judgment (Docket Nos. 19 and 22) are GRANTED, in relevant part;

2. All of plaintiff's claims against defendants are DISMISSED, with prejudice with respect to his federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court;

3. The Clerk is directed to file judgment accordingly and close the file.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

Plaintiff Michael McQueen, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights arising out of his pretrial detention at the Albany County Correctional Facility. In his complaint, plaintiff alleges that he slipped and injured himself while exiting a shower area and was thereafter denied medical treatment, in violation of his constitutional rights.

Currently pending before the court are two separate but similar motions by the defendants for summary judgment dismissing plaintiff's claims against them. In their motions, defendants argue that plaintiff's claims against them are subject to dismissal on a variety of grounds, including procedurally based upon his failure to exhaust available administrative remedies before commencing suit, and on the merits. Having carefully considered the record now before the court in light of defendants' arguments and plaintiff's failure to properly oppose the defendants' motions, while I find the existence of triable issues of fact surrounding the defense of exhaustion, precluding dismissal on this procedural basis, I recommend that the motions be granted, in relevant part, and that plaintiff's complaint be dismissed on the merits.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.2d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

*2 After being arrested on charges not disclosed in the record, plaintiff was temporarily housed at the Albany County Correctional Facility ("ACCF") as a pretrial detainee from October 2, 2007 until March 19, 2008, when he was transferred into the custody of the New York State Department of Correctional Services (the "DOCS"). *See* ACCF Medical Record (Dkt. No. 22-5). Upon his arrival at ACCF, plaintiff was screened by defendant Correctional Medical Services and found to have no

physical complaints. *See id* .

On January 22, 2008, as he was exiting the facility's shower area, McQueen slipped on a puddle of water and fell.[FN2] Complaint (Dkt. No. 1) p. 3. When he slipped, plaintiff "pulled" his right side and felt a sharp pain in the lower right side of his abdomen. *Id.* Plaintiff reported this incident and his injury to the corrections officer on duty and was told to complete a sick call request. *Id.*

> FN2. There is some discrepancy in the record as to the date of plaintiff's accident. In his complaint and during his deposition testimony, plaintiff alleged that the incident occurred on January 22, 2008. *See* Complaint (Dkt. No. 1) p. 3; *see also* Deposition Transcript ("Tr.") (Dkt. No. 19-5) p. 19. Later during his deposition, however, plaintiff testified that the incident occurred on January 14, 2008, which coincides with the date of his first sick call request. Tr. (Dkt. No. 19-5) pp. 21-22.

The first request for health services from plaintiff contained in the record relating to a problem on his right side is dated January 14, 2008, and states, "I believe I have an [sic] hernia on my top right side, witch [sic] is causing me discomfort and pain." [FN3] *See* ACCF Medical Record (Dkt.22-5); *see also* Tr. (Dkt. No. 19-5) pp. 21-22. McQueen was seen by a nurse the following day, who consulted with a physician and prescribed Motrin for his pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was administered Motrin over the period of January 15 through 25, 2008. *See id.*

> FN3. Plaintiff testified that the January 14, 2008 request was his second, and that he never received a copy of the first one that he filled out. Tr. (Dkt. No. 19-5) p. 22. Plaintiff did not identify the date or testify as to the substance of the first request.

On January 31, 2008, plaintiff lodged another complaint of a right side hernia and requested to see a doctor. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was seen the following day by a physician's assistant, who

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

prescribed a ten-day supply of Motrin to be taken at night for the pain. Tr. (Dkt. No. 19-5) p. 23. On that occasion, McQueen was told that the physical examination revealed a small lump, but there was nothing more that could be done for him. *Id.* at 24.

The record reflects that McQueen did not complain about his condition again until more than two weeks later when, on February 17, 2008, he completed another request for health services identifying a right side hernia and pain. *See* ACCF Medical Record (Dkt. No. 22-5). Plaintiff was again seen the following day by a member of the facility's medical staff, on this occasion a nurse. *Id.* The record of plaintiff's examination on that date reveals a diagnosis of "intermittent bulging [of the] upper right inguinal area with discomfort", and notes plaintiff's request to see a physician. *Id.*

Plaintiff was examined on February 19, 2008 by Dr. Michael Salzman. Tr. (Dkt. No. 19-5) p. 25; *see also* Affidavit of Michael A. Salzman, M.D. ("Salzman Aff.") (Dkt. No. 22-9) ¶ 6. Based upon his examination, Dr. Salzman diagnosed McQueen as suffering from a mild right side femoral hernia, one-half centimeter in size, with an estimated onset of about two months.[FN4] *See* ACCF Medical Record (Dkt. No. 22-5). Dr. Salzman states that although plaintiff wrote on the health services request form that he was experiencing pain, McQueen did not voice any complaints of pain during his visit of February 19, 2008, and the doctor's examination revealed no objective or subjective signs of pain. Salzman Aff. (Dkt. No. 22-9) ¶ 6.

FN4. Plaintiff testified to having experienced a hernia when he was a child, and that he had it surgically repaired. Tr. (Dkt. No. 19-5) at pp. 13-14.

*3 According to Dr. Salzman, a mild hernia does not require surgical intervention provided that it is not incarcerated. Salzman Aff. (Dkt. No. 22-9) ¶ 7. Upon examination of plaintiff's hernia, Dr. Salzman determined that it was not. *Id.* Dr. Salzman advised plaintiff of his diagnosis as well as the fact that the hernia was not life threatening and did not require immediate surgery. Tr. (Dkt. No. 19-5) p. 25. Dr. Salzman recommended to

plaintiff that if he was going home, he should see his own medical provider regarding removal of the hernia, adding that if he was being transferred to the custody of the DOCS, it would be that agency's responsibility to treat him. *Id.* at pp. 25-26. Dr. Salzman provided plaintiff with 650 milligrams of Tylenol and a stool softener, which was administered from February 19 through 29, 2008, and released him back to his unit. *Id.*

The following day, plaintiff left ACCF for a court appearance and subsequently was transferred into the custody of the DOCS. Tr. (Dkt. No. 19-5) p. 26. Since that time McQueen has not had surgery to repair the hernia, takes ibuprofen occasionally for pain, and has only been restricted in his ability to work out and lift a coffee urn. *Id.* at pp. 27, 33.

Albany County Sheriff James L. Campbell reports that a review of ACCF records reflects that plaintiff did not file any informal or formal grievances or grievance appeals while housed at that facility. Affidavit of James L. Campbell ("Campbell Aff.") (Dkt. No. 19-10) ¶ 5. According to the plaintiff, however, on January 30, 2008, while still housed at ACCF he hand wrote a document labeled by him as an "inmate grievance complaint to Albany County Correctional Facility", complaining of a dangerous slippery condition resulting from a puddle in the shower area where his accident occurred and requesting the installation of rubber mats to prevent future similar occurrences. *See* Attachment to Complaint (Dkt. No. 1). The written complaint did not include any reference to his injuries or complaints regarding his medical treatment. Plaintiff also wrote a letter to Superintendent Wigger on February 8, 2008, referencing his earlier grievance, advising of his accident and injuries, and on this occasion complaining that he was denied medical treatment. *See id.* Plaintiff received no response to either the grievance or his letter, nor did he take any further action regarding the complaints voiced in those documents. Tr. (Dkt. No. 19-5) pp. 30, 38.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 23, 2008, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 8. His complaint names three defendants,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

including the County of Albany; Thomas Wigger, the superintendent of the ACCF; and Correctional Medical Services. In it, plaintiff asserts a claim of cruel and unusual punishment based upon an alleged deliberate indifference of medical officials to the hernia allegedly sustained after he slipped and fell. As relief, plaintiff seeks compensatory damages.

*4 Following joinder of issue and the close of discovery, all defendants moved for summary judgment dismissing plaintiff's claims against them on a variety of grounds.[FN5] Dkt. Nos. 19, 22. In their motions, defendants argue that 1) plaintiff's claims are subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit; 2) plaintiff has failed to demonstrate entitlement to compensatory damages; 3) plaintiff cannot establish deliberate indifference to a serious medical need; 4) plaintiff's claims against the superintendent of the facility must be dismissed for lack of personal involvement; 5) plaintiff has failed to demonstrate a sufficient basis for holding Albany County or Correctional Medical Services liable; and 6) plaintiff's pendent state law claims, if any, are barred by virtue of his failure to file a notice of claim.

> FN5. The County of Albany and defendant Wigger are jointly represented by counsel, and Correctional Medical Services is separately represented by another attorney. The defendants have filed two separate but similar motions for summary judgment.

Despite the passage of the deadline for doing so, which was extended upon his request, see Text Order of March 16, 2009, plaintiff has failed to respond to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). See also Fed.R.Civ.P. 72(b).

III. DISCUSSION

A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

*5 When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Motions*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motions, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motions.

Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N .Y. May 22, 1998) (Pooler, J. & Hurd, M.J.) FN6; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Before such a motion can be granted under such circumstances, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.); *see also* N.D.N.Y.L.R. 7.1(b)(3).

FN6. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's note: Copies accessible on Westlaw as separate documents.]

While a plaintiff's failure to properly oppose a defendant's

motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. This court's rules require that "[a]ny motion for summary judgment shall contain a Statement of Material Facts setting forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." N.D.N.Y.L.R. 7.1(a)(3). By electing not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.FN7 *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

FN7. According to Local Rule 7.1(a)(3), *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* *See* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original).

**\*6** I recommend that the court follow this well-established practice when reviewing defendants' motions for facial sufficiency and, notwithstanding McQueen's *pro se* status, accept the facts set forth in defendants' Local Rule 7.1(a)(3) Statements as uncontroverted, in light of plaintiff's failure to respond to those statements.

C. *Failure to Exhaust*

While plaintiff's complaint alleges that he exhausted available administrative remedies before commencing suit, and attaches two documents which he claims to have filed with officials at ACCF complaining of the dangerous condition in the shower and subsequently of the alleged denial of medical treatment for his injuries, Albany County and defendant Wigger assert that a review of ACCF records shows that plaintiff filed no grievances or appeals while housed at that facility. Defendants therefore

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

argue that plaintiff failed to avail himself of the inmate grievance procedure available at ACCF and that having failed to exhaust administrative remedies, he cannot now maintain this action.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 914-15, 166 L.Ed.2d 798 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, any unexhausted claims are subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion"

requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense," an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*7** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN8] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN9] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

FN8. As will be seen, whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* No. 04-CV-395, 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. & Homer, M.J.).

FN9. In practicality these three prongs of the

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

a) *Availability of Remedy*

The record reveals that inmates at ACCF have available to them an inmate grievance procedure ("IGP") for complaining of conditions of their confinement. Brousseau Aff. (Dkt. No. 19-2) Exh. F. That policy sets forth both informal and formal channels for handling grievances, providing for grievance forms to be made available to inmates, and refers inmates to the inmate handbook for further instructions. *Id.*

Despite an inmate's entitlement to file and pursue a grievance in accordance with the IGP prescribed by ACCF, there are circumstances under which the grievance procedure nonetheless could be deemed not to have been available to the plaintiff. *See Hemphill,* 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 38 F.3d at 688 (quotations and citations omitted); *see also Hargrove,* 2007 WL 389003, at *8 n. 15.

b) *Presentation of Defense/Estoppel*

**\*8** The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the

affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

c) *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Hemphill,* 380 F.3d at 688).

In this case, the first prong of the *Hemphill* test is easily satisfied. As was previously discussed, defendants have produced a copy of the Albany County Sheriff's Department's Inmate Grievance Procedure, which is applicable to inmate grievances at ACCF. It thus appears that there was an internal remedy available to the plaintiff.

As to the second and third prongs of the analysis, however, they are not so easily dispensed with. The evidence in the record bearing upon the issue of whether plaintiff filed any grievance related to the matters set out in his complaint is equivocal. Based upon the record before the court it appears that on January 30, 2008 plaintiff submitted a written complaint, designated as an "inmate grievance complaint", though not filed utilizing the prescribed form, complaining of a constant puddle in the shower area creating a slippery condition and requesting the installation of rubber mats; no mention is made in that letter of the failure to provide requested medical treatment. The record also reveals that just over a week later, on February 8, 2008, plaintiff wrote a letter

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

to Superintendent Wigger, in which he referenced his earlier grievance and also alleged that he had slipped and fallen in a puddle in the shower area, causing him to sustain a hernia, and also complained that he had been refused medical treatment, in violation of his Eighth Amendment rights. *See* Attachments to Complaint (Dkt. No. 1). Plaintiff admits that he did not receive any response to either his grievance or the letter to defendant Wigger, and that he did not file any other grievances or appeals regarding the incidents at issue. It is unclear whether defendants dispute having received the documents attached to plaintiff's complaint. In support of their motion, they merely assert somewhat obliquely that a review of ACCF records reveals that McQueen did not file any informal or formal grievances or appeals.

**\*9** Undeniably, the document that plaintiff labeled as an inmate grievance does not complain of medical indifference. Plaintiff's subsequent letter of February 8, 2008, however, does include this complaint. Ordinarily, under an analogous procedure prescribed for use by New York State prison inmates, letters to DOCS employees and officials are not considered as sufficient to satisfy the grievance exhaustion requirement. *See Colon v. Farrell, No. 01-CV6480(FE), 2004 WL 2126659, at \*5 (W.D.N.Y. Sept.23, 2004)* (noting that "letters of complaints to DOCS employees and officials do not satisfy the grievance procedure exhaustion requirement"); *Conner v. Hurley, No. 00 Civ. 8354(LTS)(AJP), 2004 WL 885828, at \*2 (S.D.N.Y. Apr. 26, 2004)* (letters to facility superintendent and DOCS commissioner "may not be deemed substitutes for strict compliance with requirements of the IGP").

In this case, the IGP at issue outlines a protocol for inmates to follow in registering both informal and formal complaints. *See generally* Albany County Sheriff's Dep't IGP (Dkt. No. 19-8). In accordance with the formal process, the Tour Commander is required to provide assistance to an inmate in the preparation of the written grievance "if assistance is requested or obviously necessary because of language barriers or literacy problems." *Id.* at § II .G. While an inmate grievance form is attached to the IGP, the written procedures provided to the court do not explicitly mandate that an inmate utilize that form and, more importantly, the procedure does not expressly identify with whom a written grievance must be filed.[FN10] In fact, the Albany County Sheriff's Department

grievance procedure seems to require an effort at informal resolution before the formal process is instituted and, in the event that the informal process is unsuccessful, appears to delegate the responsibility of initiating the formal grievance process to a corrections officer. *See id.* at §§ II.F and II.G.

> [FN10.] A note appearing at the end of the Albany County Sheriff's Department IGP states, "NOTE: Inmate instructions regarding filing grievances are contained within the Inmate Rules and Regulations Handbook." No further information regarding the Inmate Rules and Regulations Handbook has been provided to the court, and there is nothing before the court that contradicts my analysis of the relevant procedures as discussed above.

When viewed in light of the Albany County Sheriff's Department's prescribed procedures, it is at least arguable that plaintiff's February 8, 2008 letter to the superintendent sufficed as an informal grievance and placed defendants on notice of plaintiff's complaint. It is not clear whether Superintendent Wigger denies receiving the letter. It is obvious, however, that this unresolved issue raises a material question of fact as to whether defendants' actions, or inaction, interfered with McQueen's ability to exhaust administrative remedies. Conceivably, plaintiff's letter was delivered to the superintendent, and by their inaction defendants prevented plaintiff from pursuing available internal remedies. Drawing all inferences and resolving all ambiguities in plaintiff's favor, I am therefore unable to say no reasonable factfinder could conclude that plaintiff did not properly apprise defendants, both procedurally and substantively, of his claim concerning medical indifference, and therefore recommend denial of the portion of defendants' motions seeking dismissal of plaintiff's claim for failure to exhaust.

### D. *Plaintiff's Medical Indifference Claims*

**\*10** The centerpiece of plaintiff's complaint in this action is his claim that he was denied medical treatment for the injuries allegedly sustained after he slipped and fell. In their motions, defendants assert that the record does not support a finding of liability on plaintiff's medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

indifference claim, both because plaintiff's condition was not sufficiently serious and because defendants were not indifferent to that condition.

As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003). In *Benjamin,* the Second Circuit acknowledged the government's duty to assume responsibility for the safety, general well-being, and basic human needs of those whose liberty it involuntarily restrains, and specifically distinguished between the circumstances presented by a pretrial detainee, who is still presumed innocent, and an inmate who has been convicted of a crime. *Id.* at 50-51. Following *Benjamin,* however, there was significant uncertainty surrounding the precise standard to be applied to claims of deliberate medical indifference brought by pretrial detainees. While it was clear that such claims were subject to analysis under the Due Process Clause of the Fourteenth Amendment, *Bryant v. Maffucci,* 923 979, 983 (2d Cir.1991), the precise contours of the obligation imposed thereunder had not been definitively established by the Second Circuit until its recent decision in *Caiozzo v. Koreman,* wherein the court pronounced that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." 581 F.3d 63, 72 (2d Cir.2009).

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970,

1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291.

### 1. Serious Medical Need

**\*11** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment", a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 701 (citation and internal quotations omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV0774, 2002 WL 31309244, at \*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, the record leads invariably to the conclusion that plaintiff's hernia is not objectively sufficient to qualify as constitutionally significant. There is no indication that plaintiff's condition was emergent or one that could produce death, degeneration, or extreme pain. Plaintiff's subjective complaints of pain are not substantiated by any objective evidence, and he variously described what he felt as "discomfort" and "pain." After his first two requests for treatment, which came a week

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

apart, plaintiff did not require medical services again until more than two weeks later, all suggesting that plaintiff was by no means in constant or extreme pain, or suffering from a dire physical condition.

Significantly, Dr. Salzman states that plaintiff did not voice any complaints of pain during his examination of February 19, 2009, the hernia was not incarcerated and therefore did not necessitate surgery, and any surgery at that time would have been merely elective. Dr. Salzman's opinion is buttressed by the fact that even as of the time of his deposition, approximately ten months after the treatment complained of, plaintiff had not undergone surgery and, by his own admission, experienced pain only occasionally. The evidence thus establishes that, at worst, plaintiff's hernia caused him to suffer intermittent pain and/or discomfort, which is patently insufficient to objectively prove that his condition was serious. Indeed, other courts have recognized that an inguinal hernia is not objectively serious enough to satisfy the objective prong of the Eighth Amendment test. *Arroyo v. City of New York,* No. 99 Civ. 1458, 2003 WL 22211500, at *2-3 (S.D.N.Y. Sept. 25, 2003); *see also, Day v. Lantz,* No. 3:07-CV-388, 2009 WL 801612, at *3 (D.Conn. Mar. 25, 2009) (citing cases).

**\*12** For these reasons, I find that plaintiff's hernia was not sufficiently serious to warrant constitutional protection.

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on a medical indifference claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach v. Dufrain,* 103 F.Supp.2d 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97-CV-1325, 1998 WL 713809, at *2 (same) (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. & Hurd, M.J.).

It should be noted that the constitution does not afford prisoners a right to medical treatment of their choosing; the question of that diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted). "Charges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo,* 2003 WL 22211500, at * 2 (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292).

The record now before the court overwhelmingly demonstrates the lack of merit of this prong of plaintiff's claim of deliberate indifference. The evidence in the record flatly contradicts the notion that plaintiff was exposed to an excessive risk to his health and safety. Each time plaintiff requested medical attention he was seen within twenty four hours, and on each occasion was examined and given medication for pain. At best, plaintiff's apparent complaint that the hernia was not surgically removed amounts to nothing more than a disagreement as to the method of treatment and fails to rise to the level of indifference necessary to support a medical indifference claim under the Fourteenth Amendment. *See Wandell v. Koenigsmann,* 99-CV-8652, 2000 WL 1036030, at *5 (S.D.N.Y. July 27, 2000) (differences in opinion between a doctor and a prisoner over appropriate medication is simply disagreement over treatment plan and does not implicate the Eighth Amendment); *see also Grant v. Burroughs,* 96-CV-2753, 2000 WL 1277592, at *5 (S.D.N.Y.Sept.8, 2000) (prisoner denied pain medication does not have a constitutional right to treatment of his choice). Accordingly, even if plaintiff's hernia were sufficiently serious to implicate the due process clause of the Fourteenth Amendment, the evidence shows that defendants were not deliberately indifferent to that medical need.

IV. *SUMMARY AND CONCLUSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 338081 (N.D.N.Y.)
(Cite as: 2010 WL 338081 (N.D.N.Y.))

**\*13** This action stems from an alleged slip and fall in the shower occurring on January 14, 2008, as a result of which plaintiff claims to have sustained a hernia. Thereafter, plaintiff contends, he requested but was denied medical treatment for his injuries. Although defendants have asserted that the action must be dismissed as a result of plaintiff's failure to exhaust administrative remedies, the record establishes the existence of triable issues of material fact in this regard, and I am therefore not recommending dismissal on this procedural basis at this juncture. As to the merits of plaintiff's medical indifference claim, however, the record now before the court firmly establishes that plaintiff's condition was not sufficiently serious to trigger constitutional protection and, moreover, that he was provided with timely and adequate medical treatment each time it was requested. I therefore recommend dismissal of plaintiff's medical indifference claim on the merits, and in light of that recommendation have not addressed the other arguments raised in the defendants' motions.[FN11]

FN11. To the extent that plaintiff's complaint may be regarded as encompassing state law claims against defendants, I recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed ." Stephenson v. Albany County Policymakers, Civ. No. 6:09-CV-326, 2009 WL 2922805, at \*2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)). In light of this recommendation, I have declined to address defendants' argument that plaintiff's state law claims must be dismissed for failure to file a notice of claim.

Based upon the foregoing it is hereby

RECOMMENDED, that defendants' motions for summary judgment (Dkt. Nos. 19 and 22) be GRANTED, in relevant part, and that all of plaintiff's claims against defendants be DISMISSED, with prejudice with respect to plaintiff's federal claims, but without prejudice to his right to assert any pendent state law claims in an appropriate state court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) and (d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules, and to mail an additional copy, addressed to the plaintiff at the Green Haven Correctional Facility.[FN12]

FN12. Plaintiff is listed on the docket sheet as being confined in the Clinton Correctional Facility. A search of the New York State Department of Correctional Services inmate locator website, however, reflects that he may now be housed in the Green Haven Correctional Facility. If so, then plaintiff has failed to fulfill his obligation to notify the court of any change of address while this action is pending. See N.D.N.Y.L.R. 10.1(c).

N.D.N.Y.,2010.
McQueen v. County of Albany
Slip Copy, 2010 WL 338081 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.